**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **FRANKLIN CONSTRUCTION GROUP, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WILLIAM SHORE, JWSC, LLC, KEITH** | ) | **Case No. _____** |
| **MEADOWS, JOSEPH HEATH, HYDS INC.,** | ) | **JURY DEMAND** |
| **DEAN BINGHAM, LUNDON JOHNSON,** | ) | |
| **TYLER WEBER, JOEL CHEVRETTE,** | ) | |
| **DANNY KNOWLES, SCOTT MATTHEWS,** | ) | |
| **and LOWE'S HOME CENTERS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Franklin Construction Group, LLC ("FCG") respectfully submits the following Complaint:

## I.  INTRODUCTION

1.      From at least 2021 to 2023, Defendants worked in concert to execute a tremendous, purposeful fraud on FCG.  Defendants' fraud has resulted in millions of dollars in damage to FCG.

2.      During this period of time, Defendant William Shore ("Shore") was employed by FCG.  In his role as Vice President of Residential Construction Operations, Shore was tasked with budgeting, hiring subcontractors and suppliers, approving invoices from subcontractors and suppliers, and handling day-to-day operations of the projects he managed for FCG.  Rather than work in the best interests of FCG and perform the role for which he was well-compensated, Shore concocted an elaborate scheme to funnel money from FCG to himself through an illicit kickback scheme involving various intermediaries, illicitly convert FCG's property for his own personal use and gain, and breach various duties owed to FCG.

3.     Shore worked in concert with Defendants HYDS and its principals, Keith Meadows and Joseph Heath.  As detailed below, these Defendants inflated the price of goods bought and delivered to FCG, diverted a substantial portion of these goods to Shore's secret side projects, and enriched themselves by doing so.  These actions resulted in substantial and actual damage to FCG.

4.     Seeking to further enrich himself, Shore conspired with the Individual Lowe's Defendants, identified and detailed *infra*, to further defraud FCG.  In concert, Shore and the Individual Lowe's Defendants devised a scheme through which Shore provided material estimates to Lowe's for the projects he himself requested on behalf of FCG, inflated the prices that FCG paid in furtherance of these projects, and diverted the goods purchased by FCG to Shore for his own personal use.

5.     Shore's downfall was his fast-and-loose handling of evidence that implicates himself and the other Defendants, allowing FCG to piece together the inner machinations of their elaborate scheme and identify the significant damage FCG incurred.  This evidence includes, but is not limited to, email correspondence between the Defendants detailing the fraudulent schemes and a Quickbooks account that meticulously and remarkably aligns the fraudulent diversion of funds with invoices paid by FCG.

6.     As a result of their conspiracy to defraud FCG, Defendants are liable for an amount to be proven at trial, but which exceeds $8,000,0000.00.

## II. PARTIES

7.     FCG is a building and construction company doing business in Middle Tennessee. FCG is a limited liability company, organized under Tennessee law, with its principal place of business in Franklin, Tennessee.

8.     Defendant William Shore ("Shore") is an individual resident of Springfield, Tennessee.

9.     According to the Tennessee Secretary of State, Defendant JWSC, LLC ("JWSC") is a limited liability corporation, organized under Tennessee law, with its principle place of business in Springfield, Tennessee, whose corporate existence was administratively revoked on August 8, 2023. Shore is the registered agent for JWSC, and JWSC is Shore's alter ego and the instrumentality through which Shore perpetrated much of the below-described fraud upon FCG.

10.     Upon information and belief, Defendant HYDS, Inc. ("HYDS") is a corporation, organized under California law, with its principal place of business in Calabasas, California.

11.     Defendant Keith Meadows ("Meadows") holds himself out to the public as the owner of HYDS. Upon information and belief, Meadows is a resident of Woodland Hills, California.

12.     Defendant Joseph Heath ("Heath") holds himself out to the public as the CEO of HYDS. Upon information and belief, Heath is a resident of Woodland Hills, California.

13.     Defendant Lowe's Home Centers, Inc. ("Lowe's"), according to the Tennessee Secretary of State, is a corporation, organized under North Carolina law, qualified to conduct business in Tennessee, with its principal place of business in Wilkesboro, North Carolina.

14.     Upon information and belief, Defendant Dean Bingham ("Bingham") is an individual citizen and resident of Las Vegas, Nevada.

15.     Upon information and belief, Defendant Lundon Johnson ("Johnson") is an individual citizen and resident of Lebanon, Tennessee.

16.     Upon information and belief, Defendant Tyler Weber ("Weber") is an individual citizen and resident of Atlanta, Georgia.

3

17. Upon information and belief, Defendant Joel Chevrette ("Chevrette") is an individual citizen and resident of Waxhaw, North Carolina.

18. Upon information and belief, Defendant Danny Knowles ("Knowles") is an individual citizen and resident of Murfreesboro, Tennessee.

19. Upon information and belief, Defendant Scott Matthews ("Matthews") is an individual citizen and resident of Troutman, North Carolina.

20. Bingham, Johnson, Weber, Chevrette, Knowles, and Matthews are collectively referred to herein as the "Lowe's Individual Defendants."

## II. JURISDICTION AND VENUE

21. The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

22. The Court has subject matter jurisdiction under 28 U.S.C. § 1367(a) with regard to FCG's non-federal claims that "relate[] to claims in the action within such original jurisdiction that they form part of the same case or controversy."

23. This Court has general, personal jurisdiction over FCG because FCG is domiciled in Tennessee.

24. This Court has general, personal jurisdiction over Shore, JWSC, Knowles, and Johnson because Shore, JWSC, Knowles, and Johnson are domiciled in Tennessee.

25. This Court has specific, personal jurisdiction over HYDS, Meadows, Heath, Lowe's, and all of the Lowe's Individual Defendants because this action arises out of or relates to each of their below-described contacts with Tennessee.

26. HYDS purposefully availed itself of the privilege of acting in Tennessee by communicating, contracting with, and ultimately shipping items to FCG and Shore's secret side projects in Tennessee, as detailed *infra*. Moreover, the causes of action alleged herein directly

4

arise from HYDS's activities in and directed toward Tennessee, and the harm resulting from these actions is experienced by FCG in Tennessee.

27.     Meadows purposefully availed himself of the privilege of acting in Tennessee by conspiring with Shore, who at all times was domiciled and employed in the State, and as a principal of HYDS by communicating, contracting with, and ultimately shipping items to FCG and Shore's secret side projects in Tennessee, as detailed *infra*.  The causes of action alleged herein directly arise from Meadows's activities in and directed toward Tennessee, and the harm resulting from these action is experienced by FCG in Tennessee.

28.     Heath purposefully availed himself of the privilege of acting in Tennessee by conspiring with Shore, who at all times was domiciled and employed in the State, and as a principal of HYDS by communicating, contracting with, and ultimately shipping items to FCG and Shore's secret side projects in Tennessee, as detailed *infra*.  The causes of actions alleged herein directly arise from Heath's activities in and directed toward Tennessee, and the harm resulting from these actions is experienced by FCG in Tennessee.

29.     The Lowe's Individual Defendants (each of Bingham, Johnson, Weber, Chevrette, Knowles, and Matthews) purposefully availed themselves of the privilege of acting in Tennessee by directly conspiring with Shore, who at all times was domiciled and employed in the State, and by operating on behalf of Lowe's to provide services to and ship goods to FCG, which operates and is domiciled in Tennessee.  The causes of actions alleged herein directly arise from the each of the Lowe's Individual Defendants' activities in and directed toward FCG and the State of Tennessee, and the harm resulting from these actions is experienced by FCG in Tennessee.

30.     Lowe's purposefully availed itself of the privilege of doing in business in Tennessee by registering to do business in the State, maintaining and operating stores throughout

Tennessee, and selling goods and providing services to Tennessee residents—including the goods and services provided to FCG as alleged *infra*. Moreover, the causes of action alleged herein directly arise from Lowe's activities in and directed toward FCG in Tennessee, and the harm stemming from these actions is experienced by FCG in Tennessee.

31.     Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391 because (a) Shore, JWSC, and Johnson are domiciled in this district, (b) FCG's principal place of business is in this district, (c) the real properties that are the subject of this action are situated in this district, and (d) a substantial part of the events and omissions occurred in this district.

### III.  FACTS

### A.     Shore's Employment with FCG.

32.     On or around November 15, 2020, FCG hired Shore as a vice-president of residential construction operations. Shore's compensation while employed by FCG was $200,000 per year with $75,000 in bonuses.

33.     During his employment, Shore was responsible for, among other things, budgeting, hiring subcontractors and suppliers, approving invoices from subcontractors and suppliers, and handling the day-to-day operations of the projects he managed for FCG.

34.     In performing these functions, Shore obtained detailed knowledge of confidential information about FCG and the projects he managed, such as the project budget, contingency reserves, and the funds available for individual budgetary line-items within a project.

35.     FCG terminated Shore's employment on September 7, 2023, for what FCG thought at the time was merely poor performance. To soften the impact from his termination, FCG provided Shore with $60,000 in severance pay.

6

36. After FCG terminated Shore's employment, FCG identified a number of irregularities concerning Shore's activities while employed at FCG. That led to an examination of Shore's company-owned computer, which revealed personal financial information stored in QuickBooks and electronic communications indicating that Shore, in concert with the other Defendants, had been perpetrating a fraud on FCG from at least September 2021 until his termination.

