# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **FRANKLIN CONSTRUCTION GROUP, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:24-cv-01255** |
| ) | **JURY DEMAND** |
| **WILLIAM SHORE, JWSC, LLC, KEITH** ) | |
| **MEADOWS, JOSEPH HEATH, HYDS, INC.,** ) | **Judge Waverly D. Crenshaw, Jr.** |
| **DEAN BINGHAM, LUNDON JOHNSON,** ) | **Magistrate Judge Jeffery S. Frensley** |
| **TYLER WEBER, JOEL CHEVRETTE,** ) | |
| **DANNY KNOWLES, SCOTT MATTHEWS,** ) | |
| **and LOWE'S HOME CENTERS, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT DEAN BINGHAM'S MOTION TO DISMISS

---

Plaintiff respectfully asks this Court to deny the Motion to Dismiss filed by Defendant Dean Bingham.

## I.    BACKGROUND AND ALLEGED FACTS

The facts of this matter are laid out in detail in the Complaint and attachments thereto. Herein, Plaintiff briefly summarizes the facts of this case and the facts that specifically relate to Defendant Bingham's Motion to Dismiss.[1]

From at least 2021 to 2023, the defendants in this case worked in concert to execute a tremendous and purposeful fraud on Plaintiff, which caused millions of dollars in damage. Comp., at ¶ 1. Defendant Shore was employed by Plaintiff, a building and construction company. *Id.* at ¶¶

---

[1] Plaintiff is responding separately to seven motions to dismiss by various individual defendants and defendant groups.

1

2, 7. Defendant HYDS is a construction materials supplier, with Defendant Meadows holding himself out as the public owner of Defendant HYDS and Defendant Heath holding himself out as the CEO. *Id.* at ¶ 37. Defendants HYDS, Meadows and Heath (collectively the "HYDS Defendants") inflated the price of goods bought and delivered to Plaintiff, diverted a substantial portion of these goods to Defendant Shore's secret side projects, and enriched themselves by doing so. *Id.* at ¶¶ 3, 130-31. The HYDS Defendants introduced Defendant Shore to the Lowe's Individual Defendants (Defendants Bingham, Johnson, Weber, Chevrette, Knowles, and Matthews) as part of their scheme to defraud Plaintiff. *Id.* at ¶¶ 74, 75. Defendant Shore and the Individual Lowe's Defendants instituted a fraud through which Defendant Shore provided material estimates to Defendant Lowe's for the projects he himself requested on behalf of Plaintiff, inflated the prices that Plaintiff paid in furtherance of these projects, and diverted the goods purchased by Plaintiff to Defendant Shore for his own personal use. *Id.* at ¶ 4. The HYDS Defendants and the Lowe's Individual Defendants often worked together to perpetuate the fraud on Plaintiff. *Id.* at ¶¶ 102, 110. The defendants have taken various steps to cover up their fraudulent activities. *See id.* at ¶¶ 98, 100, 101.

Some of the allegations against Defendant Bingham specifically include that he, as part of the overall scheme and in concert with the other defendants, worked with Defendant Shore to provide fraudulent estimates and cover them up, *id.* at ¶¶ 74, 75 ("On December 9, 2020, Meadows and Heath expanded their fraudulent conspiracy with Shore to include Lowe's Individual Defendant Bingham when Heath introduced Shore to Bingham by email stating, 'I have add my good friend Dean from Lowe's on this email they can save you lots of money on projects send him over anything you have and see what he can do for you.' Once Meadows and Heath connected Shore with Bingham, Shore was able to further defraud Plaintiff by acting in concert with Bingham

2

and other Lowe's Individual Defendants."); paid fraudulent kickbacks and accepted "commissions and fees," *id.* at ¶ 86 ("Bingham paid Shore or JWSC $36,500.00 in fraudulent kickbacks"); invoiced for products that would be used at Defendant Shore's secret side projects, *id.* at ¶ 91 ("Mr. Fitzgerald sent Bingham an email on February 11, 2022, stating, 'This is one of Wills [meaning Shore's] side projects they have a question.' The email concludes with a February 17, 2022 email from Shore to Bingham stating, 'I only need floor truss quote. We are stick framing roof system.' Despite Bingham's knowledge that the floor trusses for which Lowe's was obtaining a quote were for Shore's side project, Lowe's invoiced FCG for them, and FCG paid them."); and fraudulently inflated the price of sinks*, id.* at ¶ 102 ("Lowe's Individual Defendant Bingham further conspired with Shore, Meadows, and Heath to defraud FCG by Shore issuing purchase orders to HYDS for Lowe's materials at a cost to FCG that was well above market pricing. For example, on August 30, 2021, Bingham sent Heath an email with a quote, which included a profit mark-up by Lowe's, for 'Franklin's sinks,' which HYDS marked up again before invoicing FCG for the sinks.").

## II.     STANDARD OF REVIEW

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff." *Solomon v. Solomon*, No. 3:21-cv-00498, 2022 WL 610825, at *2 (M.D. Tenn. Mar. 1, 2022). A complaint is sufficient when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) . "[T]he standard on a motion to dismiss is not whether Plaintiff can prove his claim, but whether he has alleged facts [] from which the court can reasonably infer the defendant is liable for the alleged conduct." *Stanton v. Joyner*, No. 3:19-cv-00270, 2021 WL 4480508, at *9 (M.D. Tenn. Sept. 30,

3

2021). "Thus, dismissal is appropriate only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Solomon*, 2022 WL 610825, at *2 (quotation omitted). The moving party has the burden of proving that no claim exists. *Pinnacle Bank v. Fid. & Deposit Co.*, 598 F. Supp. 3d 666, 670 (M.D. Tenn. 2022).

