**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **FRANKLIN CONSTRUCTION GROUP, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:24-cv-01255** |
| ) | **JURY DEMAND** |
| **WILLIAM SHORE, JWSC, LLC, KEITH** ) | |
| **MEADOWS, JOSEPH HEATH, HYDS, INC.,** ) | **Judge Waverly D. Crenshaw, Jr.** |
| **DEAN BINGHAM, LUNDON JOHNSON,** ) | **Magistrate Judge Jeffery S. Frensley** |
| **TYLER WEBER, JOEL CHEVRETTE,** ) | |
| **DANNY KNOWLES, SCOTT MATTHEWS,** ) | |
| **and LOWE'S HOME CENTERS, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS LUNDEN JOHNSON**
**AND DANNY KNOWLES'S MOTION TO DISMISS**

Plaintiff respectfully asks this Court to deny the Motion to Dismiss filed by Defendants Lunden Johnson and Danny Knowles.

## I.     INTRODUCTION AND RELEVANT FACTS

The facts of this matter are laid out in detail in the Complaint and attachments thereto. Herein, Plaintiff briefly summarizes the facts of this case and the facts that specifically relate to Defendants Johnson and Knowles's Motion to Dismiss.[1]

From at least 2021 to 2023, the defendants in this case worked in concert to execute a tremendous and purposeful fraud on Plaintiff, which caused millions of dollars in damage. Compl., at ¶ 1. Defendant Shore was employed by Plaintiff, a building and construction company. *Id.* at ¶¶

---

[1] Plaintiff is responding separately to seven motions to dismiss by various individual defendants and defendant groups.

1

2, 7. Defendant HYDS is a construction materials supplier, with Defendant Meadows holding himself out as the public owner of Defendant HYDS and Defendant Heath holding himself out as the CEO. *Id.* at ¶ 37. Defendants HYDS, Meadows and Heath (collectively the "HYDS Defendants") inflated the price of goods bought and delivered to Plaintiff, diverted a substantial portion of these goods to Defendant Shore's secret side projects, and enriched themselves by doing so. *Id.* at ¶¶ 3, 130-31. The HYDS Defendants introduced Defendant Shore to the Lowe's Individual Defendants (Defendants Bingham, Johnson, Weber, Chevrette, Knowles, and Matthews) as part of their scheme to defraud Plaintiff. *Id.* at ¶¶ 74, 75. Defendant Shore and the Individual Lowe's Defendants instituted a fraud through which Defendant Shore provided material estimates to Defendant Lowe's for the projects he himself requested on behalf of Plaintiff, inflated the prices that Plaintiff paid in furtherance of these projects, and diverted the goods purchased by Plaintiff to Defendant Shore for his own personal use. *Id.* at ¶ 4. The HYDS Defendants and the Lowe's Individual Defendants often worked together to perpetuate the fraud on Plaintiff. *Id.* at ¶¶ 102, 110. The defendants have taken various steps to cover up their fraudulent activities. *See id.* at ¶¶ 98, 100, 101.

Some of the allegations against Defendant Johnson specifically include that he, as part of the overall scheme and in concert with the other defendants, provided materials for Defendant Shore's secret side projects and invoiced Plaintiff, *id.* at ¶ 93

> ("On November 16, 2022, a Lowe's employee named Ryan Ruddell sent Johnson an email to which he attached an order for Pella windows, and in his cover email message to Johnson, Mr. Ruddell specifically identified the windows for Shore's 'Ramirez' project. Johnson then sent a November 17, 2022 email to Shore stating, 'Here is the original receipt from the first order on the Ramirez house. It appears there is only 6 windows total on the receipt that show Double Hung style.' . . . In his November 17, 2022 email to Shore, Johnson shows his knowledge that the Ramirez project was a 'house,' and Johnson knew that none of FCG's projects was a house. In addition, Johnson knew that there were no Pella windows on any FCG projects. . . . Despite Johnson's knowledge that the Pella windows were for Shore's

2

secret side project known as the Ramirez house, not an FCG project, Lowe's invoiced FCG for those materials, and FCG paid it."),

and signed at least 12 false delivery receipts, *id.* at ¶ 97 ("To cover up the fraud Shore and the Lowe's Individual Defendants were perpetrating upon FCG, Lowe's Individual Defendant Johnson signed at least twelve (12) delivery receipts, falsely attesting that materials totaling $112,211.40 had been received by FCG, when they were not."). Some of the allegations against Defendant Knowles include that he deceived Plaintiff regarding whether Defendant Shore was an "estimator," *id.* at ¶¶ 81-85

> ("After FCG terminated Shore and FCG began trying to understand the relationship between Lowe's and Shore, FCG asked the Lowe's Individual Defendants, Knowles and Matthews, if Lowe's had hired Shore to be an 'estimator.' Instead of being honest and forthright with FCG, Knowles and Matthews were deceptive and engaged in a cover-up of the fraud Shore, JWSC, and the other Lowe's Individual Defendants perpetrated on FCG. . . . As FCG continued to seek information on this topic, Matthews finally admitted that Lowe's had paid Shore, through Shore's various side entities, in excess of $100,000 to act as an 'estimator.'"),

and that he told lies related to the credit card Defendant Shore used, *id.* at ¶¶ 99-100

> ("When FCG questioned Knowles about the card, Knowles, in a September 18, 2023 email stated that the card was issued to Shore for in-store purchases only. Like his statement about Shore not 'estimating' FCG projects, Knowles's statement that the card was for in-store purchases only was a lie to cover up the fraud that had been perpetrated upon FCG. . . .").