### B. Shore's Scheme with HYDS, Meadows, and Heath.

37. HYDS is a construction materials supplier that sources a good deal of its supplies from Asia. At all times relevant to this action, Meadows held himself out to the public as the owner of HYDS, and Heath held himself out to the public as the CEO of HYDS. As a result of personal contact Shore made with Meadows and/or Heath, Shore caused FCG to engage HYDS as a supplier on various FCG construction projects beginning sometime no later than September 2021.

38. Until Shore began work at FCG, no one at FCG was aware of HYDS, Meadows, or Heath. Beginning no later than in the late summer or early fall of 2021, Shore began recommending that FCG engage HYDS to become one of FCG's largest subcontractors and suppliers. From the fall of 2021 to the summer of 2024, FCG paid HYDS $8,731,901.00 for construction materials and construction labor on FCG's projects, including cabinets, cabinet hardware, countertops, light fixtures, flooring, tile, trashcans, trashcan inserts, bathroom sinks, and shipping, storage, and labor with respect to those materials.

39. Among the FCG projects for which HYDS supplied materials were the projects Shore managed for FCG. Those projects included Beechcroft, Kedron Square, Green Lea, Lebanon Townhomes, and the renovation of the Marriott Cool Springs.

40.    Based upon the information currently available to FCG, Shore agreed with Meadows and/or Heath, beginning no later than in September 2021, that Shore would abuse his position as an employee of FCG by signing purchase orders on FCG's behalf for HYDS to supply FCG with labor and materials at excessive prices in exchange for HYDS paying Shore monetary kickbacks and supplying Shore and/or JWSC with labor and materials, which were billed to and paid by FCG, but used by Shore and/or JWSC in the construction of side projects Shore was building without FCG's knowledge and outside the scope of his employment with FCG.

41.    Because Shore was responsible for the purchasing of labor and materials for the FCG projects he managed, Shore knew the budgets for these projects. Knowing this information, Shore would inform Meadows and/or Heath of the highest possible price FCG's budget could support without detection, which was well above market prices. Armed with this information, Meadows and/or Heath would inflate HYDS's pricing to FCG to the amounts Shore dictated. This resulted in FCG paying HYDS an excessive amount for the labor and materials HYDS supplied to FCG's projects and FCG paying HYDS for labor and materials HYDS supplied to Shore's secret side projects.

42.    Meanwhile, while Shore was conspiring with Meadows and/or Heath to falsely state and artificially inflate the prices of the labor and materials HYDS was supplying to FCG, Shore induced FCG into believing that HYDS's prices were competitive. FCG had (and still has) a policy to gather at least three competitive bids on project-related scopes of work. By recommending HYDS as the selection, Shore misled FCG into believing that he had followed FCG's policy and that HYDS's pricing was in FCG's best interest. Also, Shore often boasted to FCG executives that he was getting FCG the "best value" subcontractor and/or vendors for the projects Shore managed. Shore also often stated he would "level bids" by using FCG leveling

sheets, which reinforced a false belief by FCG executives that Shore was following FCG's policy and obtaining competitive pricing on FCG's behalf.

43.     As payment for the fraudulent amounts HYDS was receiving from FCG for labor and materials, HYDS and/or Meadows would either pay Shore and/or JWSC a monetary kickback or supply Shore and/or JWSC with labor and materials on Shore's secret side projects, which labor and materials Meadows and/or Heath caused HYDS to bill to FCG, Shore approved for payment, and FCG paid.

44.     The above-described kickback scheme among Shore, Meadows, Heath, and their respective companies grew over time, and as the fraud they were perpetrating upon FCG continued to go undetected, they became increasingly emboldened to defraud FCG out of greater and greater amounts.

45.     Some examples of the above-described kickback scheme among Shore, Meadows, Heath, and their respective companies are described below.

46.     On September 13, 2021, Shore issued HYDS FCG Purchase Order No. 109 for lighting fixtures. The price Shore and Meadows and/or Heath concocted for those fixtures, which is reflected on the purchase order, was $30,000.00. However, the market price for these fixtures was only $15,000.00, resulting in a fraudulent overpayment by FCG of $15,000.00. Contemporaneously with this transaction, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS for $10,000.00, which Meadows or HYDS paid. Confirming that the $10,000.00 payment Shore or JWSC received was a fraudulent kickback on account of FCG Purchase Order No. 109, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $10,000.00 payment as being for FCG Purchase Order No. 109.

9

47.     On September 13, 2021, Shore issued HYDS FCG Purchase Order No. 108R for $80,300 for 3,650 light fixtures.  Contemporaneously with this transaction, Shore or JWSC received a payment from Meadows or HYDS for $9,125 with a notation that payment was for lights "3,650 @ $2.50".

48.     On September 13, 2021, Shore issued HYDS FCG Purchase Order No. 109 for $30,000 for 300 undercounter sinks.  Contemporaneously with this transaction, Shore or JWSC received a payment from Meadows or HYDS for $3,750 with a notation that payment was for "bathroom sinks."

49.     On November 15, 2021, Shore issued HYDS FCG Purchase Order No. 113 for lighting fixtures. The price Shore and Meadows and/or Heath concocted for those fixtures, which is reflected on the purchase order, was $16,752.42. However, the market price for this fixtures was only $7,902.20, resulting in a fraudulent overpayment by FCG of $8,850.22. Contemporaneously with this transaction, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS for $2,500.00, which Meadows or HYDS paid.  Confirming that the $2,500.00 payment Shore or JWSC received was a fraudulent kickback on account of FCG Purchase Order No. 113, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $2,500.00 payment as being for FCG Purchase Order No. 113.

50.     On November 18, 2021, Shore issued HYDS FCG Purchase Order No. 201, and on November 30, 2021, Shore issued HYDS FCG Purchase Order No. 202. Contemporaneously with this transaction, Shore issued invoices, either from himself or through JWSC, to Meadows or HYDS for $14,751.00, which Meadows or HYDS paid.  Confirming that the $14,751.00 in payments Shore or JWSC received was a fraudulent kickback on account of FCG Purchase Order

Nos. 201 and 202, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $14,751.00 in payments as being for FCG Purchase Order Nos. 201 and 202.

51.     On December 15, 2021, Shore issued HYDS FCG Purchase Order No. 114 for extra freight. The price Shore and Meadows and/or Heath concocted for the supposedly extra freight, which is reflected on the purchase order, was $151,500. Contemporaneously with this transaction, Shore issued two invoices, either from himself or through JWSC, to Meadows or HYDS, each for $5,000.00, which Meadows or HYDS paid. Confirming that the two $5,000.00 payments Shore or JWSC received were fraudulent kickbacks on account of FCG Purchase Order No. 114, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $5,000.00 invoices and payments as being for FCG Purchase Order No. 114. Not only are the $5,000.00 payments to Shore or JWSC fraudulent, the entire $151,500.00 amount of this purchaser order is fraudulent because freight and insurance were HYDS's responsibility under the Vendor Agreement between FCG and HYDS.

52.     On September 25, 2022, Shore issued HYDS FCG Purchase Order No. 04-201 for countertops, flooring, tile, and bathroom sinks in the amount of $695,343.52, which FCG paid in full. FCG Purchase Order No. 04-201 corresponds to HYDS Sales Order No. 112031. Contemporaneously with these purchase orders, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $10,000.00, and that invoice and payment are expressly identified on Shore's Invoice and Payment detail as being on account of HYDS Sales Order No. 112031.

53.     On September 25, 2022, Shore issued HYDS FCG Purchase Order No. 03-201 for countertops, flooring, tile, and bathroom sinks in the amount of $704,873.13, which FCG paid in full. FCG Purchase Order No. 03-201 corresponds to HYDS Sales Order No. 112032.

Contemporaneously with these purchase orders, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $10,000.00, and that invoice and payment are expressly identified on Shore's Invoice and Payment detail as being on account of HYDS Sales Order No. 112032.

54. On September 25, 2022, Shore issued HYDS FCG Purchase Order No. 02-301 for cabinets, countertops and bathroom sinks in the amount of $1,914,737.47, which FCG paid in full. FCG Purchase Order No. 02-301 corresponds to HYDS Sales Order No. 112033. Contemporaneously with these purchase orders, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $10,000.00, and that invoice and payment are expressly identified on Shore's Invoice and Payment detail as being on account of HYDS Sales Order No. 112033.

55. On September 26, 2022, Shore issued HYDS FCG Purchase Order No. 506.01-101. Contemporaneously with this transaction, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS for $10,000.00, which Meadows or HYDS paid. Confirming that the $10,000.00 payment Shore or JWSC received was a fraudulent kickback on account of FCG Purchase Order No. 506.01-101, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $10,000.00 payment as being for FCG Purchase Order No. 506.01-101.

56. On October 19, 2022, Shore issued HYDS FCG Purchase Order No. 504.02-302 in the amount of $150,000.00 for cabinet door upgrades. On October 19, 2022, Shore issued HYDS FCG Purchase Order No. 504.02-303 in the amount of $120,000.00 for more cabinet door upgrades. FCG paid in full these purchase orders totaling $270,000.00. These FCG purchase orders correspond to HYDS Sales Order No. 112044. Contemporaneously with these purchase orders, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which

Meadows or HYDS paid, for $40,000.00, and that invoice and payment is expressly identified on Shore's Invoice and Payment detail as being on account of HYDS Sales Order No. 112044. Not only is the $40,000.00 payment to Shore or JWSC fraudulent, the entire $270,000.00 amount of these purchaser orders is fraudulent because there were no cabinet upgrades on the specified project.