Fed. R. Civ. P. 9(b) states that "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Defendant Bingham asserts that the heightened "particularity" pleading standard in Rule 9(b) applies to Plaintiff's RICO, fraud, and TCPA claims. However, "[i]n the Sixth Circuit, in order to prevail on a motion to dismiss under Rule 12(b)(6) premised solely on non-compliance with the heightened pleading standards of Rule 9(b)—as opposed to the more lenient, general standard of Rule 8—a defendant must have previously filed a motion under Rule 12(e) for a more definite statement." *PSC Indus., Inc. v. Johnson*, No. 3:19-CV-00362, 2021 WL 1663574, at *14 (M.D. Tenn. Apr. 28, 2021) (collecting cases and declining to apply Rule 9(b)). None of the defendants in this case have filed a Rule 12(e) motion. Therefore, dismissal under Rule 9(b) would be inappropriate. *See e.g.*, *Legge v. Wagner*, 7 F.3d 234 (Table) (6th Cir. 1993) ("This court has noted that in the absence of a defendant's motion for a more definite statement under Rule 12(e), dismissal on the sole basis of a plaintiff's failure to comply with Rule 9(b) is inappropriate."); *Trubiano v. Fed. Nat. Mortg.*, No. 09-11968, 2010 WL 1438979, at *2 (E.D. Mich. Apr. 9, 2010) ("[I]n the absence of Defendants' motion for a more definite statement, dismissal for failure to satisfy Rule 9(b) is not appropriate.").

If the Court does find that Rule 9 applies, "even when a plaintiffs RICO allegations fail to satisfy the particularity requirement, the Court may allow discovery to proceed under Fed. R. Civ. P. 11(b)(3)." *Arnold v. Petland, Inc.*, No. 2:07-CV-01307, 2009 WL 816327, at *4 (S.D. Ohio

4

Mar. 26, 2009); *see also McLearn v. Wyndham Resort Dev. Corp.*, No. 3:19-CV-00004, 2020 WL 1189844, at *4 n.11 (M.D. Tenn. Mar. 11, 2020) ("Courts may relax Rule 9(b)'s particularity requirement when certain information is solely within the defendants' knowledge.").[2]

## III.   LEGAL ANALYSIS

### A.   <u>Plaintiff has met the pleading requirements for its state law claims.</u>

#### 1.   Plaintiff has more than adequately pled its claim for civil conspiracy (Count II).

"An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." *Carroll v. TDS Telecomms. Corp.*, No. 1:17-CV-01127-STA-EGB, 2017 WL 6757566, at *8 (W.D. Tenn. Dec. 29, 2017) (quoting *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002)).  Broken down into distinct elements, sustaining a claim of civil conspiracy requires allegations of "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

"[T]here is no higher burden upon Plaintiff for pleading a civil conspiracy claim. Plaintiff must merely meet the requirements of *Twombley* and *Iqbal*." *Carroll*, 2017 WL 6757566, at *10. Plaintiff has met its burden by specifically alleging, among other things, that the defendants worked together to pay Defendant Shore kickbacks for defrauding Plaintiff into purchasing

---

[2] Though not required, Plaintiff has specifically pled certain information held by the defendants that it does not have, that Plaintiff believes would further show the fraudulent scheme. *See e.g.*, Compl., at ¶¶ 98-99, 101, 104, 109.

5

unnecessary supplies and for the other defendants to unlawfully obtain money from the fraudulently procured sales of their goods. (*See e.g.*, Complaint, ¶¶ 116, 130-31).

### 2. Plaintiff has more than adequately pled its claims for fraud and violation of the Tennessee Consumer Protection Act (Counts IX and X).

As aforementioned, none of the defendants have previously filed a motion under Rule 12(e) for a more definite statement. Therefore, dismissal for failure to satisfy Rule 9(b) is not appropriate. *See e.g.*, *Legge*, 7 F.3d at 234. Notwithstanding the foregoing, Plaintiff has more than satisfied the heightened "particularity" pleading standard in Rule 9(b) and the notice pleading required by Rule 8.

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 664–65 (M.D. Tenn. 2022) (quotation omitted). The Sixth Circuit has explained, however, that while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading[.]

*Id.* (quoting *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008)). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* (quotation omitted).

6

"Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). Nevertheless, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

Defendant Bingham argues that Plaintiff's fraud claims (including its RICO claim, discussed more below) and claims for violation of the Tennessee Consumer Protection Act fail to satisfy Rule 9(b) because they rely on general allegations against the group of defendants as opposed to individual defendants, and with claims against multiple defendants, "[m]ere group pleading fails to meet Rule 9(b)'s specificity requirements." *Constr. Mgmt. Inc. v. Expo Hospitality, LLC*, No. 3:19-cv-00298, 2019 WL 2917991, at *5 (M.D. Tenn. July 8, 2019) (quotation omitted). It is true, in order to effectively plead fraud, that "a plaintiff must identify, at least generally, 'who [is alleged to have] made particular misrepresentations and when they were made.'" *Id.* (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992)). But as the *Construction Management* court recognized, the argument in that case was that the complaint referred to the defendants collectively "without identifying fraudulent actions attributable to any of them specifically." *Id.* at *4. In that circumstance, the court dismissed the RICO claims at issue because, while a plaintiff may not know what happened behind the closed doors of a conspiracy, "it should at least be able to assert clearly what each man did or did not say

7

to [the plaintiff]." *Id.* at *5. *Cf. Mitchell v. Owens*, No. 12-2859, 2013 WL 2422629, at *8 (W.D. Tenn. June 3, 2013) (dismissing RICO claims under Rule 9(b) where the plaintiff "fail[ed] to identify any false statement allegedly made by any defendant nor much less the time and date of any false representation," but "merely cite[d] the elements of a cause of action for fraud and include[d] no factual allegations").