## II.     STANDARD OF REVIEW

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff." *Solomon v. Solomon*, No. 3:21-cv-00498, 2022 WL 610825, at *2 (M.D. Tenn. Mar. 1, 2022). A complaint is sufficient when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he

3

standard on a motion to dismiss is not whether Plaintiff can prove his claim, but whether he has alleged facts [] from which the court can reasonably infer the defendant is liable for the alleged conduct." *Stanton v. Joyner*, No. 3:19-cv-00270, 2021 WL 4480508, at *9 (M.D. Tenn. Sept. 30, 2021). "Thus, dismissal is appropriate only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Solomon*, 2022 WL 610825, at *2 (quotation omitted). The moving party has the burden of proving that no claim exists. *Pinnacle Bank v. Fid. & Deposit Co.*, 598 F. Supp. 3d 666, 670 (M.D. Tenn. 2022).

Fed. R. Civ. P. 9(b) states that "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Defendants Johnson and Knowles assert that the heightened "particularity" pleading standard in Rule 9(b) applies to Plaintiff's fraud-based claims. However, "[i]n the Sixth Circuit, in order to prevail on a motion to dismiss under Rule 12(b)(6) premised solely on non-compliance with the heightened pleading standards of Rule 9(b)—as opposed to the more lenient, general standard of Rule 8—a defendant must have previously filed a motion under Rule 12(e) for a more definite statement." *PSC Indus., Inc. v. Johnson*, No. 3:19-CV-00362, 2021 WL 1663574, at *14 (M.D. Tenn. Apr. 28, 2021) (collecting cases and declining to apply Rule 9(b)). None of the defendants in this case have filed a Rule 12(e) motion. Therefore, dismissal under Rule 9(b) would be inappropriate. *See e.g.*, *Legge v. Wagner*, 7 F.3d 234 (Table) (6th Cir. 1993) ("This court has noted that in the absence of a defendant's motion for a more definite statement under Rule 12(e), dismissal on the sole basis of a plaintiff's failure to comply with Rule 9(b) is inappropriate."); *Trubiano v. Fed. Nat. Mortg.*, No. 09-11968, 2010 WL 1438979, at *2 (E.D. Mich. Apr. 9, 2010) ("[I]n the absence of Defendants' motion for a more definite statement, dismissal for failure to satisfy Rule 9(b) is not appropriate.").

4

If the Court does find that Rule 9 applies, "even when a plaintiffs RICO allegations fail to satisfy the particularity requirement, the Court may allow discovery to proceed under Fed. R. Civ. P. 11(b)(3)." *Arnold v. Petland, Inc.*, No. 2:07-CV-01307, 2009 WL 816327, at *4 (S.D. Ohio Mar. 26, 2009); *see also McLearn v. Wyndham Resort Dev. Corp.*, No. 3:19-CV-00004, 2020 WL 1189844, at *4 n.11 (M.D. Tenn. Mar. 11, 2020) ("Courts may relax Rule 9(b)'s particularity requirement when certain information is solely within the defendants' knowledge.").[2]

### III. LEGAL ANALYSIS

#### A. <u>RICO</u>[3]

"To state a RICO claim, a plaintiff must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791 (6th Cir. 2012) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006)). "RICO pleadings are to be liberally construed." *Greer v. Home Realty Co. of Memphis, Inc.*, No. 07-2639, 2008 WL 11318325, at *7 (W.D. Tenn. Aug. 7, 2008) (citing *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000); *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985)). In considering a RICO action, the Supreme Court has stated that Rule 11 grants "flexibility…allowing pleadings based on evidence reasonably anticipated after further investigation or discovery." *Rotella v. Wood*, 528 U.S. 549, 560 (2000). Defendants

---

[2] Though not required, Plaintiff has specifically pled certain information held by the defendants that it does not have, that Plaintiff believes would further show the fraudulent scheme. *See e.g.*, Compl., at ¶¶ 98-99, 101, 104, 109.

[3] Defendants Johnson and Knowles complain that Plaintiff has not filed a RICO Case Statement that "is required in this district." Memo., at 12. However, even the case cited by Plaintiff acknowledges that the RICO Case Statement was "court-ordered" and that a court first orders a RICO Case Statement from a plaintiff. *See Wyndham Vacation Resorts, Inc. v. The Consulting Group, Inc.*, 2013 WL 3834047, at *1 n. 2 (M.D. Tenn. July 23, 2013). If the Court so orders, Plaintiff would file a RICO Case Statement.

Johnson and Knowles seem to focus their arguments against Plaintiff's RICO claim on (a) lack of reliance allegations, and (b) their contention that the Complaint is group pleading.[4]

### 1. Plaintiff does not have to plead reliance as part of a RICO claim.

Defendants Johnson and Knowles's contention that Plaintiff must allege reliance on the defendants' misrepresentations and omissions in order to state a RICO claim is wrong. Although Defendants Johnson and Knowles rely on cases like *Cent. Distrib. v. Conn*, 5 F.3d 181, 184 (6th Cir. 1993), and *In re Reciprocal of Am. (ROA) Sales Practices Litig.*, No. 04–2078, 2007 WL 2900286, at *7 (W.D. Tenn. Sept. 28, 2007), for the proposition that a RICO plaintiff must "plead reliance in order to state a civil RICO claim predicated on acts of fraud," Memo. at 9, they fail to acknowledge that those cases have been abrogated.