57.     On October 19, 2022, Shore issued HYDS FCG Purchase Order No. 02-304 for tile in the amount of $220,620.00, which FCG paid in full. FCG Purchase Order No. 02-304 corresponds to HYDS Sales Order No. 112045. Contemporaneously with these purchase orders, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $15,000, and that invoice and payment is expressly identified on Shore's Invoice and Payment detail as being on account of HYDS Sales Order No. 112045.

58.     On November 11, 2022, Shore issued HYDS FCG Purchase Order No. 504.02-305, which corresponds to HYDS Sales Order No. 112053, for cabinet hardware. The price Shore and Meadows and/or Heath concocted for that hardware, which is reflected on the purchase order, was $82,400.00. However, the market price for that cabinet hardware was only $29,260.00, resulting in a fraudulent overpayment by FCG of $53,140.00. Contemporaneously with this transaction, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS for $24,000.00, which Meadows or HYDS paid.  Confirming that the $24,000.00 payment Shore or JWSC received was a fraudulent kickback on account of FCG Purchase Order No. 504.02-305, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $24,000.00 payment as being for HYDS Sales Order No. 112053.

59.     On November 21, 2022, Shore issued HYDS FCG Purchase Order No. 504.02-306, which corresponds to HYDS Sales Order No. 112066, for blinds. The price Shore and Meadows

and/or Heath concocted for those fixtures, which is reflected on the purchase order, was $194,253.94, which included 34" x 72" blinds for $178,160.40. However, the market price for those blinds was only $119,848.08, resulting in a fraudulent overpayment by FCG for the 34" x 72" blinds of $58,312.32. Contemporaneously with this transaction, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS for $40,000.00, which Meadows or HYDS paid. Confirming that the $40,000.00 payment Shore or JWSC received was a fraudulent kickback on account of FCG Purchase Order No. 504.02-306, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $40,000.00 payment as being for HYDS Sales Order No. 112066.

60. On March 15, 2023, Shore issued HYDS FCG Purchase Order No. 504.02-308 for storage and shipping cost. The price Shore and Meadows and/or Heath concocted for these costs, which is reflected on the purchase order, was $53,950.00. Contemporaneously with this transaction, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, for $53,000.00, which Meadows or HYDS paid. Confirming that the $53,000.00 payment Shore or JWSC received was a fraudulent kickback on account of FCG Purchase Order No. 504.02-308, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $53,000.00 invoices and payments as being for FCG Purchase Order No. 504.02-308.

61. On May 17, 2023, Meadows sent Shore an email to Shore's FCG email address in which Meadows informed Shore of HYDS's true pricing for certain labor and materials. When Shore received Meadows' May 17, 2023 email, Shore printed it and handwrote on it the fraudulent amounts Shore and Meadows would bill FCG and the corresponding FCG purchase order numbers on which those fraudulent amounts would be billed:

a. On FCG Purchase Order No. 506-105, instead of billing FCG $4,353.00 to repair broken cabinets, Shore and Meadows conspired to bill FCG $13,059.00. Moreover, any broken cabinets were HYDS's responsibility, and FCG should have paid nothing to repair broken cabinets.

b. On FCG Purchase Order No. 504.03-206, instead of billing FCG $30,250.00 to correct the size of 121 countertops that had been delivered, Shore and Meadows conspired to bill FCG $40,250.00. Moreover, any errors in the size of the countertops were HYDS's responsibility, and FCG should have paid nothing to cut them to the correct size.

c. On FCG Purchase Order No. 504.03-205, instead of billing FCG $4,600.00 to replace incorrect light fixtures that had been delivered, Shore and Meadows conspired to bill FCG $13,800. Moreover, replacing the incorrect light fixtures that had been delivered was HYDS's responsibility, and FCG should have paid nothing for them to be replaced.

d. On FCG Purchase Order No. 506-106, instead of billing FCG $6,500.00 for trashcan inserts, Shore and Meadows conspired to bill FCG $19,500.00.

62. The May 17, 2023 email also specifically shows that HYDS's actual costs for shipping, insurance, and four months' of storage was going to be $8,821.00. However, instead of billing FCG those costs, Shore and Meadows conspired to bill FCG $66,800.00 on FCG Purchase Order No. 504.02-308A. Contemporaneously with this purchase order, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $30,453.00, and that invoice and payment are expressly identified on Shore's Invoice and Payment detail as being on account of FCG Purchase Order Nos. 504.02-308A. Not only is the $30,453.00 payment to Shore or JWSC fraudulent, the sizeable portion of the entire $66,800.00 amount of this

purchaser order is fraudulent because shipping and insurance costs were HYDS's responsibility under the Vendor Agreement between FCG and HYDS.

63.     FCG only became aware of the May 17, 2023 email with Shore's handwriting because he left a copy of it behind in his FCG desk when he was terminated.

64.     In addition to discovering the May 17, 2023 email with Shore's handwriting, FCG has also been provided a text exchange between Shore and Meadows in which they were discussing the work described in the email. In the course of the text exchange, Shore sent Meadows the following damning text, "Stop sending that emails to work please you are going to get us busted."

65.     FCG also discovered a June 6 to 8, 2023 email exchange between Shore and Meadows on Shore's FCG computer with the following additional damning evidence:

        a.      On June 6, 2023, Meadows alerted Shore that the containers of countertops being shipped, for which FCG paid in full, had 15 slabs of countertops for the Shore's secret side projects.

        b.      On June 8, 2023, Meadows wrote Shore pertaining to materials HYDS was shipping to FCG or Shore, "I forgot to include and only if you want to make some more for yourself because I said I'm not billing you for this."

66.     On June 7, 2023, Shore issued HYDS FCG Purchase Order No. 504.04-205 for "Additional Cabinets and Trim" and 504.02-309 for "Extra Cabinets" totaling $80,734.07, which FCG paid in full. Contemporaneously with these purchase orders, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $76,236.00, and that invoice and payment is expressly identified on Shore's Invoice and Payment detail as being on account of FCG Purchase Order Nos. 504.04-205 and 504.02-309. Not only is the $76,236.00 payment to Shore or JWSC fraudulent, the entire $80,734.07 amount of these

purchaser orders is fraudulent because there were no additional or extra cabinets needed on the specified project.

67. On June 21, 2023, Shore issued HYDS FCG Change Order No. 002 for countertop installation for $166,532.50. Contemporaneously with this transaction, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, for $45,000.00, which Meadows or HYDS paid. Confirming that the $45,000.00 payment Shore or JWSC received was a fraudulent kickback on account of FCG Change Order No. 002, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $45,000.00 invoice and payment as being for FCG Change Order No. 002. In addition, the general ledger Shore left behind on his FCG computer reflects the same $45,000.00 payment and describes it as "counter top consulting."

68. FCG also discovered an August 24, 2023 email exchange between Shore and Meadows on Shore's FCG computer with the following further damning evidence:

a. Meadows asks Shore if he can help bury and pass along to FCG costs HYDS incurred to correct deficiencies in the cabinets HYDS delivered.

b. Meadows identified the actual costs for the storage of shipping containers and tells Shore, "Up to you if you want to double this."

c. Meadows states the amounts HYDS's cabinet manufacturer is actually charging HYDS, but Shore could "figure out what we should pay them."

69. The above-described list of fraudulent transactions are only a fraction of the fraudulent transactions listed in Shore's Invoice and Payment detail and general ledger. According to Shore's Invoice and Payment detail, Meadows or HYDS paid Shore or JWSC at least $947,658.85, which means that the total amount FCG overpaid for the labor and materials HYDS supplied at Shore's direction was at least two-times that amount (*i.e.*, $1,895,317.70).

17

70. At the time FCG terminated Shore on September 7, 2023, FCG had issued purchase orders to HYDS for materials that had not yet been delivered, and FCG required those materials to continue with the construction of the projects FCG had underway. This led to a January 3 and 12, 2024 email exchange between FCG and Meadows, culminating in a January 12, 2024 email from Meadows in which he stated, "This is to clarify if there are any misunderstandings FCG can pickup there tops whenever they want and only they are stopping this from happening."

71. On January 26, 2024, however, Meadows reversed his position and refused to delivery any of the materials for which FCG had paid unless FCG signed a document releasing Meadows and HYDS from all of their above-described fraud.

72. Once counsel became involved, a February 6 to 7, 2024 email exchange ensued in which counsel for Meadows and HYDS, Darin Margules, advanced Meadows and HYDS's position to hold the materials, which FCG had paid for in full, as ransom for a general release of liability of HYDS and Meadows. Mr. Margules also advanced the position on behalf of Meadows and HYDS that HYDS would not release any materials unless FCG paid HYDS amounts to which HYDS was not entitled. Because FCG required the materials to continue construction of its projects, FCG agreed to pay, and eventually did pay, HYDS at least $84,115.16 to which HYDS was not entitled to secure the release of the materials, but FCG did not provide any release to Meadows or HYDS.

**C.**    **Lowe's Joins the Scheme.**

73. According to HYDS's website, Lowe's is a HYDS "Big Box" partner.

74. On December 9, 2020, Meadows and Heath expanded their fraudulent conspiracy with Shore to include Lowe's Individual Defendant Bingham when Heath introduced Shore to Bingham by email stating, "I have add my good friend Dean from Lowe's on this email they can

save you lots of money on projects send him over anything you have and see what he can do for you."

75.     Once Meadows and Heath connected Shore with Bingham, Shore was able to further defraud FCG by acting in concert with Bingham and other Lowe's Individual Defendants.

76.     Among the fraudulent mechanisms Shore and one or more of the Lowe's Individual Defendants employed was for Lowe's to engage Shore or JWSC as an independent contractor to perform "estimating" for Lowe's.