But a defendant is not permitted to "cherry-pick" more generalized allegations from a complaint while ignoring specific allegations in order to support a Rule 9(b) argument. *See George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255-57 (10th Cir. 2016) (holding that specific allegations against one RICO defendant, while relatively sparce, "taken as a whole" with the allegations about other defendants and the scheme more generally, "sufficiently appraised [the defendant] of its alleged role in the overall scheme"). Even if a plaintiff's allegations leave room for individual defendants to have "acted in different capacities and those differences may ultimately impact the determination of whether a particular Defendant only participated in his own affairs . . . that is a matter to be fleshed out in discovery and to be resolved through motion practice or by the jury," not at the motion to dismiss stage. *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012) (reversing dismissal of RICO claim).

Moreover, requiring every allegation in a RICO complaint to be specific to an individual defendant would be impractical and contrary to the Federal Rules of Civil Procedure. In ruling on a Rule 9(b) motion, "a court must consider the policy of simplicity in pleading found in Fed. R. Civ. P. 8." *Beard v. Worldwide Mortg. Corp.*, 354 F. Supp. 2d 789, 799 (W.D. Tenn. 2005) (Donald, J.) (citing *Michaels Bldg. Co.*, 848 F.2d at 679); *see also Bond*, 587 F. Supp. 3d at 664–65 (M.D. Tenn. 2022) (citing *Ford Motor Co.*, 532 F.3d at 504). "Rule 8 requires the plaintiff to provide a 'short and plain statement of the claim' and 'simple, concise, and direct' allegations."

8

*Beard*, 354 F. Supp. 2d at 799 (quoting Fed. R. Civ. P. 8). "The principal purpose for the Fed. R. Civ. P. 9(b) particularity requirement, when considered in context with Fed. R. Civ. P. 8, is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading." *Id.* (citing *Michaels Bldg. Co.*, 848 F.2d at 679); *see also Bond*, 587 F. Supp. 3d at 664 (quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)); *Michaels Bldg. Co.*, 848 F.2d at 680).

Furthermore, while plaintiffs alleging fraud must plead with particularity, "Rule 9(b)'s particularity requirement may be relaxed when certain information is solely within the defendant's knowledge." *Constr. Mgmt. Inc.*, 2019 WL 2917991, at *4 (quoting *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 630 (N.D. Ohio 2016)). This is because "fraud often involves subterfuge and misdirection that may leave a victim in the dark about many of the details of a scheme, even after he realizes he has been defrauded." *Id.*; *see also Beard*, 354 F. Supp. 2d at 799 ("an exception to the particularity requirement of Fed. R. Civ. P. 9(b) exists when the relevant facts 'lie exclusively within the knowledge and control of the opposing party') (quoting *Wilkins Iex rel. U.S. v. Ohio*, 885 F. Supp. 1055, 1061 (S.D. Ohio 1995)).

The Complaint includes many specific allegations regarding Defendant Bingham and the other Lowe's Individual Defendants' involvement in this illegal scheme, including examples of specific instances of fraudulent estimations, purchases, and kickbacks in paragraphs 73-109 of the Complaint. These examples often specifically mention Defendant Bingham and the other Lowe's Individual Defendants. A few examples include (emphases added):

- "Among the fraudulent mechanisms Shore and one or more of the Lowe's Individual Defendants employed was for Lowe's to engage Shore or JWSC as an independent contractor to perform "estimating" for Lowe's. By engaging Shore or JWSC to perform estimates for Lowe's, the Lowe's Individual Defendants secured Shore's loyalty to Lowe's, rather than Shore's employer, FCG, which breached the duty of loyalty Shore owed FCG. The supposed estimating services by Shore or JWSC were a fictitious scheme used to

9

provide Shore or JWSC monetary kickbacks for the material purchases, which Shore was fraudulently funneling to Lowe's and which one or more of the Lowe's Individual Defendants knew were fraudulent." Compl., at ¶¶ 76-77, 79.

- "On FCG's Union Brick project, Shore was not the project manager on that project and should not have had any involvement in it whatsoever. However, unbeknownst to FCG at the time, ___ When Lowe's estimate (which was really Shore's estimate) was provided to FCG, FCG had questions about it and asked to set up a call with Lowe's estimator (not knowing, of course, that it was really Shore). **Knowing that their estimating scheme would be exposed if Shore spoke with FCG's project management about the Union Brick estimate, Shore and the Individual Lowe's Defendants who participated in this scheme arranged for FCG's project management to speak with a dummy estimator about the estimate. It was obvious from the dummy estimator's inability to answer FCG's questions that he knew little to nothing about the estimate. However, it was not until FCG found the email on Shore's computer, in which Bingham and Weber asked Shore for a lumber estimate on the Union Brick project, that FCG realized Lowe's "estimator" who they spoke with was unable to answer their questions because he did not prepare the estimate. Shore did."** *Id.* at ¶ 80(i).

- "**Bingham paid Shore or JWSC $36,500.00 in fraudulent kickbacks** . . . Those records also show that Shore or JWSC made instant Zelle payments to Bingham for 'commissions & fees' of at least $31,650.00." *Id.* at ¶ 86.