In *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008), the Supreme Court held "that a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." That same year, the Sixth Circuit acknowledged *Bridge* following a remand from the Supreme Court and reversed a district court's dismissal of a RICO complaint based on that plaintiffs' failure to plead detrimental reliance. *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 350, 357 (6th Cir. 2008) ("After *Bridge*, plaintiffs need not plead or prove that they relied on defendants' alleged misrepresentations in order to establish the elements of their civil RICO claim based on mail or wire fraud. Dismissal of plaintiffs [*sic*] claims on this basis

---

[4] Defendants Johnson and Knowles also seem to argue that Plaintiff did not plead any specific misrepresentations or omissions by them. Without conceding that it was required to do so, Plaintiff has included specific allegations of misrepresentations and omissions that are discussed herein.

6

cannot be sustained.").[5] Per these binding cases, Defendants Johnson and Knowles's reliance argument fails.

## 2. Group pleading.

Defendants Johnson and Knowles argue that Plaintiff's fraud claims, including RICO, fail to satisfy Rule 9(b) because they rely on general allegations against the group of defendants as opposed to individual defendants, Memo., at 9, 11, and 25, and, in a RICO claim against multiple defendants, "[m]ere group pleading fails to meet Rule 9(b)'s specificity requirements." *Constr. Mgmt. Inc. v. Expo Hospitality, LLC*, No. 3:19-cv-00298, 2019 WL 2917991, at *5 (M.D. Tenn. July 8, 2019) (quotation omitted). Plaintiff contends that Rule 9 does not apply to this Motion, but herein addresses both Rule 9 and Rule 8, as Plaintiff has met the standard of either rule. It is true, in order to effectively plead fraud, that "a plaintiff must identify, at least generally, 'who [is alleged to have] made particular misrepresentations and when they were made.'" *Id.* (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992)). But as the *Construction Management* court recognized, the argument in that case was that the complaint referred to the defendants collectively "without identifying fraudulent actions attributable to any of them specifically." *Id.* at *4. In that circumstance, the court dismissed the RICO claims at issue because, while a plaintiff may not know what happened behind the closed doors of a conspiracy, "it should at least be able to assert clearly what each man did or did not say to [the plaintiff]." *Id.* at *5. *Cf. Mitchell v. Owens*, No. 12-2859, 2013 WL 2422629, at *8 (W.D. Tenn. June 3, 2013) (dismissing RICO claims under Rule 9(b) where the plaintiff "fail[ed] to identify any false statement allegedly

---

[5] *See also Grange Mut. Cas. Co. v. Mack*, 290 Fed. App'x 832, 835 n.3 (6th Cir. 2008) (noting vacation and abrogation of *Conn*).

made by any defendant nor much less the time and date of any false representation," but "merely cite[d] the elements of a cause of action for fraud and include[d] no factual allegations").

But a defendant is not permitted to "cherry-pick" more generalized allegations from a complaint while ignoring specific allegations in order to support a Rule 9(b) argument. *See George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255-57 (10th Cir. 2016) (holding that specific allegations against one RICO defendant, while relatively sparce, "taken as a whole" with the allegations about other defendants and the scheme more generally, "sufficiently appraised [the defendant] of its alleged role in the overall scheme"). Even if a plaintiff's allegations leave room for individual defendants to have "acted in different capacities and those differences may ultimately impact the determination of whether a particular Defendant only participated in his own affairs . . . that is a matter to be fleshed out in discovery and to be resolved through motion practice or by the jury," not at the motion to dismiss stage. *Ouwinga*, 694 F.3d at 793 (reversing dismissal of RICO claim).

Moreover, requiring every allegation in a RICO complaint to be specific to an individual defendant would be impractical and contrary to the Federal Rules of Civil Procedure. In ruling on a Rule 9(b) motion, "a court must consider the policy of simplicity in pleading found in Fed. R. Civ. P. 8." *Beard v. Worldwide Mortg. Corp.*, 354 F. Supp. 2d 789, 799 (W.D. Tenn. 2005) (Donald, J.) (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988)); *see also Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 664–65 (M.D. Tenn. 2022) (citing *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008)). "Rule 8 requires the plaintiff to provide a 'short and plain statement of the claim' and 'simple, concise, and direct' allegations." *Beard*, 354 F. Supp. 2d at 799 (quoting Fed. R. Civ. P. 8). "The principal purpose for the Fed. R. Civ. P. 9(b) particularity requirement, when considered in context

8

with Fed. R. Civ. P. 8, is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading." *Id.* (citing *Michaels Bldg. Co.*, 848 F.2d at 679); *see also Bond*, 587 F. Supp. 3d at 664 (quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012); *Michaels Bldg. Co.*, 848 F.2d at 680). Moreover, while RICO plaintiffs alleging fraud must plead with particularity, "Rule 9(b)'s particularity requirement may be relaxed when certain information is solely within the defendant's knowledge." *Constr. Mgmt. Inc.*, 2019 WL 2917991, at *4 (quoting *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 630 (N.D. Ohio 2016)). This is because "fraud often involves subterfuge and misdirection that may leave a victim in the dark about many of the details of a scheme, even after he realizes he has been defrauded." *Id.*; *see also Beard*, 354 F. Supp. 2d at 799 ("an exception to the particularity requirement of Fed. R. Civ. P. 9(b) exists when the relevant facts 'lie exclusively within the knowledge and control of the opposing party') (quoting *Wilkins1ex rel. U.S. v. Ohio*, 885 F. Supp. 1055, 1061 (S.D. Ohio 1995)).