77.     By engaging Shore or JWSC to perform estimates for Lowe's, the Lowe's Individual Defendants secured Shore's loyalty to Lowe's, rather than Shore's employer, FCG, which breached the duty of loyalty Shore owed FCG.

78.     Even more egregious than Lowe's engaging Shore or JWSC as an estimator on non-FCG projects, Lowe's engaged Shore or JWSC to "estimate" the projects Shore was managing for FCG, thereby allowing Shore to fraudulently overstate the type and quantity of the materials needed on FCG's projects.

79.     The supposed estimating services by Shore or JWSC were a fictitious scheme used to provide Shore or JWSC monetary kickbacks for the material purchases, which Shore was fraudulently funneling to Lowe's and which one or more of the Lowe's Individual Defendants knew were fraudulent.

80.     Below are the steps—revealed through email communications—Shore and the applicable Lowe's Individual Defendants used to perpetrate this portion of their fraud upon FCG:

    a.     Before any purchase orders were issued for the delivery of materials on a project, a representative of the project developer (an affiliate of FCG's) would create a Dropbox link where access to the project plans could be obtained.

b.     The project developer's representative would then send the link with the plans to Shore (not knowing he was conspiring with the Lowe's Individual Defendants) to arrange for the labor and materials necessary to complete the project.

c.     Once Shore obtained the link, he would then copy and paste the link into an email to one of the Lowe's Individual Defendants (*e.g.*, Bingham or Weber) using Shore's FCG email address.

d.     Having obtained the link from Shore, one of the Lowe's Individual Defendants would copy and paste the same link in an email to Shore using a different email address Shore maintained under the name JWSC.

e.     To hide the fact that JWSC was really Shore, the Lowe's Individual Defendant would never refer to JWSC as Will Shore. Instead, the Lowe's Individual Defendant would begin the email with "Good morning, JWSC" or "Sir."

f.     In the email from the Lowe's Individual Defendant to JWSC (*i.e.*, Shore), the Lowe's Individual Defendant would seek an estimate—knowing, of course, that it was Shore who notified the Lowe's Individual Defendants of the need for an estimate in the first place, and to further hide the fact that JWSC was really Shore, the Lowe's Individual Defendant would copy Shore using Shore's FCG email address.

g.     Shore, posing as an independent third-party estimator, would then send the Lowe's Individual Defendant an email from his JWSC email address acknowledging receipt of the need for an estimate, and to perpetuate the deception upon FCG, Shore would copy himself using his FCG email address.

h.     Then to complete this scheme, Shore (now using his FCG email address) would respond to the Lowe's Individual Defendant that he is "good with the quantities

your take off service did" or "we do approve these amounts," when all along it was Shore himself who was Lowe's "take off service" and who came up with "these amounts" in the first place.

         i.     On FCG's Union Brick project, Shore was not the project manager on that project and should not have had any involvement in it whatsoever. However, unbeknownst to FCG at the time, some of the Lowe's Individual Defendants (Bingham and Weber at the very least) engaged Shore to "estimate" the lumber needed on the Union Brick project. When Lowe's estimate (which was really Shore's estimate) was provided to FCG, FCG had questions about it and asked to set up a call with Lowe's estimator (not knowing, of course, that it was really Shore). Knowing that their estimating scheme would be exposed if Shore spoke with FCG's project management about the Union Brick estimate, Shore and the Individual Lowe's Defendants who participated in this scheme arranged for FCG's project management to speak with a dummy estimator about the estimate. It was obvious from the dummy estimator's inability to answer FCG's questions that he knew little to nothing about the estimate. However, it was not until FCG found the email on Shore's computer, in which Bingham and Weber asked Shore for a lumber estimate on the Union Brick project, that FCG realized Lowe's "estimator" who they spoke with was unable to answer their questions because he did not prepare the estimate. Shore did.

81.    After FCG terminated Shore and FCG began trying to understand the relationship between Lowe's and Shore, FCG asked the Lowe's Individual Defendants, Knowles and Matthews, if Lowe's had hired Shore to be an "estimator." Instead of being honest and forthright with FCG, Knowles and Matthews were deceptive and engaged in a cover-up of the fraud Shore, JWSC, and the other Lowe's Individual Defendants perpetrated on FCG.

82.     Initially, Knowles acknowledged that Shore had performed some estimating for Lowe's, but attempted to cover up the truth by minimizing the work Shore did for Lowe's, making it sound insignificant.

83.     When FCG asked Knowles and Matthews if Lowe's had paid Shore or JWSC to act as an estimator on any FCG projects, Knowles and Matthews both emphatically denied that Lowe's had done so.

84.     Knowles's and Matthews's denials that Shore had provided "estimating" on FCG projects were lies. Among the documents found on Shore's FCG computer include (a) an email from Shore to Knowles on February 15, 2023, in which Shore provided Knowles, Johnson, and Weber his menu of estimating services, (b) an email Knowles received showing that Knowles was, in fact, aware that Shore was acting as an "estimator" on FCG projects as long ago as April 13, 2023, and (c) an April 13, 2023 email between Lowe's Individual Defendant Weber and Shore with an April 13, 2023 invoice Lowe's sent FCG for estimating services that Shore (identified in the invoice as his alter ego JWSC) performed for Lowe's. All these events are months before Knowles and Matthews emphatically denied that Shore performed estimating on FCG's projects.

85.     As to Knowles's initial minimization of the estimating Shore performed for Lowe's, that, too, was a lie. As FCG continued to seek information on this topic, Matthews finally admitted that Lowe's had paid Shore, through Shore's various side entities, in excess of $100,000 to act as an "estimator."

86.     Further evidence that Shore and the Lowe's Individual Defendants were conspiring to defraud FCG is the fact that the records Shore left behind on his FCG workstation demonstrate that, over the course of their conspiracy, Chevrette paid Shore or JWSC $13,500.00 in fraudulent kickbacks; Bingham paid Shore or JWSC $36,500.00 in fraudulent kickbacks; and LPS (an

abbreviation for Lowe's Pro Supply) paid Shore or JWSC $18,550.00 in fraudulent kickbacks. Those records also show that Shore or JWSC made instant Zelle payments to Bingham for "commissions & fees" of at least $31,650.00. Those records further show that Shore was only billing Lowe's a few thousand dollars to perform an "estimate." However, a legitimate project estimate requires considerably more than a few hours to prepare, thus further revealing that the above-described "estimating" scheme was nothing more than a vehicle to pay Shore or JWSC monetary kickbacks for the fraudulent material purchases Shore was sending Lowe's.

87.     Shore and one or more of the Lowe's Individual Defendants also conspired to fraudulently bill FCG for materials that were not for FCG's projects, but for Shore or JWSC's secret side projects.

88.     Among the fraudulent invoices Lowe's sent FCG for payment, and Shore approved for payment, were invoices for materials that are not shown on the plans or specifications for FCG's projects, but are on Shore's side projects (*e.g.*, walnut cabinets, LVL beams, Pella windows).

89.     Among Shore's side projects for which Lowe's billed FCG are the projects located at 1052 Summerset Downs Boulevard, 1143 Maxwell Branch Road, and Cotton Road.

90.     Shore knew what materials were necessary for FCG's projects and which were not because Shore was responsible for ordering the materials for those projects. One or more of the Lowe's Individual Defendants also knew which materials were for FCG's projects and which were not because they had the plans for the FCG projects; FCG issued purchase orders for the materials on the FCG projects; and many of those Lowe's Individual Defendants worked closely with Shore. In addition, the below-described emails between Shore and one or more of the Lowe's Individual

Defendants, including Bingham and Weber, show that those Lowe's Individual Defendants were aware of Shore's side projects.

91.     On February 4, 2022, a Lowe's employee named James Fitzgerald sent an email to Lowe's truss supplier, Tennessee Building Components, stating, "I have a side project that is looking for a full quote when available. This is a separate customer from our other projects." As the email chain progressed, Mr. Fitzgerald sent Bingham an email on February 11, 2022, stating, "This is one of Wills [meaning Shore's] side projects they have a question." The email concludes with a February 17, 2022 email from Shore to Bingham stating, "I only need floor truss quote. We are stick framing roof system." Despite Bingham's knowledge that the floor trusses for which Lowe's was obtaining a quote were for Shore's side project, Lowe's invoiced FCG for them, and FCG paid them.

92.     Regarding Shore's secret side project on Cotton Road known as the Ramirez project, on May 10, 2022, FCG's construction accountant noticed that roofing materials on a project identified in the invoice as the Ramirez project were being billed to FCG. When FCG's construction accountant brought this to Shore's attention, Shore notified Weber who replied by email, "Fixing this now!" From this email exchange, Weber knew that materials on the Ramirez project were not to be billed to FCG.

93.     Communications from Johnson show that he knew the Pella windows were for the Ramirez project. On November 16, 2022, a Lowe's employee named Ryan Ruddell sent Johnson an email to which he attached an order for Pella windows, and in his cover email message to Johnson, Mr. Ruddell specifically identified the windows for Shore's "Ramirez" project. Johnson then sent a November 17, 2022 email to Shore stating, "Here is the original receipt from the first order on the Ramirez house. It appears there is only 6 windows total on the receipt that show

Double Hung style." Given the amount of materials Lowe's was selling to FCG, Johnson was very familiar with which projects were FCG's and which were not. In his November 17, 2022 email to Shore, Johnson shows his knowledge that the Ramirez project was a "house," and Johnson knew that none of FCG's projects was a house. In addition, Johnson knew that there were no Pella windows on any FCG projects. Yet, the delivery address (804 Branham Road) for the windows is a FCG project address, which Johnson well knew. Despite Johnson's knowledge that the Pella windows were for Shore's secret side project known as the Ramirez house, not an FCG project, Lowe's invoiced FCG for those materials, and FCG paid it.