- "**On February 4, 2022**, a Lowe's employee named James Fitzgerald sent an email to Lowe's truss supplier, Tennessee Building Components, stating, "I have a side project that is looking for a full quote when available. This is a separate customer from our other projects." As the email chain progressed, **Mr. Fitzgerald sent Bingham an email on February 11, 2022, stating, "This is one of Wills [meaning Shore's] side projects they have a question." The email concludes with a February 17, 2022 email from Shore to Bingham stating, "I only need floor truss quote. We are stick framing roof system." Despite Bingham's knowledge that the floor trusses for which Lowe's was obtaining a quote were for Shore's side project, Lowe's invoiced FCG for them, and FCG paid them."** *Id.* at ¶ 91.

- "**Lowe's Individual Defendant Bingham further conspired with Shore, Meadows, and Heath to defraud FCG by Shore issuing purchase orders to HYDS for Lowe's materials at a cost to FCG that was well above market pricing. For example, on August 30, 2021, Bingham sent Heath an email with a quote, which included a profit mark-up by Lowe's, for "Franklin's sinks," which HYDS marked up again before invoicing FCG for the sinks.** As another example, on April 21, 2023, Shore issued HYDS FCG Purchase Order No. 119 for Lowe's proprietary light fixtures in the amount of $30,000.00, which FCG paid in full. By Shore arranging for FCG to purchase the light fixtures from HYDS, which purchased them from Lowe's, Lowe's and HYDS both profited from the light fixtures while FCG paid above-market prices. Contemporaneously with this purchase order, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $23,718.85, and that invoice and

payment is expressly identified on Shore's Invoice and Payment detail as being on account of FCG Purchase Order No. 119. In comparison to the $30,000.00 FCG paid for the Lowe's light fixtures, the market contractor cost of those same light fixtures is less than $15,000.00." *Id.* at ¶ 102.

As set out in the Complaint,  the Individual Lowe's Defendants purposefully and willfully misrepresented the source of the estimation services provided to Plaintiff in regard to the various projects overseen by Defendant Shore. *Id.* at ¶ 198. Defendant Shore performed the estimation services, the Individual Lowe's Defendants knew this, they passed off these estimates as legitimate, and they represented that Defendant Shore's estimates were performed by an unrelated third party. *Id*. In reliance upon these acts, Plaintiff unknowingly paid for millions of dollars' worth of materials that either did not exist or were delivered to a project site owned by Defendant Shore. Accordingly, Plaintiff has pled fraud and violation of the Tennessee Consumer of Protection Act with more than enough specificity to put Defendant Bingham on notice as to the nature of the claims.

### 3. Plaintiff's claims for violation of the Tennessee Consumer Protection Act are timely (Count X).

"[A] motion to dismiss is 'generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations.'" *Lindsey v. Collier*, 606 F. Supp. 3d 769, 773 (M.D. Tenn. 2022) (citations omitted). "This is because the statute of limitations is an affirmative defense, for which the defendant bears the burden of proof . . . a motion to dismiss on statute of limitations grounds should only be granted if the allegations in the complaint affirmatively show that the claim is time-barred." *Id.*

Though Defendant Shore was terminated in September of 2023, at that time, Plaintiff had no knowledge of any malfeasance. Plaintiff simply believed that Defendant Shore had performed his job duties poorly and even gave him a generous severance package to soften the blow of

11

termination. Complaint, at ¶ 35. It was not until after Defendant Shore's termination that Plaintiff discovered financial irregularities and began investigating the documentation left behind by Defendant Shore. *Id.* at ¶ 36. Indeed, Plaintiff did not become aware, nor should have become aware, of its claims against Defendant Shore and the other defendants until Larry Grace of Central Century Supply, LLC telephoned a principal of Plaintiff on November 30, 2023, to confirm the fraud that had been perpetrated against Plaintiff. Complaint, ¶ 110. Plaintiff filed the Complaint less than a year later on October 21, 2024. Therefore, Plaintiff's claims for violation of the Tennessee Consumer Protection Act are timely.

### 4. Plaintiff has more than adequately pled its claim for conversion (Count VIII).

Contrary to the defendants' asserted positions, a defendant can convert money—including money in the form of a check. *See PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553-56 (Tenn. Ct. App. 2012) (discussing that money that is specific and capable of identification can be converted; plaintiffs maintained cause of action for conversion of funds against one defendant); *Pomeroy v. McGinnis*, No. E2020-00960-COA-R3-CV, 2021 WL 3017199, at *16–17 (Tenn. Ct. App. July 16, 2021) (conversion of money in the form of checks recognized by the court as being "actionable"); *Colyar v. Taylor*, 41 Tenn. 372, 373-78 (Tenn. 1860) (defendant liable for conversion when he gratuitously undertook to receive $1,500 for the plaintiff and deliver it to him, but instead gave the money to a third party who subsequently lost it); *Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1017 (E.D. Tenn. 2022) (citation omitted) (conversion claim involving money was actionable because "[i]dentifiable funds are deemed a chattel for purposes of conversion" and checks were considered identifiable funds for a specific purpose; the court noted that "to the extent Plaintiffs' claims rest on the conversion of their trade secrets, they must be dismissed"); *Lingham Rawlings, LLC v. Gaudiano*

12

*(In re Lingham Rawlings, LLC)*, Nos. 10-32769, 10-3125, 2013 WL 1352320, at *152 (Bankr. E.D. Tenn. Apr. 3, 2013) (defendant's motion to dismiss plaintiff's conversion claim was denied because the court found that defendant converted plaintiff's funds by paying himself "management fees and reimbursements for loans payable to which he was not entitled"). For money to be the subject of a conversion claim, it must be specific and identifiable, or there must be a determinate sum that the defendant was entrusted to apply to a certain purpose. *See* 90 C.J.S. Trover and Conversion § 16; *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship*, 387 S.W.3d at 553; *Pomeroy*, 2021 WL 3017199, at *16–17.