Despite this relaxed standard, Plaintiff did include specific allegations against Defendants Johnson and Knowles, including (emphases added):

- "After FCG terminated Shore and FCG began trying to understand the relationship between Lowe's and Shore, **FCG asked the Lowe's Individual Defendants, Knowles and Matthews, if Lowe's had hired Shore to be an "estimator." Instead of being honest and forthright with FCG, Knowles and Matthews were deceptive and engaged in a cover-up of the fraud Shore, JWSC, and the other Lowe's Individual Defendants perpetrated on FCG.**" Compl., at ¶ 81.

- "Initially, **Knowles acknowledged that Shore had performed some estimating for Lowe's, but attempted to cover up the truth by minimizing the work Shore did for Lowe's, making it sound insignificant.**" *Id.* at ¶ 82.

- "Knowles's and Matthews's denials that Shore had provided "estimating" on FCG projects **were lies**. Among the documents found on Shore's FCG computer include (a) **an email from Shore to Knowles on February 15, 2023, in which Shore provided Knowles, Johnson, and Weber his menu of estimating services**, (b) **an email Knowles received showing that Knowles was, in fact, aware that Shore was acting as an "estimator" on**

9

**FCG projects as long ago as April 13, 2023**, and (c) an April 13, 2023 email between Lowe's Individual Defendant Weber and Shore with an April 13, 2023 invoice Lowe's sent FCG for estimating services that Shore (identified in the invoice as his alter ego JWSC) performed for Lowe's. **All these events are months before Knowles and Matthews emphatically denied that Shore performed estimating on FCG's projects.**" *Id.* at ¶ 84.

- "As to Knowles's initial minimization of the estimating Shore performed for Lowe's, that, too, was **a lie**. As FCG continued to seek information on this topic, Matthews finally admitted that Lowe's had paid Shore, through Shore's various side entities, in excess of $100,000 to act as an 'estimator.'" *Id.* at ¶ 85.

- "When FCG questioned Knowles about the card, Knowles, in a September 18, 2023 email stated that the card was issued to Shore for in-store purchases only. Like his statement about Shore not 'estimating' FCG projects, **Knowles's statement that the card was for in-store purchases only was a lie to cover up the fraud that had been perpetrated upon FCG**." *Id.* at ¶¶ 99-100.

- Communications from Johnson show that he knew the Pella windows were for the Ramirez project [one of Shore's secret side projects]. On November 16, 2022, a Lowe's employee named Ryan Ruddell sent Johnson an email to which he attached an order for Pella windows, and in his cover email message to Johnson, Mr. Ruddell specifically identified the windows for Shore's "Ramirez" project. Johnson then sent a November 17, 2022 email to Shore stating, "Here is the original receipt from the first order on the Ramirez house. It appears there is only 6 windows total on the receipt that show Double Hung style." **Given the amount of materials Lowe's was selling to FCG, Johnson was very familiar with which projects were FCG's and which were not. In his November 17, 2022 email to Shore, Johnson shows his knowledge that the Ramirez project was a "house," and Johnson knew that none of FCG's projects was a house. In addition, Johnson knew that there were no Pella windows on any FCG projects. Yet, the delivery address (804 Branham Road) for the windows is a FCG project address, which Johnson well knew. Despite Johnson's knowledge that the Pella windows were for Shore's secret side project known as the Ramirez house, not an FCG project, Lowe's invoiced FCG for those materials, and FCG paid it.** *Id.* at ¶ 93.

- Certain Lowe's delivery tickets for materials Lowe's billed FCG are further confirmation that materials for which Lowe's was invoicing FCG, and Shore was approving for payment, were not, in fact, received by FCG. To cover up the fraud Shore and the Lowe's Individual Defendants were perpetrating upon FCG, **Lowe's Individual Defendant Johnson signed at least twelve (12) delivery receipts, falsely attesting that materials totaling $112,211.40 had been received by FCG, when they were not.** *Id.* at ¶ 97.

These allegations, particularly when "taken as a whole" with the allegations about other defendants and the scheme more generally, are more than sufficient to satisfy either the Rule 8 or Rule 9 pleading standard. *See George*, 833 F.3d at 1255-57.

10

### 3. RICO Conspiracy

Defendants Johnson and Knowles argue that Plaintiff has not pled "with any specificity the conspiratorial acts that Johnson or Knowles are alleged to have engaged in." Memo., at 12. But even had Defendants Johnson and Knowles filed a motion for a more definite statement, a RICO conspiracy claim under Section 1962(d) is not subject to the Rule 9(b) heightened pleading requirement. *See, e.g.*, *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 411 (6th Cir. 2012) ("The plaintiffs' third amended complaint does allege that [the defendants] conspired . . . through a pattern of racketeering activity, and this agreement can be inferred from the individual defendants' involvement in the four well-pled predicate acts in which they made false representations . . . with the goal of defrauding those couples of money."); *Justice v. Nelson*, No. 3:19-cv-185, 2019 WL 6971371, at *1 (E.D. Tenn. Dec. 19, 2019) (Rule 8's notice pleading standard applies to RICO conspiracy claims); *Dowling v. Select Portfolio Servicing, Inc.*, No. 2:05-CV-049, 2006 WL 571895, at *9 (S.D. Ohio Mar. 7, 2006) (same, citing cases). Plaintiff's Section 1962(d) claim satisfies the appropriate standard.