94. When Weber sent Shore an invoice for materials on the side project at 1143 Maxwell Branch Road to Shore's FCG email address on November 13, 2022, Shore shot back from a different address, "WTF." When Weber sent Shore another invoice for materials on one of Shore's side projects again to Shore's FCG email address on December 10, 2022, Shore replied from a different address, "WTF and why is it coming to my work email." This vulgarity shows that Shore was angry that the conspiracy he and one or more of the Lowe's Individual Defendants were perpetrating upon FCG was at risk of exposure.

95. Documentation found on Shore's FCG computer for the materials on Shore's Summerset Downs Boulevard and Maxwell Branch Road secret side projects initially show those materials being delivered to the address of the side project. However, in each of those cases, Shore sent an email to Lowe's which resulted in a communication back from Lowe's that the "Delivery Details Have Been Updated."

96. This repeated pattern indicates that one or more of the Lowe's Individual Defendants and Shore were conspiring to manipulate the delivery information within Lowe's system to cover up that materials for Shore's secret side projects were being billed to FCG and

that, to hide their scheme, those materials were either delivered to FCG's project where Shore would then pick them up and take them away, or Lowe's delivered the materials to Shore's side project, but the delivery information in Lowe's system was manipulated to falsely reflect that the materials were delivered to FCG's project.

97. Certain Lowe's delivery tickets for materials Lowe's billed FCG are further confirmation that materials for which Lowe's was invoicing FCG, and Shore was approving for payment, were not, in fact, received by FCG. To cover up the fraud Shore and the Lowe's Individual Defendants were perpetrating upon FCG, Lowe's Individual Defendant Johnson signed at least twelve (12) delivery receipts, falsely attesting that materials totaling $112,211.40 had been received by FCG, when they were not.

98. During FCG's attempt to unravel Shore's fraud, FCG requested Matthews to provide all documentation within Lowe's system that would show the original delivery address and any changes to the delivery address for all Lowe's materials FCG could not confirm were actually provided to FCG, but Matthews refused, falsely claiming that Lowe's has no such records. FCG also requested Lowe's in-house counsel to provide delivery receipts or any other documentation, confirming receipt by FCG, as to all the materials for which Lowe's has invoiced FCG, but like Matthews, Lowe's in-house counsel stonewalled FCG and did not respond.

99. To facilitate the above-described fraud on FCG, one or more of the Lowe's Individual Defendants arranged for Lowe's to issue Shore or JWSC a Lowe's Pro Supply credit card, which Lowe's billed to FCG and Shore approved for payment. Despite FCG's repeated requests, Lowe's has produced no documentation to indicate that Lowe's ever sought, much less received, FCG's authorization to set up the card. When FCG questioned Knowles about the card,

Knowles, in a September 18, 2023 email stated that the card was issued to Shore for in-store purchases only.

100.    Like his statement about Shore not "estimating" FCG projects, Knowles's statement that the card was for in-store purchases only was a lie to cover up the fraud that had been perpetrated upon FCG. That lie is revealed from, at the very least, the following information:

      a.    According to Lowe's own records, Shore charged over $1.5 million to the card, which is clearly more than in-store purchases.

      b.    The invoice numbers identified by Lowe's as being associated with the Beechcroft project do not correlate to the invoice numbers of the Lowe's invoices FCG received from Lowe's.

      c.    Among the purchases on the card are approximately $308,000 for shingles. That amount of shingles is clearly not from in-store purchases. Also, Lowe's received separate purchase orders from FCG for shingles on its projects, which FCG paid, revealing that Lowe's knew or should have known that the shingles charged to the card were not for FCG's projects. Yet, Lowe's billed those shingles to FCG, and Shore approved the payment of those bills by FCG.

      d.    There are $572,000 in materials charged to the card for FCG's Beechcroft project. However, FCG already had a legitimate Lowe's Pro Supply card for the Beechcroft project.

      e.    The card lists numerous other charges for the Ramirez project, which Bingham, Johnson, and Weber all knew was not an FCG project but a side project of Shore's.

f. The card was set up to conceal who authorized purchases on the card. This is apparent from the invoice for the windows used on the Ramirez residence and the invoice for the lumber used on the Ramirez residence that were charged to the card, both of which identify the Authorized Buyer as only "LPS/Purchase Card."

g. According to the income statement Shore left on his FCG workstation, Shore earned income on his Ramirez side-job of $506,424.29, and he incurred only $6,500.00 in expenses. This was made possible by the Lowe's Individual Defendants conspiring with Shore to bilk FCG for the cost of the materials necessary to build the Ramirez project and then attempting to cover it up when FCG began to ask questions.

101. To further cover up the above-described fraud upon FCG, one or more of the Lowe's Individual Defendants falsified Lowe's invoices using fictitious product codes and fictitious unit prices, making it impossible for FCG to discern what materials were reflected on the invoice, which, in turn, made it impossible for FCG to confirm receipt of the materials reflected on the invoice. During FCG's investigation into these entries, FCG asked Knowles and Matthews to explain this, but they refused.

102. Lowe's Individual Defendant Bingham further conspired with Shore, Meadows, and Heath to defraud FCG by Shore issuing purchase orders to HYDS for Lowe's materials at a cost to FCG that was well above market pricing. For example, on August 30, 2021, Bingham sent Heath an email with a quote, which included a profit mark-up by Lowe's, for "Franklin's sinks," which HYDS marked up again before invoicing FCG for the sinks. As another example, on April 21, 2023, Shore issued HYDS FCG Purchase Order No. 119 for Lowe's proprietary light fixtures in the amount of $30,000.00, which FCG paid in full. By Shore arranging for FCG to purchase the light fixtures from HYDS, which purchased them from Lowe's, Lowe's and HYDS both profited

from the light fixtures while FCG paid above-market prices. Contemporaneously with this purchase order, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $23,718.85, and that invoice and payment is expressly identified on Shore's Invoice and Payment detail as being on account of FCG Purchase Order No. 119. In comparison to the $30,000.00 FCG paid for the Lowe's light fixtures, the market contractor cost of those same light fixtures is less than $15,000.00.

103.     As a result of the above-described scheme and attempted cover-up of it by Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews, they enriched themselves by obtaining commissions or other compensation on the supplies and materials they were defrauding FCG into purchasing. In addition, Lowe's profited by the above-described scheme and attempted cover-up by unlawfully obtaining money from FCG for supplies and materials that were unnecessary or excessive for the completion of FCG construction projects and/or were at artificially inflated prices.

104.     From May 4, 2021, to June 13, 2023, FCG issued Lowe's purchase orders totaling $30,185,843.09. FCG considered itself to be a valued customer of Lowe's given the dollar amount of materials FCG purchased from Lowe's. However, by refusing to reimburse FCG for the damage the Lowe's Individual Defendants caused FCG by their above-described fraud, cover-up, and stonewalling, Lowe's has displayed a callous disregard for its customers such as FCG and demonstrated that its true goal is maximizing profits at all costs, even when those profits are derived from the fraudulent conduct of Lowe's employees.

105.     Based upon all documentation available to date, because of the above described fraud and conspiracy between Shore and the Lowe's Individual Defendants, FCG has suffered damages with respect to FCG's Beechcroft project of $3,531,831.94.

106.     With respect to FCG's Kedron Square Cottages project, FCG issued FCG Purchase Order Nos. 101, 101R1, 104, 110, 111, 112, 112r1, and 113 to Lowe's on or around the dates shown each of the purchase orders and accepted Lowe's Quote 11413056-00 ("Kedron Square Purchase Orders"). True and authentic copies of the Kedron Square Purchase Orders are attached as collective **Exhibit 1**. FCG paid deposits to Lowe's on account of the Kedron Square Purchase Orders in the amount of $2,230,298.07. However, of the $2,230,298.07 in deposits FCG has paid to Lowe's, Lowe's has only delivered $520,713.03 in materials. As a result, Lowe's owes FCG $1,709,585.04, which is the amount FCG has paid Lowe's for materials on the Kedron Square Cottages project that Lowe's did not deliver.

107.     With respect to FCG's Green Lea project, FCG issued FCG Purchase Order Nos. 504.02.101, 504.03.101, 504.03.102, 504.03.103, 504.04.101, 504.04.102, and 504.04.103 to Lowe's on or around the dates shown each of the purchase orders ("Green Lea Purchase Orders"). True and authentic copies of the Green Lea Purchase Orders are attached as collective **Exhibit 2**. FCG paid deposits to Lowe's on account of the Green Lea Purchase Orders plus Lowe's invoices 10719876-00 and 10719883-00 for which FCG did not issue purchase orders in the amount of $2,337,834.76. However, of the $2,337,834.76 in deposits FCG has paid to Lowe's, Lowe's has only delivered materials or issued FCG credits totaling $1,177,130.25. As a result, Lowe's owes FCG $1,160,704.51, which is the amount FCG has paid Lowe's for materials on the Green Lea project that Lowe's did not deliver.

108.     On July 11, 2024, counsel for FCG notified in-house senior counsel at Lowe's of the foregoing wrongful conduct by the Lowe's Individual Defendants and requested that Lowe's pay FCG the amounts FCG had calculated at the time. Lowe's never responded.