As pled in the Complaint, the funds converted by the defendants are specific and identifiable, including but not limited to the following specifically pled examples: a fraudulent kick-back of $10,000 related to Purchase Order No. 109, Compl., at ¶ 46; a fraudulent kick-back of $9,125 related to Purchase Order No. 108R, *id.* at ¶ 47; a fraudulent kick-back of $3,750 related to Purchase Order No. 109, *id.* at ¶ 48; a fraudulent kick-back of $2,500 related to Purchase Order No. 113, *id.* at ¶ 49; a fraudulent kick-back of $14,751 related to Purchase Order No. 201, *id.* at ¶ 50; a fraudulent kick-back of $5,000 related to Purchase Order No. 114, *id.* at ¶ 51; a fraudulent kick-back of $10,000 related to Purchase Order No. 04-201, *id.* at ¶ 52; a fraudulent kick-back of $10,000 related to Purchase Order No. 03-201, *id.* at ¶ 53; a fraudulent kick-back of $10,000 related to Purchase Order No. 02-301, *id.* at ¶ 54; a fraudulent kick-back of $10,000 related to Purchase Order No. 506.01-101, *id.* at ¶ 55; a fraudulent kick-back of $40,000 related to Purchase Order No. 504.02-302, *id.* at ¶ 56; a fraudulent kick-back of $15,000 related to Purchase Order No. 02-304, *id.* at ¶ 57; a fraudulent kick-back of $24,000 related to Purchase Order No. 504.02-305, *id.* at ¶ 58; a fraudulent kick-back of $40,000 related to Purchase Order No. 504.02-306, *id.* at ¶ 59); a fraudulent kick-back of $53,000 related to Purchase Order No. 504.02-308 (*Id.* at ¶ 60;

13

$156,970 converted via fictitious Purchase Orders Nos. 504.04-205 and 504.02-309*, id.* at ¶ 66; a fraudulent kick-back of $45,000 related to Change Order No. 002*, id.* at ¶ 67; and fraudulent kickbacks of $13,500.00, $36,500.00 and $18,550.00 related to fraudulent estimation services*, id.* at ¶ 86. As the foregoing amounts are specific and identifiable sums, Plaintiff has adequately pled its claim for conversion of funds.

Furthermore, the Complaint also alleges the conversion of certain materials. As stated in Defendant Matthews' memorandum, the appellate court in Tennessee has identified three ways in which property may be converted: "First, a person may personally dispossess another of tangible personalty. Second, a person may dispossess another of tangible property through the active use of an agent. Third, under certain circumstances, a person who played no direct part in dispossessing another of property, may nevertheless be liable for conversion for receiving a chattel." Memo., at 22 (citing *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Community Development Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012).

After Plaintiff ordered and paid Defendant Lowes for certain materials, it then owned and/or was entitled to the possession of those materials. By changing the delivery addresses for certain materials or otherwise failing to deliver Plaintiff's materials to Plaintiff, Defendant Lowes and the Lowes Individual Defendants dispossessed Plaintiff of tangible property. The Complaint states specific allegations regarding the conversion of materials, a few examples of which are listed below (emphasis added).

- On February 4, 2022, a Lowe's employee named James Fitzgerald sent an email to Lowe's truss supplier, Tennessee Building Components, stating, "I have a side project that is looking for a full quote when available. This is a separate customer from our other projects." As the email chain progressed, Mr. Fitzgerald sent Bingham an email on February 11, 2022, stating, "This is one of Wills [meaning Shore's] side projects they have a question." The email concludes with a February 17, 2022 email from Shore to Bingham stating, "I only need floor truss quote. We are stick framing roof system." **Despite Bingham's knowledge that the floor trusses for which Lowe's was obtaining a quote**

14

were for Shore's side project, Lowe's invoiced FCG for them, and FCG paid them. Compl., at ¶ 91.

- Regarding Shore's secret side project on Cotton Road known as the Ramirez project, on May 10, 2022, FCG's construction accountant noticed that roofing materials on a project identified in the invoice as the Ramirez project were being billed to FCG. When FCG's construction accountant brought this to Shore's attention, Shore notified Weber who replied by email, "Fixing this now!" From this email exchange, **Weber knew that materials on the Ramirez project were not to be billed to FCG.**

  **Communications from Johnson show that he knew the Pella windows were for the Ramirez project.** On November 16, 2022, a Lowe's employee named Ryan Ruddell sent Johnson an email to which he attached an order for Pella windows, and in his cover email message to Johnson, Mr. Ruddell specifically identified the windows for Shore's "Ramirez" project. Johnson then sent a November 17, 2022 email to Shore stating, "Here is the original receipt from the first order on the Ramirez house. It appears there is only 6 windows total on the receipt that show Double Hung style." Given the amount of materials Lowe's was selling to FCG, Johnson was very familiar with which projects were FCG's and which were not. **In his November 17, 2022 email to Shore, Johnson shows his knowledge that the Ramirez project was a "house," and Johnson knew that none of FCG's projects was a house. In addition, Johnson knew that there were no Pella windows on any FCG projects. Yet, the delivery address (804 Branham Road) for the windows is a FCG project address, which Johnson well knew. Despite Johnson's knowledge that the Pella windows were for Shore's secret side project known as the Ramirez house, not an FCG project, Lowe's invoiced FCG for those materials, and FCG paid it.** Id., at ¶¶ 92-93.