### B. <u>Plaintiff has met the pleading requirements for its state law claims.</u>

#### 1. Plaintiff has more than adequately pled its claim for civil conspiracy (Count II).

"An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." *Carroll v. TDS Telecomms. Corp.*, No. 1:17-CV-01127-STA-EGB, 2017 WL 6757566, at *8 (W.D. Tenn. Dec. 29, 2017) (quoting *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002)). Broken down into distinct elements, sustaining a claim of civil conspiracy requires allegations of "(1) a common design between two or more persons, (2) to accomplish by concerted

11

action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

 "[T]here is no higher burden upon Plaintiff for pleading a civil conspiracy claim. Plaintiff must merely meet the requirements of *Twombley* and *Iqbal*." *Carroll*, 2017 WL 6757566, at *10. Plaintiff has met its burden by specifically alleging that, among other things, the defendants worked together to pay Defendant Shore kickbacks for defrauding Plaintiff into purchasing unnecessary supplies and for the other defendants to unlawfully obtain money from the fraudulently procured sales of their goods. *See e.g.*, Compl., at ¶¶ 116, 130-31.

### 2. Plaintiff has more than adequately pled its claims for fraud and violation of the Tennessee Consumer Protection Act (Counts IX and X).

As aforementioned, none of the defendants have previously filed a motion under Rule 12(e) for a more definite statement. Therefore, dismissal for failure to satisfy Rule 9(b) is not appropriate. *See e.g.*, *Legge*, 7 F.3d at 234. Notwithstanding the foregoing, Plaintiff has more than satisfied the heightened "particularity" pleading standard in Rule 9(b) and the notice pleading standard under Rule 8.

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." *Bond*, 587 F. Supp. 3d at 664–65 (quotation omitted). The Sixth Circuit has explained, however, that while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading[.]

12

*Id.* (quoting *Ford Motor Co.*, 532 F.3d at 504). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* (quotation omitted).

"Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). Nevertheless, as stated above with respect to Plaintiff's RICO claim, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams*, 681 F.3d at 803 (quoting *Michaels Bldg. Co.*, 848 F.2d at 680).

The Complaint includes many specific allegations regarding the defendants' involvement in this illegal scheme, including examples of specific instances of fraudulent estimations, purchases and kickbacks in paragraphs 73-109 of the Complaint. These examples (some of which are cited above) often specifically mention Defendants Johnson and Knowles and clearly identify the circumstances of the fraud. As set out in the Complaint, the Individual Lowe's Defendants purposefully and willfully misrepresented the source of the estimation services provided to Plaintiff in regard to the various projects overseen by Defendant Shore. Compl., at ¶ 198). Defendant Shore performed the estimation services, the Individual Lowe's Defendants knew this, they passed off these estimates as legitimate, and they represented that Defendant Shore's estimates were performed by an unrelated third party. *Id*. In reliance upon these acts, Plaintiff

13

unknowingly paid for millions of dollars' worth of materials that either did not exist or were delivered to a project site owned by Defendant Shore.

Accordingly, Plaintiff has pled fraud and violation of the Tennessee Consumer of Protection Act with more than enough specificity to put the defendants on notice as to the nature of the claims.

### 3. Plaintiff's claims for violation of the Tennessee Consumer Protection Act are timely (Count X).

"[A] motion to dismiss is 'generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations.'" *Lindsey v. Collier*, 606 F. Supp. 3d 769, 773 (M.D. Tenn. 2022) (citations omitted). "This is because the statute of limitations is an affirmative defense, for which the defendant bears the burden of proof . . . a motion to dismiss on statute of limitations grounds should only be granted if the allegations in the complaint affirmatively show that the claim is time-barred." *Id.*

Though Defendant Shore was terminated in September of 2023, at that time, Plaintiff had no knowledge of any malfeasance. Plaintiff simply believed that Defendant Shore had performed his job duties poorly and even gave him a generous severance package to soften the blow of termination. Compl., at ¶ 35. It was not until after Defendant Shore's termination that Plaintiff discovered financial irregularities and began investigating the documentation left behind by Defendant Shore. *Id.* at ¶ 36. Indeed, Plaintiff did not become aware, nor should have become aware, of its claims against Defendant Shore and the other defendants until Larry Grace of Central Century Supply, LLC telephoned a principal of Plaintiff on November 30, 2023, to confirm the fraud that had been perpetrated against Plaintiff. *Id.* at ¶ 110. Plaintiff filed the Complaint less than a year later on October 21, 2024. Therefore, Plaintiff's claims for violation of the Tennessee Consumer Protection Act are timely.