109.    Lowe's has claimed that FCG owes Lowe's money for materials Lowe's claims to have delivered to FCG's projects. In response to those assertions by Lowe's, FCG has invited Lowe's to provide substantiating documentation of its claim, such as purchase orders, confirming that FCG ordered the alleged materials, and delivery receipts, confirming that FCG received the alleged materials, but Lowe's has refused. Therefore, FCG disputes that it owes Lowe's any amount whatsoever.

### C.    Larry Grace Confirms Defendants' Scheme.

110.    One of the individuals who witnessed portions of the above-described conspiracy among the defendants to defraud FCG was an individual named Larry Grace ("Grace"). HYDS hired Grace's company, Central Century Supply, LLC, to fabricate and install some of the cabinets on FCG's projects. On November 30, 2023, after FCG terminated Shore and the Defendants' conspiracy started coming to light, Grace telephoned an FCG principle to confirm the fraud the Defendants had been perpetrating upon FCG as follows:

> 5:29-5:55
> Grace:  ….we were instructed—and I'm saying we loosely, I'll just use Keith's name—Keith was instructed by Will how to quote, how to bill, what to bill for and what amount to bill for.  He was directed as to what to bill not send a bill in, but directed as to. That's just scratching the surface.

> 7:35-8:30
> Grace:  …cabinets I built for Will's house and Will's spec. house.  I would look at the amounts of money that I used purchase those and get paid by HYDS most likely that was kicked back to HYDS from Will, so nobody had to pay for it.  I'm sure those are involved in there.

> FCG:  So Will was building houses on the side and are you telling me that Will…

> Grace:  You didn't know?  He had an account at Lowe's that he was $200,000 down.  He's got, I knew that he had this guy, there were a couple of guys who were still playing the same game, Landon was playing it with him and somebody else, I know Landon's gone now but that was the game, it was a pay to play game and Will was able to prosper from it.

FCG:  Interesting.

8:52-9:20
Grace: I'm certainly willing to work with your team on undercovering, I have emails and dates and especially for ordering materials for the houses that he built, his spec house.  And you will probably will find all your subs in some way worked on that spec house for Will, probably at the cost of Franklin, most likely.  And, this needs to be stopped, this is what they do, it is ridiculous.

## IV.  CAUSES OF ACTION

### Count I
### Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1961, *et seq.* Against All Defendants

111.  FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 110 above.

112.  FCG, as a "person" who has been injured within the meaning of 18 U.S.C. § 1964(c), brings this claim for civil remedies under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), against all Defendants, each of whom is a "person" within the meaning of 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

113.  Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

114.  Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate section 1962(c)."

115.  The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

116. The Defendants formed an association-in-fact enterprise for the purpose of engaging in a scheme to unlawfully enrich themselves by fraudulently charging FCG excessive amounts for unnecessary or excessive supplies or materials for its construction projects.

117. In support of their enterprise's common purpose and fraudulent scheme, Defendants agreed that Shore would abuse his position as an employee of FCG in order to engage in the wrongful conduct described above, which wrongful conduct greatly enriched each of the defendants and greatly damaged FCG.

118. Each of the Defendants who formed the enterprise is a person within the meaning of 18 U.S.C. § 1962(c) and acted to enable the common purpose and fraudulent scheme of the enterprise.

119. At all relevant times, the enterprise (a) had an existence separate and distinct from each of the Defendants; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Defendants; (d) was characterized by interpersonal relationships among the Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the profits obtained therefrom.

120. At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce because many of the Defendants are from different states and used the Internet, mail, and telephone to conduct the above-described fraudulent enterprise.

121. Each of the Defendants conducted and participated in the conduct of the affairs of the enterprise through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) and as prohibited by 18 U.S.C. § 1962(c).

122.    The Defendants engaged in multiple, repeated, and continuous violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, each of which constitutes a predicate act of racketeering activity pursuant to 18 U.S.C. § 1961(1).

123.    The Defendants committed, conspired to commit, and/or aided and abetted others in the violation of at least two predicate acts of racketeering activity (as outlined above) within a two-year period.

124.    The multiple acts of racketeering activity that the Defendants committed, conspired to commit, and/or aided and abetted others in committing were related to each other and posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

125.    The Defendants committed these predicate acts intentionally and knowingly with the specific intent to advance the enterprise.

126.    As a result of these actions, FCG has suffered damage as described herein and in an amount to be proven at trial, which amount is expected to be no less than $8,297,469.19.

127.    HYDS is legally responsible for the above-described conduct of Meadows and Heath pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Meadows and Heath committed the above-described fraud, they were acting in the course and scope of their ownership and/or employment as the owner and as an officer of HYDS.

128.    Lowe's is legally responsible for the above-described conduct of Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews committed the above-described fraud, they were acting in the course and scope of their employment with Lowe's.

## Count II
## Conspiracy Against All Defendants

129.    FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 128 above.

130.    As described above, the Defendants had an agreement and scheme among themselves to (a) create orders through Shore for unnecessary or excessive supplies and materials, ostensibly for use on FCG construction projects and/or for supplies and materials at artificially inflated priced; (b) request and collect payments from FCG knowing that the amounts collected were based on false or fraudulent orders; and (c) pay kickbacks to Shore in the form of money and construction materials as compensation for his efforts to secure these false, fraudulent, or artificially inflated orders.

131.    Pursuant to this scheme, the Defendants enriched themselves by unlawfully obtaining money from FCG for supplies and materials that were unnecessary or excessive for the completion of FCG construction projects and/or were at artificially inflated prices.

132.    The Defendants' above-described acts and omissions are each overt acts in furtherance of Defendants' conspiracy.

133.    As a result of the Defendants' actions and misrepresentations, FCG has suffered damage as described herein and in an amount to be proven at trial, which amount is expected to be no less than $8,297,469.19.

134.    JWSC is legally responsible for the above-described conduct of Shore pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Shore committed the above-described fraud, he was acting within the course and scope of his ownership and/or employment with JWSC.

135. HYDS is legally responsible for the above-described conduct of Meadows and Heath pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Meadows and Heath committed the above-described fraud, they were acting in the course and scope of their ownership and/or employment as the owner and as an officer of HYDS.

136. Lowe's is legally responsible for the above-described conduct of Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews committed the above-described fraud, they were acting in the course and scope of their employment with Lowe's.

**Count III**
**Fraud Against JWSC and Shore**

137. FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 136 above.

138. As described above, Shore represented to FCG that he was performing his employment duties in the best interests of FCG, and that all purchases that it made using FCG funds were necessary and proper for performance of FCG construction projects and were at competitive prices.

139. Shore's foregoing representations were false.

140. Shore made the foregoing false representations knowing they were false, without regard to their truth or falsity, and without the exercise of reasonable care.

141. Shore made the foregoing false representations in order to enrich himself from the funds obtained from FCG for these fraudulent purchases and through the above-described kickbacks and materials he received from his co-conspirator Defendants.

142.    In reasonable reliance on Shore's above-described misrepresentations, FCG expended considerable sums to purchase unnecessary or excessive volumes of materials and supplies that were unnecessary to complete the construction projects to which Shore was assigned and/or to purchase materials and supplies at artificially inflated prices.

143.    As a result of Shore's actions and misrepresentations, FCG has suffered damage as described herein and in an amount to be proven at trial, which amount is expected to be no less than $8,297,469.19.

144.    JWSC is legally responsible for the above-described conduct of Shore pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Shore committed the above-described fraud, he was acting within the course and scope of his ownership and/or employment with JWSC.

**Count IV**
**Conversion Against JWSC and Shore**

145.    FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 144 above.

146.    As described more fully herein, Shore caused invoices and/or other requests for payment to be submitted to FCG for supplies and materials that were unnecessary or exceeded the volume necessary to perform the construction projects for which they were being supplied and/or that were at artificially inflated prices.

147.    FCG paid these invoices in full.

148.    The Defendants had no right to payments from FCG for supplies and materials that Shore knew were unnecessary for the underlying construction project or in excess of the amount need to complete the project and/or were at artificially inflated prices.

149. By causing FCG to pay amounts to which the Defendants were not entitled, Shore intentionally exercised dominion and control over, and appropriated for his own use and benefit, FCG's money in violation of its rights.

150. FCG suffered damage as a result of the misappropriation and conversion by Shore in an amount to be proven at trial, which amount is expected to be no less than $8,297,469.19.

151. JWSC is legally responsible for the above-described conduct of Shore pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Shore committed the above-described fraud, he was acting within the course and scope of his ownership and/or employment with JWSC.

## Count V
## Breach of Duty of Loyalty Against Shore

152. FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 151 above.

153. As an employee, project manager, and agent of FCG, Shore owed FCG a fiduciary duty of absolute fidelity and loyalty.

154. Shore breached his fiduciary duties, including the duty of loyalty and the duty of care, by acting for his own benefit to the determent of FCG through actions and inactions as described above, and by failing to act in the best interests of his employer, FCG.

155. Shore's breaches of his fiduciary duty were intentional, fraudulent, and/or malicious.

156. As a direct result of Shore's breaches of his fiduciary duty, FCG has suffered damage as described herein and in an amount to be proven at trial, which amount is expected to be no less than $8,297,469.19.

## Count VI
### Fraud Against HYDS, Meadows, and Heath

157.    FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 156 above.

158.    By causing HYDS Sales Orders to be sent to FCG for payment, Meadows and Heath represented to FCG that HYDS was supplying labor and materials to FCG's construction projects at competitive prices.

159.    Meadows and Heath 's foregoing representations were false.

160.    Meadows and Heath made the foregoing false representations knowing they were false, without regard to their truth or falsity, and without the exercise of reasonable care on behalf of FCG.