- When Weber sent Shore an invoice for materials on the side project at 1143 Maxwell Branch Road to Shore's FCG email address on November 13, 2022, **Shore shot back from a different address, "WTF." When Weber sent Shore another invoice for materials on one of Shore's side projects again to Shore's FCG email address on December 10, 2022, Shore replied from a different address, "WTF and why is it coming to my work email." This vulgarity shows that Shore was angry that the conspiracy he and one or more of the Lowe's Individual Defendants were perpetrating upon FCG was at risk of exposure.**

  Documentation found on Shore's FCG computer for the materials on Shore's Summerset Downs Boulevard and Maxwell Branch Road secret side projects initially show those materials being delivered to the address of the side project. **However, in each of those cases, Shore sent an email to Lowe's which resulted in a communication back from Lowe's that the "Delivery Details Have Been Updated."** Id., at ¶¶ 94-95.

- Certain Lowe's delivery tickets for materials Lowe's billed FCG are further confirmation that materials for which Lowe's was invoicing FCG, and Shore was approving for payment, were not, in fact, received by FCG. **To cover up the fraud Shore and the Lowe's Individual Defendants were perpetrating upon FCG, Lowe's Individual Defendant**

15

**Johnson signed at least twelve (12) delivery receipts, falsely attesting that materials totaling $112,211.40 had been received by FCG, when they were not.** Id., at ¶ 97.

- Like his statement about Shore not "estimating" FCG projects, Knowles's statement that the card was for in-store purchases only was a lie to cover up the fraud that had been perpetrated upon FCG. That lie is revealed from, at the very least, the following information:

    a.      According to Lowe's own records, Shore charged over $1.5 million to the card, which is clearly more than in-store purchases.

    b.      The invoice numbers identified by Lowe's as being associated with the Beechcroft project do not correlate to the invoice numbers of the Lowe's invoices FCG received from Lowe's.

    c.      **Among the purchases on the card are approximately $308,000 for shingles.** That amount of shingles is clearly not from in-store purchases. Also, **Lowe's received separate purchase orders from FCG for shingles on its projects, which FCG paid, revealing that Lowe's knew or should have known that the shingles charged to the card were not for FCG's projects. Yet, Lowe's billed those shingles to FCG, and Shore approved the payment of those bills by FCG.**

    d. **There are $572,000 in materials charged to the card for FCG's Beechcroft project. However, FCG already had a legitimate Lowe's Pro Supply card for the Beechcroft project. . .** Id., at ¶ 100.

- Lowe's Individual Defendant Bingham further conspired with Shore, Meadows, and Heath to defraud FCG by Shore issuing purchase orders to HYDS for Lowe's materials at a cost to FCG that was well above market pricing. For example, on August 30, 2021, Bingham sent Heath an email with a quote, which included a profit mark-up by Lowe's, for "Franklin's sinks," which HYDS marked up again before invoicing FCG for the sinks. **As another example, on April 21, 2023, Shore issued HYDS FCG Purchase Order No. 119 for Lowe's proprietary light fixtures in the amount of $30,000.00, which FCG paid in full. By Shore arranging for FCG to purchase the light fixtures from HYDS, which purchased them from Lowe's, Lowe's and HYDS both profited from the light fixtures while FCG paid above-market prices. Contemporaneously with this purchase order, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $23,718.85, and that invoice and payment is expressly identified on Shore's Invoice and Payment detail as being on account of FCG Purchase Order No. 119. In comparison to the $30,000.00 FCG paid for the Lowe's light fixtures, the market contractor cost of those same light fixtures is less than $15,000.00.** Id., at ¶ 102.

- Based upon all documentation available to date, because of the above described fraud and conspiracy between Shore and the Lowe's Individual Defendants, FCG has suffered damages with respect to FCG's Beechcroft project of $3,531,831.94.

With respect to FCG's Kedron Square Cottages project, FCG issued FCG Purchase Order Nos. 101, 101R1, 104, 110, 111, 112, 112r1, and 113 to Lowe's on or around the dates shown each of the purchase orders and accepted Lowe's Quote 11413056-00 ("Kedron

16

Square Purchase Orders"). True and authentic copies of the Kedron Square Purchase Orders are attached as collective Exhibit 1. **FCG paid deposits to Lowe's on account of the Kedron Square Purchase Orders in the amount of $2,230,298.07. However, of the $2,230,298.07 in deposits FCG has paid to Lowe's, Lowe's has only delivered $520,713.03 in materials. As a result, Lowe's owes FCG $1,709,585.04, which is the amount FCG has paid Lowe's for materials on the Kedron Square Cottages project that Lowe's did not deliver.**

With respect to FCG's Green Lea project, FCG issued FCG Purchase Order Nos. 504.02.101, 504.03.101, 504.03.102, 504.03.103, 504.04.101, 504.04.102, and 504.04.103 to Lowe's on or around the dates shown each of the purchase orders ("Green Lea Purchase Orders"). True and authentic copies of the Green Lea Purchase Orders are attached as collective Exhibit 2. **FCG paid deposits to Lowe's on account of the Green Lea Purchase Orders plus Lowe's invoices 10719876-00 and 10719883-00 for which FCG did not issue purchase orders in the amount of $2,337,834.76. However, of the $2,337,834.76 in deposits FCG has paid to Lowe's, Lowe's has only delivered materials or issued FCG credits totaling $1,177,130.25. As a result, Lowe's owes FCG $1,160,704.51, which is the amount FCG has paid Lowe's for materials on the Green Lea project that Lowe's did not deliver.** Id., at ¶¶ 105-107.