### 4. Plaintiff has more than adequately pled its claim for conversion (Count VIII).

Contrary to the defendants' asserted positions, a defendant can convert money—including money in the form of a check. *See PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553-56 (Tenn. Ct. App. 2012) (discussing that money that is specific and capable of identification can be converted; plaintiffs maintained cause of action for conversion of funds against one defendant); *Pomeroy v. McGinnis*, No. E2020-00960-COA-R3-CV, 2021 WL 3017199, at *16–17 (Tenn. Ct. App. July 16, 2021) (conversion of money in the form of checks recognized by the court as being "actionable"); *Colyar v. Taylor*, 41 Tenn. 372, 373-78 (Tenn. 1860) (defendant liable for conversion when he gratuitously undertook to receive $1,500 for the plaintiff and deliver it to him, but instead gave the money to a third party who subsequently lost it); *Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1017 (E.D. Tenn. 2022) (citation omitted) (conversion claim involving money was actionable because "[i]dentifiable funds are deemed a chattel for purposes of conversion" and checks were considered identifiable funds for a specific purpose; the court noted that "to the extent Plaintiffs' claims rest on the conversion of their trade secrets, they must be dismissed"); *Lingham Rawlings, LLC v. Gaudiano (In re Lingham Rawlings, LLC)*, Nos. 10-32769, 10-3125, 2013 WL 1352320, at *54 (Bankr. E.D. Tenn. Apr. 3, 2013) (defendant's motion to dismiss plaintiff's conversion claim was denied because the court found that defendant converted plaintiff's funds by paying himself "management fees and reimbursements for loans payable to which he was not entitled"). For money to be the subject of a conversion claim, it must be specific and identifiable, or there must be a determinate sum that the defendant was entrusted to apply to a certain purpose. *See* 90 C.J.S. Trover and Conversion § 16; *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship*, 387 S.W.3d at 553; *Pomeroy*, 2021 WL 3017199, at *16–17.

15

As pled in the Complaint, the funds converted by the defendants are specific and identifiable, including but not limited to the following specifically pled examples: a fraudulent kick-back of $10,000 related to Purchase Order No. 109, Compl. at ¶ 46; a fraudulent kick-back of $9,125 related to Purchase Order No. 108R, *id.* at ¶ 47; a fraudulent kick-back of $3,750 related to Purchase Order No. 109, *id.* at ¶ 48; a fraudulent kick-back of $2,500 related to Purchase Order No. 113, *id.* at ¶ 49; a fraudulent kick-back of $14,751 related to Purchase Order No. 201, *id.* at ¶ 50; a fraudulent kick-back of $5,000 related to Purchase Order No. 114, *id.* at ¶ 51; a fraudulent kick-back of $10,000 related to Purchase Order No. 04-201, *id.* at ¶ 52; a fraudulent kick-back of $10,000 related to Purchase Order No. 03-201, *id.* at ¶ 53; a fraudulent kick-back of $10,000 related to Purchase Order No. 02-301, *id.* at ¶ 54; a fraudulent kick-back of $10,000 related to Purchase Order No. 506.01-101, *id.* at ¶ 55; a fraudulent kick-back of $40,000 related to Purchase Order No. 504.02-302, *id.* at ¶ 56; a fraudulent kick-back of $15,000 related to Purchase Order No. 02-304, *id.* at ¶ 57; a fraudulent kick-back of $24,000 related to Purchase Order No. 504.02-305, *id.* at ¶ 58; a fraudulent kick-back of $40,000 related to Purchase Order No. 504.02-306 *id.* at ¶ 59; a fraudulent kick-back of $53,000 related to Purchase Order No. 504.02-308, *id.* at ¶ 60; $156,970 converted via fictitious Purchase Orders Nos. 504.04-205 and 504.02-309, *id.* at ¶ 66; a fraudulent kick-back of $45,000 related to Change Order No. 002, *id.* at ¶ 67; and fraudulent kickbacks of $13,500.00, $36,500.00 and $18,550.00 related to fraudulent estimation services, *id.* at ¶ 86. As the foregoing amounts are specific and identifiable sums, Plaintiff has adequately pled its claim for conversion of funds.

Furthermore, the Complaint also alleges the conversion of certain materials. The Tennessee Court of Appeals has identified three ways in which property may be converted: "First, a person may personally dispossess another of tangible personalty. Second, a person may dispossess another

of tangible property through the active use of an agent. Third, under certain circumstances, a person who played no direct part in dispossessing another of property, may nevertheless be liable for conversion for receiving a chattel." *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Community Development Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012).

After Plaintiff ordered and paid Defendant Lowe's for certain materials, it then owned and/or was entitled to the possession of those materials. By changing the delivery addresses for certain materials or otherwise failing to deliver Plaintiff's materials to Plaintiff, Defendant Lowe's and the Lowe's Individual Defendants dispossessed Plaintiff of tangible property. The Complaint states specific allegations regarding the conversion of materials, a few examples of which are listed below (emphasis added).

- On February 4, 2022, a Lowe's employee named James Fitzgerald sent an email to Lowe's truss supplier, Tennessee Building Components, stating, "I have a side project that is looking for a full quote when available. This is a separate customer from our other projects." As the email chain progressed, Mr. Fitzgerald sent Bingham an email on February 11, 2022, stating, "This is one of Wills [meaning Shore's] side projects they have a question." The email concludes with a February 17, 2022 email from Shore to Bingham stating, "I only need floor truss quote. We are stick framing roof system." **Despite Bingham's knowledge that the floor trusses for which Lowe's was obtaining a quote were for Shore's side project, Lowe's invoiced FCG for them, and FCG paid them.** Compl., at ¶ 91.