161.    Meadows and Heath made the foregoing false representations in order to enrich themselves from the funds obtained from FCG for these fraudulent purchases and through the above-described kickbacks scheme.

162.    In reasonable reliance on Meadows and Heath's above-described misrepresentations, FCG expended considerable sums to purchase unnecessary or excessive volumes of materials and supplies that were unnecessary to complete the construction projects to which Shore was assigned and to purchase materials and supplies at artificially inflated prices.

163.    As a result of Meadows and Heath's actions and misrepresentations, FCG has suffered damage as described herein and in an amount to be proven at trial, which amount is expected to be no less than $1,895,317.70.

164.    HYDS is legally responsible for the above-described conduct of Meadows and Heath pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time

Meadows and Heath committed the above-described fraud, they were acting in the course and scope of their ownership and/or employment as the owner and as an officer of HYDS.

**Count VII**
**Violation of the Tennessee Consumer Protection Act Against HYDS, Meadows, and Heath.**

165.    FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 164 above.

166.    FCG is a person within the meaning of the Tennessee Consumer Protection Act. *See* Tenn. Code Ann § 47-18-103(18).

167.    Under the Act, it is an unfair and deceptive practice to "falsely pass[] off goods or services as those of another." Tenn. Code Ann. § 47-18-104(b)(1).

168.    Under the Act, it is an unfair and deceptive practice to "caus[e] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of good or services." Tenn. Code Ann. § 47-18-104(b)(2).

169.    Under the Act, it is an unfair and deceptive practice to "cause[e] likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." Tenn. Code Ann. § 47-18-104(b)(3).

170.    HYDS, Meadows, and Heath purposefully and willfully misrepresented the source of the installation services and quotes provided to FCG in regard to various projects overseen by Shore.  Particularly, HYDS, Meadows, and Heath knew that the installation services and quotes were provided through direct coordination and oversight by Shore, while HYDS, Meadows, and Heath represented that these services were provided independently.

171.    The actual damages FCG has suffered as a result of the above-described violations of the Act include, without limitation, (a) the amount, to be determined at trial, in which FCG overpaid for the installation services and quotes from HYDS, and (b) attorneys' fees and costs.

172.    The violations of the Act by HYDS, Meadows, and Heath were willful or knowing because HYDS, Meadows, and Heath knew the services provided through direct oversight and consultation with Shore while representing and holding themselves out as independent actors.

173.    Pursuant to Tenn. Code Ann. §47-18-109(a)(3), FCG is entitled to recover three times the actual damages it will suffer as a result of the willful or knowing violations of the Act by HYDS, Meadows, and Heath.

174.    Upon a finding that HYDS, Meadows, and Heath violated the Act, FCG is further entitled to recover its reasonable attorneys' fees and litigation expenses pursuant to Tenn. Code Ann. §47-18-109(e)(1).

175.    As a result of the above-described unfair and deceptive acts and practices by HYDS, Meadows, and Heath, FCG has suffered damage as described herein and in an amount to be proven at trial, which amount is expected to be no less than $1,895,317.70.

176.    HYDS is legally responsible for the above-described conduct of Meadows and Heath pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Meadows and Heath committed the above-described fraud, they were acting in the course and scope of their ownership and/or employment as the owner and as an officer of HYDS.

### Count VIII
### Conversion Against HYDS, Meadows, and Heath

177.    FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 176 above.

178.    As described more fully herein, HYDS, Meadows, and Heath caused invoices and/or other requests for payment to be submitted to FCG for supplies and materials that were unnecessary or exceeded the volume necessary to perform the construction projects for which they were being supplied and/or that were at artificially inflated prices.

179.     FCG paid these invoices in full.

180.     HYDS had no right to payments from FCG for supplies and materials that Meadows and Heath knew were unnecessary for the underlying construction project or in excess of the amount need to complete the project and/or were at artificially inflated prices.

181.     By causing FCG to pay amounts to which HYDS was not entitled, HYDS, Meadows, and Heath intentionally exercised dominion and control over, and appropriated for their own use and benefit, FCG's money in violation of its rights.

182.     FCG suffered damage as a result of the misappropriation and conversion by HYDS, Meadows, and Heath in an amount to be proven at trial, which amount is expected to be no less than $1,895,317.70.

183.     HYDS is legally responsible for the above-described conduct of Meadows and Heath pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Meadows and Heath committed the above-described actions, they were acting within the course and scope of their ownership and/or employment with HYDS.

**Count IX**
**Fraud Against Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews**

184.     FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 183 above.

185.     By causing Lowe's invoices to be sent to FCG for payment, Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews represented to FCG that Lowe's was supplying labor and materials to FCG's construction projects at competitive prices or attempted to cover up that Lowe's had not done so.

186.     Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews's foregoing representations were false.

42

187. Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews made the foregoing false representations knowing they were false, without regard to their truth or falsity, and without the exercise of reasonable care on behalf of FCG.

188. Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews made the foregoing false representations in order to enrich themselves from the funds obtained from FCG for these fraudulent purchases and through the above-described kickbacks scheme.

189. In reasonable reliance on Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews's above-described misrepresentations, FCG expended considerable sums to purchase unnecessary or excessive volumes of materials and supplies that were unnecessary to complete the construction projects to which Shore was assigned and to purchase materials and supplies at artificially inflated prices.

190. As a result of the above-described actions and misrepresentations by Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews, they enriched themselves by obtaining commissions or other compensation on the supplies and materials they were defrauding FCG into purchasing pursuant to the above-described scheme. In addition, Lowe's profited by the above-described scheme by unlawfully obtaining money from FCG for supplies and materials that were unnecessary or excessive for the completion of FCG construction projects and/or were at artificially inflated prices.

191. As a result of the above-described actions and misrepresentations by Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews, FCG has suffered damage in an amount to be proven at trial, which amount is expected to be no less than $6,402,151.49.

192. Lowe's is legally responsible for the above-described conduct of Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews pursuant to the doctrine of *respondeat*

*superior* and the laws of agency because, at the time Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews committed the above-described fraud, they were acting in the course and scope of their employment with Lowe's.

**Count X**
**Violation of the Tennessee Consumer Protection Act Against Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews**

193.    FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 192 above.

194.    FCG is a person within the meaning of the Tennessee Consumer Protection Act. *See* Tenn. Code Ann § 47-18-103(18).

195.    Under the Act, it is an unfair and deceptive practice to "falsely pass[] off goods or services as those of another." Tenn. Code Ann. § 47-18-104(b)(1).

196.    Under the Act, it is an unfair and deceptive practice to "caus[e] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of good or services." Tenn. Code Ann. § 47-18-104(b)(2).

197.    Under the Act, it is an unfair and deceptive practice to "cause[e] likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." Tenn. Code Ann. § 47-18-104(b)(3).

198.    The Individual Lowe's Defendants purposefully and willfully misrepresented the source of the estimation services provided to FCG in regard to the various projects overseen by Shore.  Particularly, Shore performed the estimation services, the Individual Lowe's Defendants knew this, they passed off these estimates as legitimate, and they represented that Shore's estimates were performed by an unrelated third party.

44

199.    The actual damages FCG has suffered as a result of the above-described violations of the Act include, without limitation, (a) the amount, to be determined at trial, for which FCG was overcharged as a result of the estimating services provided in relation to FCG's numerous projects, and (b) attorneys' fees and costs.

200.    The above-described violations of the Act by the Lowe's Individual Defendants were willful or knowing because the Lowe's Individual Defendants knew that they were misrepresenting the source of the services provided to FCG.

201.    Pursuant to Tenn. Code Ann. §47-18-109(a)(3), FCG is entitled to recover three times the actual damages it has suffered as a result of the willful or knowing violations of the Act by the Individual Lowe's Defendants.

202.    Upon a finding that Bingham, Chevrette, Johnson, Weber, Knowles and/or Matthews violated the Act, FCG is entitled to recover its reasonable attorneys' fees and litigation expenses pursuant to Tenn. Code Ann. §47-18-109(e)(1).

203.    As a result of the above-describe unfair and deceptive acts and practices by the Lowe's Individual Defendants, FCG has suffered damage as described herein and in an amount to be proven at trial, which amount is expected to be no less than $6,402,151.49.

204.    Lowe's is legally responsible for the above-described conduct of Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews committed the above-described fraud, they were acting in the course and scope of their employment with Lowe's.

**Count XI**
**Conversion Against Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and**
**Matthews**

205.    FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 204 above.

206.    As described more fully herein, Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews caused invoices and/or other requests for payment to be submitted to FCG for supplies and materials that were unnecessary or exceeded the volume necessary to perform the construction projects for which they were being supplied and/or that were at artificially inflated prices.

207.    FCG paid these invoices in full.

208.    Lowe's had no right to payments from FCG for supplies and materials that Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews knew were unnecessary for the underlying construction project or in excess of the amount need to complete the project and/or were at artificially inflated prices.

209.    Lowe's has no right to retain deposits paid by FCG for supplies and materials Lowe's did not provide.

210.    By causing FCG to pay amounts to which Lowe's was not entitled, Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews intentionally exercised dominion and control over, and appropriated for their own use and benefit, FCG's money in violation of its rights.

211.    As a result of the above-described misappropriation and conversion by Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews, they enriched themselves by obtaining commissions or other compensation on the supplies and materials they were defrauding

FCG into purchasing pursuant to the above-described scheme. In addition, Lowe's profited by the above-described scheme by unlawfully obtaining money from FCG for supplies and materials that were unnecessary or excessive for the completion of FCG construction projects and/or were at artificially inflated prices.