As the foregoing examples demonstrate how the defendants dispossessed Plaintiff of tangible property, Plaintiff has adequately pled its claim for conversion.

### B. Plaintiff has stated a RICO claim sufficient to survive a motion to dismiss.

"To state a RICO claim, a plaintiff must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Ouwinga*, 694 F.3d at 791 (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006)). "RICO pleadings are to be liberally construed." *Greer v. Home Realty Co. of Memphis, Inc.*, No. 07-2639, 2008 WL 11318325, at *7 (W.D. Tenn. Aug. 7, 2008) (citing *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000); *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985)). In considering a RICO action, the Supreme Court has stated that Rule 11 grants "flexibility…allowing pleadings based on evidence reasonably anticipated after further investigation or discovery." *Rotella v. Wood*, 528 U.S. 549, 560 (2000).

17

Defendant Bingham challenges Plaintiff's allegations of an "enterprise." The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4). The Supreme Court has emphasized that the word "enterprise" in the RICO statute should be interpreted broadly:

> The statute does not specifically define the outer boundaries of the "enterprise" concept but states that the term "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). This enumeration of included enterprises is obviously broad, encompassing "any ... group of individuals associated in fact." *Ibid.* (emphasis added). The term "any" ensures that the definition has a wide reach, *see, e.g.*, *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218 – 219, 128 S. Ct. 831, 833, 169 L. Ed. 2d 680 (2008), and the very concept of an association in fact is expansive. In addition, the RICO statute provides that its terms are to be "liberally construed to effectuate its remedial purposes." § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961; *see also, e.g.*, *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 257, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994) ("RICO broadly defines 'enterprise' "); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S. Ct. 3275, 87 L. Ed. 2d 346(1985) ("RICO is to be read broadly"); *Russello v. United States*, 464 U.S. 16, 21, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) (noting "the pattern of the RICO statute in utilizing terms and concepts of breadth").

> In light of these statutory features, we explained in *Turkette* that "an enterprise includes any union or group of individuals associated in fact" and that RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S., at 580, 583, 101 S. Ct. 2524. Such an enterprise, we said, "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*, at 583, 101 S. Ct. 2524.

*Boyle v. United States*, 556 U.S. 938, 944–45 (2009).

"In order to establish the existence of an 'enterprise' under § 1962(c), a plaintiff is required to prove: (1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of

18

racketeering activity in which it engaged." *Ouwinga*, 694 F.3d at 793. Regarding requirement (3), "although the existence of an enterprise is a separate element that must be proved, the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Ouwinga*, 694 F.3d at 794 (quoting *Boyd*, 556 U.S. at 947); *see also Hofstetter v. Fletcher*, 905 F.2d 897, 903 (6th Cir. 1988) ("RICO applies both to legitimate enterprises conducted through racketeering operations as well as illegitimate enterprises. . . . [A]lthough "enterprise" and "pattern of racketeering activity" are separate elements, they may be proved by the same evidence.") (internal citation and quotation marks omitted). "A discrete set of facts is not necessary[.]" *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 792 (E.D. Mich. 2014). Indeed, "An enterprise may have been 'formed solely for the purpose of engaging in the racketeering activity.'" *Laudien v. Caudill*, 92 F. Supp. 3d 614, 620 (E.D. Ky. 2015) (quoting *Slorp v. Lerner, Sampson & Rothfuss*, 587 Fed. Appx. 249, 265 (6th Cir. 2014)).

Defendant Bingham argues that the only "common purpose" pled by Plaintiff is a desire to participate in the fraudulent scheme, but a separate purpose is required. Memo. at 12. Plaintiff has pled more than just a common desire to participate in a fraudulent scheme. Plaintiff pleads that a common purpose of the scheme was to pay Defendant Shore kickbacks and for the defendants to unlawfully obtain money. *See e.g.*, Complaint, at ¶¶ 116, 130-31. The Sixth Circuit recognizes that "[t]he common purpose of making money can support the enterprise element of a RICO conviction." *United States v. Johnson*, 440 F.3d 832, 840 (6th Cir. 2006); *see also Bloodstock Rsch. Info. Servs., Inc. v. Edbain.com, LLC*, 622 F. Supp. 2d 504, 512–13 (E.D. Ky. 2009) ("The enterprise had a common purpose of monetary gain to [Plaintiff's] detriment.").

District courts in the Sixth Circuit have regularly found that pleading the common purposes of defrauding and obtaining money is more than sufficient to survive a motion to dismiss. *See e.g.*,

*In re Khan*, No. 19-04258, 2023 WL 3746537, at *20 (Bankr. W.D. Mich. May 30, 2023) (refusing to dismiss RICO claim and explaining that "The Trustee alleges that the purpose of the enterprise was to enrich the participants . . . The supposed profiteering associated . . . certainly supplies an age-old purpose for many a criminal enterprise, if that is what the Trustee proves at trial. In other words, '[t]he common purpose of making money can support the enterprise element' in our Circuit." (quoting *Johnson*, 440 F.3d at 840)); *Llewellyn-Jones*, 22 F. Supp. 3d at 792 ("Here, the complaint describes the defendants' specific roles and relationships, and alleges the enterprise functioned since at least 2011 for the common purpose to defraud and obtain money from the plaintiffs. Those allegations are sufficient to plead the element of an enterprise."); *Lopardo v. Lehman Bros.*, 548 F. Supp. 2d 450, 470 (N.D. Ohio 2008) (denying motion to dismiss state RICO claims where there was "a common purpose in hiding [] illegal acts and in laundering money that [the defendant] was allegedly misappropriating from his clients' accounts"); *Liberte Cap. Grp., LLC v. Capwill*, No. 5:99 CV 818, 1999 WL 35818658, at *2 (N.D. Ohio Nov. 22, 1999) ("It is reasonable to infer from the complaint that these three entities were engaged with each other for the common purpose of converting and wrongfully transferring monies held in escrow. . . The plaintiff's complaint therefore alleges the existence of an enterprise.").