- Regarding Shore's secret side project on Cotton Road known as the Ramirez project, on May 10, 2022, FCG's construction accountant noticed that roofing materials on a project identified in the invoice as the Ramirez project were being billed to FCG. When FCG's construction accountant brought this to Shore's attention, Shore notified Weber who replied by email, "Fixing this now!" From this email exchange, **Weber knew that materials on the Ramirez project were not to be billed to FCG.**

  **Communications from Johnson show that he knew the Pella windows were for the Ramirez project.** On November 16, 2022, a Lowe's employee named Ryan Ruddell sent Johnson an email to which he attached an order for Pella windows, and in his cover email message to Johnson, Mr. Ruddell specifically identified the windows for Shore's "Ramirez" project. Johnson then sent a November 17, 2022 email to Shore stating, "Here is the original receipt from the first order on the Ramirez house. It appears there is only 6 windows total on the receipt that show Double Hung style." Given the amount of materials Lowe's was selling to FCG, Johnson was very familiar with which projects were FCG's

17

and which were not. **In his November 17, 2022 email to Shore, Johnson shows his knowledge that the Ramirez project was a "house," and Johnson knew that none of FCG's projects was a house. In addition, Johnson knew that there were no Pella windows on any FCG projects. Yet, the delivery address (804 Branham Road) for the windows is a FCG project address, which Johnson well knew. Despite Johnson's knowledge that the Pella windows were for Shore's secret side project known as the Ramirez house, not an FCG project, Lowe's invoiced FCG for those materials, and FCG paid it.** Id., at ¶¶ 92-93.

- When Weber sent Shore an invoice for materials on the side project at 1143 Maxwell Branch Road to Shore's FCG email address on November 13, 2022, **Shore shot back from a different address, "WTF." When Weber sent Shore another invoice for materials on one of Shore's side projects again to Shore's FCG email address on December 10, 2022, Shore replied from a different address, "WTF and why is it coming to my work email." This vulgarity shows that Shore was angry that the conspiracy he and one or more of the Lowe's Individual Defendants were perpetrating upon FCG was at risk of exposure.**

  Documentation found on Shore's FCG computer for the materials on Shore's Summerset Downs Boulevard and Maxwell Branch Road secret side projects initially show those materials being delivered to the address of the side project. **However, in each of those cases, Shore sent an email to Lowe's which resulted in a communication back from Lowe's that the "Delivery Details Have Been Updated."** Id., at ¶¶ 94-95.

- Certain Lowe's delivery tickets for materials Lowe's billed FCG are further confirmation that materials for which Lowe's was invoicing FCG, and Shore was approving for payment, were not, in fact, received by FCG. **To cover up the fraud Shore and the Lowe's Individual Defendants were perpetrating upon FCG, Lowe's Individual Defendant Johnson signed at least twelve (12) delivery receipts, falsely attesting that materials totaling $112,211.40 had been received by FCG, when they were not.** Id., at ¶ 97.

- Like his statement about Shore not "estimating" FCG projects, Knowles's statement that the card was for in-store purchases only was a lie to cover up the fraud that had been perpetrated upon FCG. That lie is revealed from, at the very least, the following information:

  a.      According to Lowe's own records, Shore charged over $1.5 million to the card, which is clearly more than in-store purchases.

  b.      The invoice numbers identified by Lowe's as being associated with the Beechcroft project do not correlate to the invoice numbers of the Lowe's invoices FCG received from Lowe's.

  c.      **Among the purchases on the card are approximately $308,000 for shingles.** That amount of shingles is clearly not from in-store purchases. Also, **Lowe's received separate purchase orders from FCG for shingles on its projects, which FCG paid, revealing that Lowe's knew or should have known that the shingles charged to the card were not for FCG's projects. Yet, Lowe's billed those shingles to FCG, and Shore approved the payment of those bills by FCG.**

18

d. **There are $572,000 in materials charged to the card for FCG's Beechcroft project. However, FCG already had a legitimate Lowe's Pro Supply card for the Beechcroft project. . .** Id., at ¶ 100.

- Lowe's Individual Defendant Bingham further conspired with Shore, Meadows, and Heath to defraud FCG by Shore issuing purchase orders to HYDS for Lowe's materials at a cost to FCG that was well above market pricing. For example, on August 30, 2021, Bingham sent Heath an email with a quote, which included a profit mark-up by Lowe's, for "Franklin's sinks," which HYDS marked up again before invoicing FCG for the sinks. **As another example, on April 21, 2023, Shore issued HYDS FCG Purchase Order No. 119 for Lowe's proprietary light fixtures in the amount of $30,000.00, which FCG paid in full. By Shore arranging for FCG to purchase the light fixtures from HYDS, which purchased them from Lowe's, Lowe's and HYDS both profited from the light fixtures while FCG paid above-market prices. Contemporaneously with this purchase order, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $23,718.85, and that invoice and payment is expressly identified on Shore's Invoice and Payment detail as being on account of FCG Purchase Order No. 119. In comparison to the $30,000.00 FCG paid for the Lowe's light fixtures, the market contractor cost of those same light fixtures is less than $15,000.00.** Id., at ¶ 102.

- Based upon all documentation available to date, because of the above described fraud and conspiracy between Shore and the Lowe's Individual Defendants, FCG has suffered damages with respect to FCG's Beechcroft project of $3,531,831.94.