212. FCG suffered damage as a result of the misappropriation and conversion by Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and/or Matthews in an amount to be proven at trial, which amount is expected to be no less than $6,402,151.49.

213. Lowe's is legally responsible for the above-described conduct of Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Chevrette, Johnson, Weber, Knowles, and Matthews committed the above-described fraud, he was acting within the course and scope of his employment with Lowe's.

## Count XII
## Breach of Contract Against Lowe's

214. FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 213 above.

215. FCG issued the Kedron Square Purchase Orders to Lowe's, and Lowe's accepted the Kedron Square Purchase Orders.

216. FCG's issuance of the Kedron Square Purchase Orders and Lowe's acceptance of the Kedron Square Purchase Orders formed a legally binding contract according to their terms.

217. FCG complied with the Kedron Square Purchase Orders by paying deposits to Lowe's on account of the Kedron Square Purchase Orders in the amount of $2,230,298.07. However, of the $2,230,298.07 in deposits FCG has paid to Lowe's, Lowe's has only delivered material totaling $520,713.03.

218. Lowe's has not supplied all of the materials specified in the Kedron Square Purchase Orders.

219. When Lowe's did not supply all of the materials specified in the Kedron Square Purchase Orders, FCG requested Lowe's to return the $1,709,585.04 in deposits Lowe's is holding toward the Kedron Square Purchase Orders, but Lowe's has refused to do so.

220. Lowe's refusal to return the $1,709,585.04 in deposits Lowe's is holding toward the Kedron Square Purchase Orders is a material breach of the Kedron Square Purchase Orders.

221. As a result of Lowe's material breach of the Kedron Square Purchase Orders, FCG has incurred damages in the principal amount of $1,709,585.04 .

222. FCG issued the Green Lea Purchase Orders to Lowe's, and Lowe's accepted the Green Lea Purchase Orders.

223. FCG's issuance of the Green Lea Purchase Orders and Lowe's acceptance of the Green Lea Purchase Orders formed a legally binding contract according to their terms.

224. FCG complied with the Green Lea Purchase Orders by paying deposits to Lowe's on account of the Green Lea Purchase Orders in the amount of $2,337,834.76. However, of the $2,337,834.76 in deposits FCG has paid to Lowe's, Lowe's has only delivered materials or issued FCG credits totaling $1,177,130.25.

225. Lowe's has not supplied all of the materials specified in the Green Lea Purchase Orders.

226. When Lowe's did not supply all of the materials specified in the Green Lea Purchase Orders, FCG requested Lowe's to return the $1,160,704.51 in deposits Lowe's is holding toward the Green Lea Purchase Orders, but Lowe's has refused to do so.

227. Lowe's refusal to return the $1,160,704.51 in deposits Lowe's is holding toward the Green Lea Purchase Orders is a material breach of the Green Lea Purchase Orders.

228. As a result of Lowe's material breach of the Green Lea Purchase Orders, FCG has incurred damages in the principal amount of $1,160,704.51.

**Count XIII**
**Unjust Enrichment Against Lowe's**

229. FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 228 above.

230. Of the $2,230,298.07 FCG paid Lowe's toward the Kedron Square Purchase Orders, Lowe's has only delivered $520,713.03 in materials. As a result, Lowe's is holding $1,709,585.04 of FCG's money for materials Lowe's did not deliver to the Kedron Square Cottages project. Of the $2,337,834.76 FCG paid Lowe's toward the Green Lea Purchase Orders, Lowe's has only delivered materials or issued FCG credits totaling $1,177,130.25. As a result, Lowe's is holding $1,160,704.51 of FCG's money for materials Lowe's did not deliver to the Green Lea project.

231. FCG's payment to Lowe's of $1,709,585.04 for materials Lowe's did not deliver to the Kedron Square Cottages project and FCG's payment to Lowe's of $1,160,704.51 for materials Lowe's did not deliver to the Green Lea project conferred a benefit on Lowe's.

232. Lowe's has appreciated the above-described benefit FCG has conferred upon it by keeping the $1,709,585.04 FCG paid Lowe's for materials Lowe's did not deliver to the Kedron Square Cottages project and keeping the $1,160,704.51 FCG paid Lowe's for materials Lowe's did not deliver to the Green Lea project t.

233. The value of the above-described benefit FCG conferred upon Lowe's is the $1,709,585.04 FCG paid Lowe's for materials Lowe's did not deliver to the Kedron Square

Cottages project and the $1,160,704.51 FCG paid Lowe's for materials Lowe's did not deliver to the Green Lea project, for a total benefit of $2,870,289.55.

234.    Equity will not countenance Lowe's retention of such benefit without payment to Lowe's for the value thereof.

235.    To the extent the Court finds there to be no express contract between FCG and Lowe's governing the Kedron Square Purchase Orders and Green Lea Purchase Orders, FCG is entitled to recover from Lowe's $2,870,289.55 under the Tennessee common law cause of action of unjust enrichment.

## Count XIV
## Declaratory Judgment Against Lowe's

236.    FCG incorporates herein by reference the allegations contained in Paragraphs 1 through 235 above.

237.    As described above, there is a dispute between FCG and Lowe's over whether FCG owes Lowe's any amount whatsoever.

238.    The above-described dispute between FCG and Lowe's is an actual, bona fide, present, definite, and substantial justiciable controversy, seeking specific relief through conclusive judgment or decree, touching on the adverse legal interests of FCG and Lowe's, which is ripe for adjudication.

239.    Pursuant to 28 U. S. C. § 2201, FCG is entitled to a judgment declaring that FCG does not owe FCG any amount whatsoever.

240.    If the Court does not exercise its discretionary authority to declare the rights and legal responsibilities of FCG and Lowe's on this issue FCG would suffer harm. Without a declaratory judgment on the above-described controversy, Lowe's is likely to continue to assert

its claim against FCG, the validity of such claim would not be adjudicated, and FCG would not be permitted to order its affairs knowing that the claim has no merit.

241.    If the Court exercises its discretionary authority to declare the validity (or as FCG believes, the lack thereof) of Lowe's claim, FCG would be permitted to order its affairs accordingly.

## PRAYER FOR RELIEF

FCG respectfully prays for the following relief:

1.    That the Court enter a Temporary Restraining Order and/or Temporary Injunction enjoining Defendants from moving or transferring any funds obtained from the above-described conduct;

2.    That the Court award FCG a judgment against all Defendants, jointly and severally, for all damages to which FCG is entitled as a result of their RICO violations and civil conspiracy, in an amount to be proven at trial, which damages are estimated to be no less than $8,297,469.19;

3.    That the Court award FCG a judgment against Shore and JWSC, jointly and severally, for all damages to which FCG is entitled as a result of their fraud and conversion, in an amount to be proven at trial, which damages are estimated to be no less than $8,297,469.19;

4.    That the Court award FCG a judgment against Shore for all damages to which FCG is entitled as a result of his breach of his duty of loyalty to FCG, in an amount to be proven at trial, which damages are estimated to be no less than $8,297,469.19;

5.    That the Court award FCG a judgment against HYDS, Meadows, and Heath, jointly and severally, for all damages to which FCG is entitled as a result of their fraud and conversion, in an amount to be proven at trial, which damages are estimated to be no less than $1,895,317.70;

6. That the Court award FCG a judgment against HYDS, Meadows, and Heath, jointly and severally, for treble the actual damages FCG suffered as a result of their violation of Tennessee Consumer Protection Act;

7. That the Court award FCG a judgment against HYDS, Meadows, and Heath, jointly and severally, in an amount shown at trial for FCG's reasonable attorneys' fees and litigation expenses pursuant to Tenn. Code Ann. §47-18-109(e)(1);

8. That the Court award FCG a judgment against Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews, jointly and severally, for all damages to which FCG is entitled as a result of their fraud and conversion, in an amount to be proven at trial, which damages are estimated to be no less than $6,402,151.49;

9. That the Court award FCG a judgment against Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews, jointly and severally, for treble the actual damages FCG suffered as a result of their violation of Tennessee Consumer Protection Act;

10. That the Court award FCG a judgment against Lowe's, Bingham, Chevrette, Johnson, Weber, Knowles, and Matthews, jointly and severally, in an amount shown at trial for FCG's reasonable attorneys' fees and litigation expenses pursuant to Tenn. Code Ann. §47-18-109(e)(1);

11. That the Court award FCG a judgment against Lowe's for breach of contract or, in the alternative, unjust enrichment in the amount of $2,870,289.55;

12. That the Court issue a judgment declaring that FCG owes Lowe's no amount whatsoever;

13. That the Court award FCG punitive damages from and against the Defendants in an amount to be determined by the Court;

14.    That the Court award FCG a judgment against the Defendants, jointly and severally, for FCG's reasonable attorneys' fees, litigation expense, and costs;

15.    That the Court award FCG a judgment against the Defendants, jointly and severally, for pre- and post-judgment interest on all amounts to which FCG is entitled;

16.    That the Court empanel a jury to try this action; and

17.    That the Court award FCG further relief as it may deem appropriate.


Respectfully submitted,


/s/ Todd E. Panther
Todd E. Panther (BPR #014438)
Christopher C. Sabis (BPR #030032)
Thomas B. Hall (BPR #036186)
SHERRARD ROE VOIGT & HARBISON, PLC
150 Third Ave South, Suite 1100
Nashville, TN  37201
(615) 742-4200 - telephone
(615) 742-4539 - fax
tpanther@srvhlaw.com
csabis@srvhlaw.com

*Attorneys for Franklin Construction Group, LLC*