 The common purpose of making money is not the only common purpose in the Complaint. As noted above, the defendants also had the common purpose of transferring goods and services, in this case through fraudulent means that enriched each of them. *See e.g.*, Complaint, at ¶¶ 116, 130-31. This is more than sufficient to plead an enterprise at this stage of the litigation. *Nevada-Martinez v. Amhad*, No. 5:15-cv-239, 2016 WL 1559426, at *6-7 (E.D. Ky. Apr. 15, 2016) (finding plaintiff had successfully pled an association-in-fact enterprise with a purpose of "filing immigration applications that have no basis in law or fact . . . for the purpose of generating profits

20

for the Defendants"). They also had the common purpose of inducing Plaintiff to pay fraudulent invoices, which satisfies the requirements of a RICO claim. *See Allstate Ins. Co. v. Lint Chiropractic PC*, 735 F. Supp. 3d 833, 844 (E.D. Mich. 2024) ("Plaintiffs allege that all the predicate acts of mail and wire fraud served the common purpose of inducing Plaintiffs to pay large sums for bogus medical bills."); *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 784 (E.D. Mich. 2015) ("common purpose of submitting false claims").

Indeed, Defendant Bingham's argument is belied by his own purported authority. In *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4279233, at *2 (N.D. Ohio Sept. 10, 2019), the court denied a motion to dismiss, finding, *inter alia*, that the defendants "associated together for the common purpose of expanding the prescription opioid market." The fact that the common purpose in that case "*include[d]* unlawful conduct does not mean the enterprise's common purpose must be unlawful." *Id.* (emphasis in original). Here, Defendant Bingham and the other defendants, as discussed above, had common purposes of engaging in the purchase and sale of goods, through which they made money. Neither of these purposes is illegal in and of itself, but they chose to achieve those purposes through illegal means. This is a quintessential RICO violation.

## IV.  CONCLUSION

For all these reasons, Defendant Bingham's Motion to Dismiss should be denied. If the Court is inclined to grant the Motion to Dismiss, in the alternative, Plaintiff would request that the Court order that Defendant Bingham file a motion under Rule 12(e) and that Plaintiff have the opportunity to amend its Complaint.

21

Dated:  March 3, 2025

Respectfully submitted,

/s/      *Todd E. Panther*
Todd E. Panther (BPR #014438)
Christopher C. Sabis (BPR #030032)
Thomas B. Hall (BPR #036816)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN  37203
(615) 742-4200 - telephone
(615) 742-4539 - fax
tpanther@srvhlaw.com
csabis@srvhlaw.com
thall@srvhlaw.com

*Attorneys for Franklin Construction Group, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this the 3rd day of March, 2025, the foregoing Plaintiff's Response in Opposition to Defendant Bingham's Motion to Dismiss was filed electronically with the Clerk of Court to be served by the Court's electronic filing system upon the parties in this matter.

Scarlett Singleton Nokes
**Sheppard Mullin**
2200 Ross Avenue, Suite Floor 20
Dallas, Texas 75201
469-391-7411
snokes@bradley.com

R. Brandon Bundron
**Bradley Arant Boult Cummings LLP**
1221 Broadway, Suite 2400
Nashville, Tennessee 372023
snokes@bradley.com
bbundren@bradley.com

*Attorneys for Dean Bingham*

Don L. Hearn, Jr.
**Glankler Brown PLLC**
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
dhearn@glankler.com
na@rpnalaw.com

Nicholas P. Roxborough
Joseph C. Gjonola
Nadine Alsaadi
**Roxborough, Pomerance, NYE & Adreani, LLP**
5900 Canoga Avenue, Suite 450
Woodland Hills, California 91467
npr@rpnalaw.com
jcg@rpnalaw.com
na@rpnalaw.com

*Attorneys for Joseph Heath*

Darrick Lee O'Dell
**Spicer Rudstrom, PLLC**
220 Athens Way, Suite 403
Nashville, Tennessee 37228
dodell@spicerfirm.com

Nicholas C. Stevens
Robert J. Uhorchuk
**Spicer Rudstrom, PLLC**
537 Market Street, Suite 203
Chattanooga, Tennessee 37402
nstevens@spicerfirm.com
rju@spicerfirm.com

*Attorneys for Lundon Johnson, Joel Chevrette and Danny Knowles*


Gary C. Shockley
Ryan P. Loofbourrow
Scott D. Carey
**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**
1600 West End Avenue, Suite 2000
Nashville, TN 37203
gshockley@bakerdonelson.com
rloofbourrow@bakerdonelson.com
scarey@bakerdonelson.com

*Attorneys for Lowe's Home Centers, Inc.*


Jerry E. Martin
Matthew Edward McGraw
Seth Marcus Hyatt
**Barret Johnston Martin & Garrison, LLC**
200 31st Avenue North
Nashville, TN 37203
jmartin@barrettjohnston.com
mmcgraw@barrettjohnston.com
shyatt@barrettjohnston.com

*Attorneys for Keith Meadows and HYDS, Inc.*


/s/ Todd E. Panther
Todd E. Panther

24