With respect to FCG's Kedron Square Cottages project, FCG issued FCG Purchase Order Nos. 101, 101R1, 104, 110, 111, 112, 112r1, and 113 to Lowe's on or around the dates shown each of the purchase orders and accepted Lowe's Quote 11413056-00 ("Kedron Square Purchase Orders"). True and authentic copies of the Kedron Square Purchase Orders are attached as collective Exhibit 1. **FCG paid deposits to Lowe's on account of the Kedron Square Purchase Orders in the amount of $2,230,298.07. However, of the $2,230,298.07 in deposits FCG has paid to Lowe's, Lowe's has only delivered $520,713.03 in materials. As a result, Lowe's owes FCG $1,709,585.04, which is the amount FCG has paid Lowe's for materials on the Kedron Square Cottages project that Lowe's did not deliver.**

With respect to FCG's Green Lea project, FCG issued FCG Purchase Order Nos. 504.02.101, 504.03.101, 504.03.102, 504.03.103, 504.04.101, 504.04.102, and 504.04.103 to Lowe's on or around the dates shown each of the purchase orders ("Green Lea Purchase Orders"). True and authentic copies of the Green Lea Purchase Orders are attached as collective Exhibit 2. **FCG paid deposits to Lowe's on account of the Green Lea Purchase Orders plus Lowe's invoices 10719876-00 and 10719883-00 for which FCG did not issue purchase orders in the amount of $2,337,834.76. However, of the $2,337,834.76 in deposits FCG has paid to Lowe's, Lowe's has only delivered materials or issued FCG credits totaling $1,177,130.25. As a result, Lowe's owes FCG**

19

**$1,160,704.51, which is the amount FCG has paid Lowe's for materials on the Green Lea project that Lowe's did not deliver.** Id., at ¶¶ 105-107.

As the foregoing examples demonstrate how the defendants dispossessed Plaintiff of tangible property, Plaintiff has adequately pled its claim for conversion.

### 5. Adoption of the other defendants' arguments.

At the end of their argument, Defendants Johnson and Knowles incorporate the other motions to dismiss. To the extent the Court finds any other arguments relevant to Defendants Johnson and Knowles, Plaintiff incorporates its responses to the other pending motions to dismiss herein.

## IV. CONCLUSION

For all these reasons, Defendants Johnson and Knowles's Motion to Dismiss should be denied. If the Court is inclined to grant the Motion to Dismiss, in the alternative, Plaintiff would request that the Court order that Defendants Johnson and Knowles file a motion under Rule 12(e) and that Plaintiff have the opportunity to amend its Complaint.

Dated:  March 3, 2025

Respectfully submitted,

/s/     *Todd E. Panther*
Todd E. Panther (BPR #014438)
Christopher C. Sabis (BPR #030032)
Thomas B. Hall (BPR #036816)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN  37203
(615) 742-4200 - telephone
(615) 742-4539 - fax
tpanther@srvhlaw.com
csabis@srvhlaw.com
thall@srvhlaw.com

*Attorneys for Franklin Construction Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this the 3rd day of March, the foregoing Plaintiff's Response in Opposition to Defendants Johnson and Knowles's Motion to Dismiss was filed electronically with the Clerk of Court to be served by the Court's electronic filing system upon the parties in this matter.

        Scarlett Singleton Nokes
        **Sheppard Mullin**
        2200 Ross Avenue, Suite Floor 20
        Dallas, Texas 75201
        469-391-7411
        snokes@bradley.com

        R. Brandon Bundron
        **Bradley Arant Boult Cummings LLP**
        1221 Broadway, Suite 2400
        Nashville, Tennessee 372023
        snokes@bradley.com
        bbundren@bradley.com

        *Attorneys for Dean Bingham*

        Don L. Hearn, Jr.
        **Glankler Brown PLLC**
        6000 Poplar Avenue, Suite 400
        Memphis, Tennessee 38119
        dhearn@glankler.com
        na@rpnalaw.com

        Nicholas P. Roxborough
        Joseph C. Gjonola
        Nadine Alsaadi
        **Roxborough, Pomerance, NYE & Adreani, LLP**
        5900 Canoga Avenue, Suite 450
        Woodland Hills, California 91467
        npr@rpnalaw.com
        jcg@rpnalaw.com
        na@rpnalaw.com

        *Attorneys for Joseph Heath*

Darrick Lee O'Dell
**Spicer Rudstrom, PLLC**
220 Athens Way, Suite 403
Nashville, Tennessee 37228
dodell@spicerfirm.com

Nicholas C. Stevens
Robert J. Uhorchuk
**Spicer Rudstrom, PLLC**
537 Market Street, Suite 203
Chattanooga, Tennessee 37402
nstevens@spicerfirm.com
rju@spicerfirm.com

*Attorneys for Lundon Johnson, Joel Chevrette and Danny Knowles*


Gary C. Shockley
Ryan P. Loofbourrow
Scott D. Carey
**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**
1600 West End Avenue, Suite 2000
Nashville, TN 37203
gshockley@bakerdonelson.com
rloofbourrow@bakerdonelson.com
scarey@bakerdonelson.com

*Attorneys for Lowe's Home Centers, Inc.*


Jerry E. Martin
Matthew Edward McGraw
Seth Marcus Hyatt
**Barret Johnston Martin & Garrison, LLC**
200 31st Avenue North
Nashville, TN 37203
jmartin@barrettjohnston.com
mmcgraw@barrettjohnston.com
shyatt@barrettjohnston.com

*Attorneys for Keith Meadows and HYDS, Inc.*

/s/ Todd E. Panther
Todd E. Panther