UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| FRANKLIN CONSTRUCTION GROUP, LLC, | ) ) ) | |
| Plaintiff, | ) ) | NO. 3:24-cv-1255 |
| v. | ) ) | |
| WILLIAM SHORE, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Franklin Construction Group ("FCG") is a large builder that between 2020 and 2023 employed William Shore ("Shore") as its vice president of residential construction operations. FCG alleges that Shore and his personal company, JWSC, LLC ("JWSC"), conspired with a host of others to defraud FCG out of millions of dollars. FCG filed this lawsuit against Shore and his alleged co-conspirators, claiming: (1) violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d); (2) conspiracy; (3) fraud; (4) conversion; (5) violation of the Tennessee Consumer Protection Act ("TCPA"); (6) breach of duty of loyalty (Shore only); (7) breach of contract (Lowe's only); (8) unjust enrichment (Lowe's only); and (9) declaratory judgment (Lowe's only). Shore and JWSC have not filed responsive pleadings and appear to be in default. (Doc. No. 81.) Tyler Weber has already been dismissed from this action at FCG's request. (Doc. No. 130.) Shore's remaining alleged co-conspirators—Keith Meadows ("Meadows"), Joseph Heath ("Heath"), HYDS Inc. ("HYDS"), Dean Bingham, Lundon Johnson, Joel Chevrette, Danny Knowles, Scott Matthews, and Lowe's Companies Inc.—have all filed motions to dismiss FCG's claims against them. (Doc. Nos. 66, 68, 70, 74, 76, 78 and 88).

1

For the reasons that follow, the Court will drop Dean Bingham, Lundon Johnson, Joel Chevrette, Danny Knowles, Scott Matthews, and Lowe's Companies Inc. ("Lowe's Defendants") from this case because, based on the current pleadings, they are improperly joined. Because the Lowe's Defendants have been dropped from this case, their motions to dismiss (Doc. Nos. 66, 68, 70, 76, 88) are moot and will be denied as such. The motions to dismiss (Doc. Nos. 74, 78) filed by Heath, HYDS, and Meadows ("HYDS Defendants") will also be denied as to the RICO, conspiracy and fraud claims; however, the motions will be granted as to the conversion and TCPA claims.

## I. BACKGROUND[1]

### A. William Shore

Shore is the architect of any alleged fraud or theft against FCG. FCG hired Shore as its vice-president of residential construction operations on November 15, 2020. (Doc. No. 1 ¶ 32). In this role, Shore was responsible for budgeting, hiring subcontractors and suppliers, and approving invoices from outside parties. (Id. ¶ 33). Because of his position within FCG's organization, Shore had the authority and latitude to identify and hire contractors and suppliers who were willing to engage in kick-back schemes with him. As part of these schemes: (1) the contractors or suppliers (at the direction of Shore) would grossly overcharge FCG for work or materials, (2) Shore would have FCG pay the inflated bill, and (3) the contractors or suppliers would pay Shore a portion of the ill-gotten gains (either in goods or cash). According to FCG, during Shore's three-years at the company, he and his co-conspirators unlawfully pocketed millions of dollars of FCG's money. (Id. ¶ 126)

---

[1] These facts are taken from the Complaint and are accepted as true at this stage. See City of Columbus, Ohio v. Hotels.com, L.P., 693 F.3d 642, 648 (6th Cir. 2012).

When FCG terminated Shore's employment on September 7, 2023, it thought he was simply bad at his job. (Id. ¶ 35). However, after Shore was terminated, FCG identified irregularities with his records and launched an internal investigation into Shore's activities, including examining Shore's computer and the paperwork he left in his office. Shore's computer, for example, contained Shore's personal financial information and email communications with some of his alleged co-conspirators—facts that helped FCG connect the dots. (Id. ¶ 36). Based on its investigation, FCG believes that Shore worked with the HYDS Defendants and the Lowe's Defendants to inflate FCG's material costs to enrich themselves.

**B. Allegations against the HYDS Defendants**

HYDS is a California-based construction materials supplier that sources cabinets, cabinet hardware, countertops, light fixtures, flooring, tile, trashcans, trashcan inserts, and bathroom sinks, largely from Asia. (Id. ¶¶ 10, 37-38). Meadows owns HYDS, and Heath is its CEO. (Id. ¶¶ 11-12, 37). Before Shore began working with FCG, FCG and HYDS conducted no business. (Id. ¶ 38). However, in the late summer or early fall of 2021, Shore began recommending HYDS as a supplier and subcontractor. (Id.). While Shore was employed with FCG, FCG paid HYDS $8,731,901.00 for construction materials and labor. (Id.).

FCG claims that no later than September 2021, Shore, Meadows, and Heath agreed that Shore would sign "purchases orders on FCG's behalf for HYDS to supply FCG with labor and materials at excessive prices in exchange for HYDS paying Shore monetary kickbacks and supplying Shore and/or JWSC with labor and materials, which were billed to and paid by FCG." (Id. ¶ 40). Shore was able to perpetrate the scheme by convincing FCG that he had followed FCG's competitive pricing policies and that HYDS' goods and services were the best bargain on the

3

market. (Id. ¶ 42).    However, Shore was simply telling HYDS the highest possible price FCG could pay without losing money, and HYDS would then charge that inflated price.  (Id. ¶ 41).

According to FCG, the kickback scheme between Shore and the HYDS Defendant followed a familiar pattern over the course of two years.  For example:

> On September 13, 2021, Shore issued HYDS FCG Purchase Order No. 109 for lighting fixtures. The price Shore and Meadows and/or Heath concocted for those fixtures, which is reflected on the purchase order, was $30,000.00. However, the market price for these fixtures was only $15,000.00, resulting in a fraudulent overpayment by FCG of $15,000.00. Contemporaneously with this transaction, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS for $10,000.00, which Meadows or HYDS paid. Confirming that the $10,000.00 payment Shore or JWSC received was a fraudulent kickback on account of FCG Purchase Order No. 109, the Invoice and Payment detail Shore saved on his FCG computer expressly identifies the $10,000.00 payment as being for FCG Purchase Order No. 109.

(Id. ¶ 46).  Likewise, on September 13, 2021, "Shore issued HYDS FCG Purchase Order No. 108R for $80,300 for 3,650 light fixtures. Contemporaneously with this transaction, Shore or JWSC received a payment from Meadows or HYDS for $9,125 with a notation that payment was for lights "3,650 @ $2.50." (Id. ¶ 47).  In addition to these two examples of how the kickback scheme operated, FCG offers fourteen other non-exhaustive (see id. ¶ 69) examples.  (Id. ¶¶ 46-67).

FCG's internal investigation also revealed compromising communications between Shore and the HYDS Defendants.  For example, Shore sent Meadows a text message that read: "Stop sending that [sic] emails to work please you are going to get us busted." (Id. ¶ 64).  Shore and Meadows also exchanged a series of emails where Meadows identifies the actual cost of shipping containers but tells Shore "Up to you if you want to double this."  (Id. ¶ 68).

After Shore was terminated, the HYDS Defendants refused to deliver materials that FCS had already (over)paid for until FCG signed a document releasing Meadows and HYDS from all

4

liability. (Id. ¶ 71). FCG invites the inference that the HYDS Defendants—knowing of their legal exposure for the illegal kickback scheme—held the construction materials hostage so that FCG would be forced into waiving the HYDS Defendants' liability for the fraud they perpetrated with Shore. When that failed, this lawsuit followed.

### C. Allegations against Lowe's Defendants.

In addition to the two-year long scheme between Shore and the HYDS Defendants, FCG claims that various employees of Lowe's also conspired with Shore to FCG's detriment. FCG claims that Heath introduced Shore to a Lowe's employee, Dean Bingham ("Bingham"), (id. ¶ 74), and that Shore convinced Bingham and other Lowe's employees to "further defraud" FCG. (Id. ¶ 74).[2] FCG claims that one method that Shore and the Lowe's employees used to defraud FCG was to engage Shore or JWSC as an independent contractor to perform estimating services for Lowe's on FCG orders. (Id. ¶ 76). This, according to FCG, allowed the Lowe's employees to pay Shore for "fictitious" estimating services (i.e. kickbacks) in exchange for Shore overestimating "the type and quantity of materials needed on FCG's projects" thereby enriching the Lowe's employees through larger bonuses. (Id. ¶¶ 78-80). Lowe's paid Shore or JWSC more than $100,000 to act as an "estimator." (Id. ¶ 85). FCG also claims that Shore's personal computer showed that Lowe's employee Joel Chevrette paid Shore $13,500; Bingham paid Shore $36,500; and Lowe's Pro Supply paid Shore or JWSC $18,550. (Id. ¶ 86). Shore's computer also allegedly showed that Shore had paid Bingham $31,650 for "commissions and fees."[3] (Id.).

---

[2] In an attempt to connect the HYDS Defendants to the Lowe's Defendants, FCG alleges that HYDS' website lists Lowe's as a "Big Box" partner. (Id. ¶ 73).

[3] FCG does not explain why Bingham paid Shore $36,500 for Shore to then pay Bingham $31,650. Although there may be smoke, it does not appear that FCG has put all the puzzle pieces together yet, at least not sufficiently for a fire.

5

In addition to the alleged "estimator" scheme, FCG claims that Lowe's employees conspired with Shore to deliver materials to his personal "side projects" but to charge FCG. (Id. ¶¶ 87-98). According to FCG, Lowe's either delivered materials to "FCG's project where Shore would pick them up and take them away," or Lowe's would deliver "materials to Shore's side project" and manipulate Lowe's system to reflect the materials had been delivered to a FCG project. (Id. ¶ 96). FCG also contends that "one or more of the Lowe's Individual Defendants" arranged for "Lowe's to issue Shore or JWSC a Lowe's Pro Supply credit card, which Lowe's billed to FCG and Shore approved for payment." (Id. ¶ 99). Shore allegedly charged over $1.5 million to the card, which FCG paid. (Id. ¶ 100). FCG claims that Lowe's employees altered or falsified invoices and delivery receipts within Lowe's computer system to cover up the ongoing fraud, which they benefited from through "commissions and other compensation on the supplies and materials they were defrauding FCG into purchasing." (Id. ¶ 101, 103).

## II. LEGAL STANDARDS

### A. Misjoinder

Under Federal Rule of Civil Procedure 20(a)(2), defendants may be joined in one action if:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Rule 21 allows district courts, in the event of misjoinder or nonjoinder, to "add or drop a party" or "sever any claim against a party." Fed. R. Civ. P. 21. In determining whether to sever claims, courts consider the following factors:

> (1) whether the claims arise out of the same transaction or occurrence;

(2) whether the claims present some common questions of law or fact;

(3) whether settlement of the claims or judicial economy would be facilitated;

(4) whether prejudice would be avoided if severance were granted; and

(5) whether different witnesses and documentary proof are required for separate claims.

Parchman v. SLM Corp., 896 F.3d 728, 733 (6th Cir. 2018); see also Mann v. Mohr, 802 F. App'x 871, 875 (6th Cir. 2020). "The permissive language of Rule 21 permits the district court broad discretion in determining whether or not actions should be severed" or parties should be dropped. See Parchman, 896 F.3d at 733.

Whether a court severs claims or drops improperly joined parties leads to "quite different" legal effects. Kitchen v. Heyns, 802 F.3d 873, 874–75 (6th Cir. 2015) (quoting DirecTV, Inc. v. Leto, 467 F.3d 842, 845 (3d Cir. 2006)). Severing claims "creates two discrete, independent actions, which then proceed as separate suits for the purpose of finality and appealability." Id. (quoting Gaffney v. Riverboat Servs. of Ind., Inc., 451 F.3d 424, 441 & n. 17 (7th Cir. 2006); see also 7 Wright & Miller, Federal Practice & Procedure § 1689 (3d ed. 2015). On the other hand, dropping parties preserves the originally filed lawsuit and the court merely dismisses the dropped defendants without prejudice. See Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674, 682 (6th Cir. 1988). The plaintiff may then file a new lawsuit against the dropped parties. Id.

**B. Motion to Dismiss**

To survive a motion to dismiss, the Complaint must "state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), and plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

7

alleged," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addition, Rule 9(b) of the Federal Rules of Civil Procedure requires a party making allegations that sound in fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9. A complaint alleging fraud, at a minimum, must allege "the time, place and content of the alleged misrepresentation on which [the plaintiff] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." U.S. ex rel. Marlar v. BWXT Y-12, LCC, 525 F.3d 439, 444 (6th Cir. 2008).

However, Rule 9(b)'s particularity requirement must be considered alongside the "policy of simplicity in pleading" found in Rule 8 of the Federal Rules of Civil Procedure, which requires a "short and plain statement of the claim" and "simple, concise, and direct" allegations. See Michaels Bldg. Co. V. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988). Accordingly, the requirements of Rule 9(b) are met where the defendants "have fair notice of the charges against them" and the allegations are more than "mere assertions or unsupported conclusions." See First Tennessee Bank Nat'l Ass'n v. McCawley, 2009 WL 10664850, at *3 (W.D. Tenn. Apr. 15, 2009).

To prevail on a motion to dismiss under Rule 12(b)(6) premised solely on non-compliance with the heightened pleading standards of Rule 9(b)—as opposed to the more lenient, general standard of Rule 8—a defendant must have previously filed a motion under Rule 12(e) for a more definite statement. See Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993) (establishing the rule); Legge v. Wagner, 7 F.3d 234 (6th Cir. 1993) ("This court has noted that in the absence of a defendant's motion for a more definite statement under Rule 12(e), dismissal on the sole basis of a plaintiff's failure to comply with Rule 9(b) is inappropriate."). Failure to file a Rule 12(e) motion precludes a defendant from relying on Rule 9(b) for dismissal. Id.

### III.    ANALYSIS

#### A.  The Lowe's Defendants are not properly joined.

Courts, on their own motion, can drop a party for misjoinder.  <u>See</u> Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); <u>see also</u> <u>Michaels Bldg. Co. v. Ameritrust Co., N.A.</u>, 848 F.2d 674, 682 (6th Cir. 1988) ("Parties may be dropped ... by order of the court ... of its own initiative at any stage of the action and on such terms as are just."); <u>Abbey v. Metro. Gov't of Nashville & Davidson Cnty.</u>, 2025 WL 1901344, at *1, n.1 (M.D. Tenn. July 9, 2025) (same).  Where, as here, FCG asserts claims against multiple defendants, FCG must meet Rule 20(a)(2)'s twin requirements, namely that: (1) the claims asserted against the defendants arise from the same transaction(s) or occurrence(s); and (2) common questions of law or fact will arise as to all defendants. Fed. R. Civ. P. 20(a)(2).  Plaintiffs are not given "free rein to join multiple plaintiffs or multiple defendants into a single lawsuit when the claims are unrelated." <u>Smith v. Madery</u>, 2024 WL 1623089, at *2 (E.D. Mich. Apr. 15, 2024) (citing <u>Pruden v. SCI Camp Hill</u>, 252 F. App'x 436, 437 (3d Cir. 2007) and <u>George v. Smith</u>, 507 F.3d 605, 607 (7th Cir. 2007)).

Here, FCG alleges several conspiracies that they simply do not connect to one another.  To begin with, FCG claims there was a conspiracy where: (1) Shore instructed the HYGS Defendants to price-gauge FCG, (2) Shore would approve those above-market costs for payment by FCG, and (3) HYGS would provide a kickback to Shore either in cash or goods.  (Doc. No. 1 ¶¶ 37-72).  FCG then claims another conspiracy involving Shore and individual Lowe's employees where: (1) one or more Lowe's employees hired Shore as a Lowe's estimator on FCG projects, (2) Shore inflated the Lowe's order on FCG's projects to increase the sales bonuses received by Lowe's employees, and (3) the Lowe's employees paid Shore kickbacks in the form of money or goods.

9

(Id. ¶¶ 76-86).  FCG also alleges another conspiracy involving Lowe's employees charging FCG for construction materials they knew were being delivered to Shore's side-projects in exchange for kickbacks.  (Id. ¶¶ 87-97).  Finally, FCG alleges a conspiracy where Lowe's employees issued Shore a Lowe's credit card under FCG's name.  (Id. ¶ 99).  The problem for FCG is they have not pleaded sufficient facts to show that even the Lowe's-specific allegations arise from the same transaction(s) or occurrence(s).  Critically, FCG has utterly failed to connect any of the alleged Lowe's conspiracies to the alleged HYGS conspiracy.

FCG makes three attempts to connect the alleged Lowe's conspiracies to the alleged HYGS conspiracy.  First, FCG alleges that HYDS' website lists Lowe's as a "Big Box" partner.  (Id. ¶ 73).  While this allegation shows that HYDS shops at Lowe's (as do millions of other people), it does not show that HYDS and Lowe's worked together in concert with Shore to defraud FCG. Second, FCG claims that Heath sent an email introducing Shore to a Lowe's employee, Bingham. (Id. ¶ 74).  The email from Heath to Shore reads: "I have add [sic] a good friend Dean [Bingham] from Lowe's on this email [sic] they can save you lots of money on projects [sic] send him over anything you have and ee what he can do for you."  (Id.).  Again, this email simply introduces Shore to Bingham and does not show that Bingham was recruited into an existing conspiracy between Shore and HYDS.  Nothing about this email connects the alleged misconduct of the HYDS Defendants to the alleged misconduct of the Lowe's Defendants.  Finally, FCG alleges that:

> Lowe's Individual Defendant Bingham further conspired with Shore, Meadows, and Heath to defraud FCG by Shore issuing purchase orders to HYDS for Lowe's materials at a cost to FCG that was well above market pricing. For example, on August 30, 2021, Bingham sent Heath an email with a quote, which included a profit mark-up by Lowe's, for "Franklin's sinks," which HYDS marked up again before invoicing FCG for the sinks. As another example, on April 21, 2023, Shore issued HYDS FCG Purchase Order No. 119 for Lowe's proprietary light fixtures in the amount of $30,000.00, which FCG paid in full. By Shore arranging for FCG to purchase

10

the light fixtures from HYDS, which purchased them from Lowe's, Lowe's and HYDS both profited from the light fixtures while FCG paid above-market prices. Contemporaneously with this purchase order, Shore issued an invoice, either from himself or through JWSC, to Meadows or HYDS, which Meadows or HYDS paid, for $23,718.85, and that invoice and payment is expressly identified on Shore's Invoice and Payment detail as being on account of FCG Purchase Order No. 119. In comparison to the $30,000.00 FCG paid for the Lowe's light fixtures, the market contractor cost of those same light fixtures is less than $15,000.00.

(Id. ¶ 102). This allegation—despite FCG's conclusory statements about there being a conspiracy between Bingham, Shore, Meadows, and Heath—does not show any misconduct on the part of the Lowe's Defendants, much less misconduct that is connected to the alleged price-gouging conspiracy between HYDS and Shore.[4] At most, Paragraph 102 says that Lowe's sold construction supplies to HYDS at a mark-up and that HYDS then invoiced FCG for those materials with another significant mark-up. This Paragraph does not show that the Lowe's Defendants, HYDS Defendants, and Shore were working in concert.

Given how separate the allegations against the HYDS Defendants and the Lowe's Defendants appear to be, the Complaint reads like two distinct cases bundled into a single pleading. Indeed, consideration of the Parchman factors confirms the misjoinder. Parchman, 896 F.3d at 733.

---

[4] It is difficult to draw any inferences in FCG's favor from this allegation. The two examples offered by FCG either: (1) appear like normal business transactions; or (2) make little sense. For example, FCG claims that on August 30, 2021, Lowe's quoted HYDS a price for sinks. But it is entirely unclear how quoting a price for sinks (with a profit mark-up) is criminal or fraudulent. Most businesses sell goods for a profit. Likewise, FCG claims that on April 21, 2023, HYDS charged it $30,000 for Lowe's light fixtures that actually cost around $15,000 and then HYDS paid Shore a $23,718.85 kickback. But under this formulation, HYDS lost money and it is entirely unclear how Lowe's benefited in any way. Therefore, the allegation about conduct on April 21, 2023, does not make a lot of sense.

11

First, FCG's claims against the HYDS Defendants and the Lowe's Defendants do not arise out of the same transaction or occurrence. As noted above, there are no allegations that meaningfully connect these seemingly separate conspiracies; and therefore, this factor weighs in favor of severance.[5] Second, while FCG's claims against the HYDS Defendants and Lowe's Defendants do implicate common legal questions, they do not appear to implicate a common set of facts. Therefore, the second Parchman factor is, at best, neutral on the question of joinder. Third, the Court does not see how judicial economy would be facilitated by allowing these separate and distinct claims to proceed together; nor does the Court see how joinder of these Defendants would help facilitate settlement. Therefore, the third Parchman factor is, at best, neutral, but leans towards misjoinder. Fourth, the Court believes potential prejudice to all the Defendants can be avoided by severance. If the Court were to allow FCG to proceed with trying separate and distinct conspiracies together, the Defendants, as a collective, could be prejudiced. For example, the Defendants would be harmed if the jury ascribed the conduct of one defendant to the other defendants. FCG should have to prove each element as to each defendant without benefiting from a "bolstering" effect where the jury attributes the conduct of one defendant to all. Thus, the fourth Parchman factor weighs in favor of severance. Based on FCG's current pleadings, it appears the witnesses and documentary proof necessary to prove FCG's claims against the HYDS Defendants would be different from the witnesses and documentary proof necessary to prove FCG's claims against the Lowe's Defendants. While its plausible that FCG may call William Shore to testify as to the conduct of the HYDS Defendants and the Lowe's Defendants, his testimony as to each group

---

[5] The way FCG pleaded its claims supports the Court's finding that the conduct of the HYDS and Lowe's Defendants are unconnected. Specifically, FCG pleaded claims against HYDS under one sub-heading and claims against HYDS under another. If you separated the HYDS allegations (Doc. No. 1 ¶¶ 37-72) from the Lowe's allegations (id. ¶¶ 74-109), you would have two stand-alone complaints.

12

of defendants would still be discrete.  Therefore, the fifth <u>Parchman</u> factor also weighs in favor of severance.

Accordingly, the Court finds that the Lowe's Defendants have been improperly joined in this action in violation of Rule 21(a)(2).  The Court will drop the Lowe's Defendants as parties and deny their pending motions to dismiss (Doc. Nos. 66, 68, 70, 76, and 88) as moot.  If FCG can plead additional facts connecting the Lowe's Defendants' alleged misconduct to the HYDS Defendants' misconduct, it can file a motion to amend the complaint rejoining the Lowe's Defendants.[6]

### B. FCG has stated claims for RICO violations, fraud, conversion against Heath, Hyds, and Meadows.

#### 1. RICO Claim

FCG claims Shore and the HYDS Defendants violated RICO, and therefore, are liable for civil damages.  The relevant portion of the RICO statute provides:

> It shall be unlawful for any person employed by or associated with any *enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to *conduct* or participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern* of *racketeering activity* or collection of unlawful debt.

18 U.S.C. § 1962(c) (emphasis added).  As evident from the statutory language, a plaintiff must plead the following elements to state a RICO claim: "(1) conduct (2) of an enterprise (3) through

---

[6] Because the Court is dropping the Lowe's Defendants pursuant to Rule 21, it has not addressed the merits of the Lowe's Defendants' motions to dismiss.  However, the Court will note in passing that FCG's RICO claims against the Lowe's Defendants appear weak and, as currently pleaded, would likely not support federal jurisdiction as to those defendants.  Likewise, FCG's RICO and fraud-based allegations against Lowe's Companies Inc. are virtually non-existent.  If FCG seeks to amend its Complaint in this case (to connect the conduct of the HYDS and Lowe's Defendants) or files a new federal case against some or all the Lowe's Defendants, it should keep in mind its Rule 11 obligation to ensure that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)(3).

a pattern (4) of racketeering activity." <u>Moon v. Harrison Piping Supply</u>, 465 F.3d 719, 723 (6th Cir. 2006).

The HYDS Defendants argue that FCG's RICO claim should be dismissed because: (1) FCG failed to show that the HYDS and Lowe's Defendants were acting as a single, connected "enterprise," (2) FCG failed to plead its RICO claim with the particularity required by Rule 9(b); (3) FCG failed to establish "a course of conduct . . . [that] rise[s] to the level of a pattern of racketeering"; and (4) FCG failed to establish an enterprise between the HYDS Defendants and Shore.   (Doc. Nos. 75 at 5-7; 79 at 7-13).  The HYDS Defendants' motions to dismiss and supporting memoranda (Doc. Nos. 74, 75, 78 and 79) miss the mark in several respects.

For example, the HYDS Defendants dedicate many pages of their briefs to arguing the RICO claim fails because FCG did not connect the conduct of the HYDS Defendants to the conduct of the Lowe's Defendants.  (<u>E.g.</u>, Doc. Nos. 75 at 6; 79 at 7-11).  But this argument ignores that FCG can establish a RICO claim against the HYDS Defendants based on their own conduct, notwithstanding the conduct of the Lowe's Defendants.  Accordingly, this argument can be easily rejected as a red herring.  Additionally, the HYDS Defendants argue that FCG's fraud-based claims, including their RICO claim, do not satisfy Rule 9(b)'s particularity requirement.  (<u>E.g.</u>, Doc No. 75 at 4-5). But because the HYDS Defendants have not filed a Rule 12(e) motion, they cannot rely on Rule 9(b) as grounds for dismissal.  <u>See Coffey</u>, 2 F.3d at 162.  Nonetheless, even if the HYDS Defendants had complied by filing a Rule 12(e) motion, the Court would still find that FCG's allegations satisfy Rule 9(b) vis-à-vis the HYDS Defendants.  FCG's allegations establish each of the four elements of a civil RICO claim with sufficient particularity to survive a motion to dismiss.  Those four elements will be discussed in turn.

14

## a. Conduct

To establish the "conduct" element of a RICO claim, a plaintiff must plead facts showing the defendant participated, "directly or indirectly, in the conduct of [the RICO] enterprise's affairs." Ouwinga v. Benistar 419 Plan Servs., Inc., 694 F.3d 783, 791 (6th Cir. 2012) (quoting 18 U.S.C. § 1962(c)); see also Compound Prop. Mgmt., LLC v. Build Realty, Inc., 462 F. Supp. 3d 839, 855 (S.D. Ohio 2020). This requires an allegation that the defendant participated in the "operation or management" of the enterprise, Reves v. Ernst & Young, 507 U.S. 170, 183 (1993), which can include "making decisions on behalf of the enterprise or by knowingly carrying them out." United States v. Fowler, 535 F.3d 408, 418 (6th Cir. 2008).

This element is easily satisfied as to Meadows, Heath, and HYDS.[7] There are numerous allegations that the HYDS Defendants "carried out" Shore's decisions by: (1) waiting for Shore to instruct them about the maximum price FCG would pay for materials; (2) charging FCG the inflated price suggested by Shore; and (3) paying Shore a kickback in exchange for the inside information. (E.g., Doc. No. 1 ¶¶ 46-60). There are also allegations showing that Meadows, and by extension HYDS, took a more active role in making decisions and instigating criminal activity. (Id. ¶¶ 61, 65, 68). For example, FCG alleges that "Meadows ask(ed) Shore if he [could] help bury and pass along to FCG costs HYDS incurred to correct deficiencies in the cabinets HYDS

---

[7] While there are fewer allegations in the Complaint about Heath's direct involvement with the scheme, there are permissible inferences that Heath—as HYDS' CEO, see Doc. No. 1 ¶12—knew about the scheme and helped to carry out its purposes. For example, it seems likely that Heath would have noticed the exponential price markup for FCG materials and asked, "what's going on here?" At this stage, all permissible inferences must be granted to FCG. See Srisavath v. Richardson, 115 F. App'x 820, 822 (6th Cir. 2004) (at the 12(b)(6) stage, a court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein.").

delivered" and suggested that Shore could "double" the cost of some shipping containers to obtain that goal. (Id. ¶ 68). Based on these allegations, FCG can survive a motion to dismiss based on the "conduct" element of its RICO claim.

### b. Enterprise

An "enterprise" within the meaning of RICO is "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). Or stated more succinctly, an association-in-fact is "a group of persons associated together for a common purpose of engaging in a course of conduct." Id. (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). The enterprise must, however, exist for a purpose beyond the racketeering activity. [8] Turkette, 452 U.S. at 583. That being said, "a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact [enterprise]." Id. at 951.

The HYDS Defendants and Shore collectively formed an association-in-fact enterprise, and each individual defendant was part of that enterprise. Cf. Allstate Ins. Co. v. Benhamou, 190 F. Supp. 3d 631, 648 (S.D. Tex. 2016) ("[A]lthough a defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise."). The association routinely communicated and schemed to defraud FCG over the course of two years. The

---

[8] The participation of a corporation in a racketeering scheme may be sufficient, under certain circumstances, to give the enterprise a structure separate from the racketeering activity. Webster v. Omnitrition Int'l, Inc., 79 F.3d 776, 786 (9th Cir. 1996); Gen. Motors Corp. v. Ignacio Lopez de Arriortua, 948 F. Supp. 670, 680 (E.D. Mich. 1996).

16

association also existed for purposes beyond the scheme to defraud, including performing legitimate business activities. For example, Shore did ensure FCG's projects had the supplies they needed and the HYDS Defendants ordered and delivered those supplies. The illegitimate part of the operation was the price-gouging/kickback scheme, but that was not the association's *only* purpose. Because FCG alleged that: (1) Shore and the HYDS Defendants developed a relationship, (2) one purpose of that relationship was to repeatedly defraud FCG out of money; and (3) the relationship accomplished that purpose for over two years, they have sufficiently pleaded the existence of an association-in-fact enterprise.

Alternatively, Meadows and Heath were "persons" within the meaning of § 1961(c) who worked for HYDS, a corporation, and conducted HYDS's affairs through a pattern of racketeering activity. In other words, HYDS itself was the "enterprise" for the purpose of the RICO allegations against Meadows and Heath.[9] Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). So, whether Shore and the HYDS Defendants constituted an association-in-fact or whether HYDS, Inc. was the "enterprise," the enterprise element is satisfied, at least at the motion to dismiss stage.

### c. Pattern

To establish a "pattern" of racketeering activity, a plaintiff must plead, at a minimum, two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5) (emphasis in original). The Supreme Court has held, however, that the minimum two acts are not necessarily sufficient to establish a pattern. Kalitta Air, LLC v. GSBD & Assocs., 591 F. App'x 338, 343 (6th Cir. 2014) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 237 (1989)). Instead, a plaintiff

---

[9] HYDS does not argue in its motion to dismiss that the corporation, as the enterprise, cannot be liable under § 1961(c). See Doc. No. 79. Therefore, at this stage, the Court does not consider whether HYDS Inc. was the "person" or the "victim or tool" under § 1961(c). King, 533 U.S. at 162.

17

must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc., 492 U.S. at 237–39. This requirement is known as the "relationship" and "continuity" test. See Brown v. Cassens Transp. Co., 546 F.3d 347, 355 (6th Cir. 2008).

The relationship or "relatedness" prong is satisfied by showing the underlying predicate criminal acts have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc., 492 U.S. at 240; Moon, 465 F.3d at 724. The relatedness prong is easily satisfied here. FCG alleges that over the course of two years the HYDS Defendants and Shore conspired to inflate the cost of construction materials on numerous FCG orders for various FCG projects. The Complaint details multiple (non-exhaustive) examples of how the HYDS Defendants and Shore committed wire fraud, (Doc. No. 1 ¶¶ 46-60), and demonstrate that these criminal acts were not isolated and had "similar purposes, results, participants, victim(s), [and] methods of commission." H.J. Inc., 492 U.S. at 240.

The continuity prong of the test is satisfied by demonstrating either "a 'close-ended' pattern (a series of related predicate acts extending over a substantial period of time) or an 'open-ended' pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed)." Heinrich v. Waiting Angels Adoption Servs., 668 F.3d 393, 409–10 (6th Cir. 2012) (quoting H.J. Inc., 492 U.S. at 241–42). In other words, the continuity prong "is sufficiently established where the predicates can be attributed to defendant[s] operating as part of a long-term association that exists for criminal purposes." H.J. Inc., 492 U.S. at 242–43. FCG's allegations establish both a close-ended and open-ended pattern.

18

The Complaint, which details numerous criminal acts stretching over two years, sufficiently outlines a close-ended pattern. Defendants do not even attempt to argue that the alleged scheme was too short to satisfy the continuity prong. (Doc. No. 79 at 12) ("The problem with the Complaint's allegations is not necessary their temporal scope. . . ."). But even if they did, a two-year scheme with multiple, ongoing predicate acts clearly establishes a close-ended pattern. E.g., A.I. Credit Corp. v. Hartford Computer Group, Inc., 847 F.Supp. 588 (N.D. Ill. 1994) (RICO claim survives motion to dismiss where, over 13 month period, defendant fraudulently induced four plaintiffs to make a combined total of four loans to two third-party corporations); Zee–Bar Inc.–N.H. v. Kaplan, 792 F.Supp. 895, 907 (D.N.H. 1992) (25 acts of mail fraud over 23 months suggests "more than 'sporadic' criminal activity ... and over a period of time long enough to suggest 'long-term criminal conduct' "); Healey v. Pyle, 1992 W.L. 80775 at 7 (S.D.N.Y. March 31, 1992) (38 instances of mail and wire fraud over 4 years, done by one perpetrator against one victim as part of one scheme, is sufficient).

Nevertheless, even if the alleged conduct did not constitute a close-ended pattern (which it did), there are allegations supporting an open-ended pattern. There are ample allegations suggesting that but-for Shore's termination by FCG on September 7, 2023 (Doc. No. 1 ¶ 35), the scheme would have continued (perhaps indefinitely). Specifically, HYDS and Shore were still committing predicate acts as late as August 24, 2023— two weeks before Shore was fired. (Id. ¶ 68). And at the time Shore was fired, FCG was still completely in the dark about the RICO enterprise, (id. ¶ 35); therefore, the scheme could have continued if Shore continued to convince FCG that he was doing a good job. Based on these allegations, FCG has also established an open-ended pattern because the HYDS Defendants' scheme was not "inherently terminable," and there would have been an ongoing threat of criminal activity except for Shore's termination. See

Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 410 (6th Cir. 2012) (holding that an intervening criminal prosecution did not bar open-ended continuity because the fraudulent adoption scheme could have persisted indefinitely into the future but for the prosecution); see also United States v. Busacca, 936 F.2d 232, 238 (6th Cir. 1991) ("[I]n the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred.").

In their motions to dismiss, the HYDS Defendants suggest that there cannot be a "pattern" because there is only one victim, FCG. (Doc. 79 at 12). While it is true that a plaintiff has an easier time establishing a pattern of racketeering activity when there is more than one victim, there is no categorical rule that a one-victim scheme is foreclosed under RICO. Where, as here, the defendants allegedly committed separate predicate acts that took place over an extended period and defrauded the victim out of money on multiple occasions for multiple projects, a plaintiff can still state a RICO claim when there is only one victim. E.g., Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am., 113 F.3d 308, 310 (2d Cir. 1997) ("There is only one victim, but that does not, by itself, preclude a RICO pattern. The requirement of continuity is met since the unlawful acts recurred with regularity over at least fifteen months. . . ."); Bumgarner v. Blue Cross & Blue Shield of Kansas, Inc., 716 F. Supp. 493, 500 (D. Kan. 1988) (similar).

Under these circumstances, FCG has sufficiently established the "pattern" element to survive the motions to dismiss.

### d. Racketeering Activity

The statute defines "racketeering activity" as any act or threat "involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical" or any act that would violate various provisions of Title

20

18 of the United States Code including "section 1343 (relating to wire fraud)." See 18 U.S.C. § 1961(1)(A) or (B). To establish "racketeering activity," plaintiff must establish each of the elements of one of predicate crimes outlined by 18 U.S.C. § 1961(1)(A) or (B). See Benhamou, 190 F. Supp. 3d at 657 (S.D. Tex. 2016) ("'Racketeering activity,' is defined by reference to various state and federal offenses."). Here the alleged predicate criminal act is wire fraud.

Wire fraud consists of (1) a scheme to defraud, and (2) use of the wires in furtherance of the scheme. United States v. Jamieson, 427 F.3d 394, 402 (6th Cir. 2005). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." Id. at 402. A plaintiff seeking to use wire fraud as a predicate act for a civil RICO claim must also show that the defendant "acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 404 (6th Cir. 2012) (citing United States v. DeSantis, 134 F.3d 760, 764 (6th Cir. 1998)).

Here, FCG's allegations easily establish that Shore and the HYDS Defendant intentionally developed a price-gouging/kickback scheme to defraud FCG and that they used the wires (e.g., emails and text messages) to advance the scheme. See Energium Holding LLC v. Ascension MyHealth Urgent Care, No. 3:21-CV-2951-S, 2024 WL 4876957, at *6, n.7 (N.D. Tex. Nov. 22, 2024) ("[C]ommunications made over the phone, text message, and email can serve as the basis for liability under the wire fraud statute."). FCG has sufficiently alleged conduct that establishes "racketeering activity" within the meaning of RICO.

Because FCG has sufficiently pleaded that the HYDS Defendants "conducted" the affairs of an "enterprise," through a "pattern of racketeering activity," their § 1962(c) claim survives the

HYDS Defendants' motion to dismiss. FCG's § 1962(d) claim (i.e., RICO conspiracy) survives for similar reasons.

## 2. FCG's Common Law Claims

With respect to FCG's state law claims, the HYDS Defendants primarily argue that if the Court dismissed the RICO claim it should also dismiss the state claims for lack of jurisdiction. But because FCG's RICO claim survives the HYDS Defendants' motion to dismiss, the Court will exercise its supplemental jurisdiction over FCG's state law claims, all of which are closely related to the RICO claim. See Gamel v. City of Cincinnati, 625 F.3d 949, 951 (6th Cir. 2010) ("[28 U.S.C.] § 1367 grants a district court broad discretion to decide whether to exercise jurisdiction over state-law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."). The HYDS Defendants dedicated very little ink to identifying substantive deficiencies with FCG's conspiracy and fraud claims, (e.g., Doc. 79 at 18-21), and the Court will follow suit. However, more attention must be paid to the HYDS Defendants' arguments for dismissal regarding FCG's conversion and Tennessee Consumer Protection Act claims.

### a. Conspiracy

The elements of conspiracy under Tennessee common law are: "(1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage." Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC, 461 F. Supp. 2d 629, 642 (M.D. Tenn. 2006) (citing Braswell v. Carothers, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993)). Civil conspiracy must have a predicate tort committed as part of

22

the conspiracy.  See Knox Trailers, Inc. v. Maples, 581 F. Supp. 3d 1000, 1019–20 (E.D. Tenn. 2022).  Fraud is an intentional tort under Tennessee law.  Coffey, 2 F.3d at 159.

Based on the allegations in the Complaint, the HYDS Defendants and Shore engaged in a conspiracy.  They are: (1) two or more persons; (2) who acted in concerted action for an unlawful purpose—i.e., to defraud FCG through a price-gouging and kick-back scheme; (3) who committed overt acts in furtherance of the conspiracy by inflating prices and paying kickbacks; and (4) who injured FCG, which, by its count, overpaid millions of dollars for materials.  Right now, there is no basis to dismiss FCG's conspiracy claim.

### b.  Fraud

The elements of fraud are: "(1) an intentional misrepresentation of material fact; (2) the misrepresentation was made 'knowingly,' 'without belief in its truth,' or 'recklessly without regard to its truth or falsity'; (3) the plaintiff reasonably relied on the misrepresentation and suffered damages; and (4) the misrepresentation relates to an existing or past fact, or, 'if the claim is based on promissory fraud, then the misrepresentation must 'embody a promise of future action without the present intention to carry out the promise' [.]"  Power & Tel. Supply Co. v. SunTrust Banks, Inc., 447 F.3d 923, 931 (6th Cir. 2006) (quoting Stacks v. Saunders, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)).  Again, FCG has pleaded sufficient facts to satisfy these elements.  At the very least, it can be inferred that the HYDS Defendants represented themselves to be legitimate, law-abiding suppliers of construction materials who based their pricing on market conditions (not on inside information).  Each time HYDS Inc. submitted an invoice, FCG assumed those representations to be true and paid artificially inflated prices because of those misrepresentations.  Assuming the allegations in the Complaint are true, the HYDS Defendants engaged in textbook fraud.  Accordingly, FCG's fraud claim survives the motion to dismiss.

23

### c. Conversion

In Tennessee, the elements of a conversion claim are "(1) an appropriation of another's *tangible* property to one's use and benefit; (2) an intentional exercise of dominion over the chattel alleged to have been converted; and (3) defiance of the true owner's rights to the chattel." In re Piercy, 21 F.4th 909, 922 (6th Cir. 2021) (quoting White v. Empire Express, Inc., 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012)) (emphasis added). The general rule is "that money is intangible and therefore not subject to a claim for conversion." Pomeroy v. McGinnis, 2021 WL 3017199, at *6 (Tenn. Ct. App. July 16, 2021). However, money can be "tangible" where it "is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose." Id.

FCG allegations show that the money in this case is "intangible" rather than determinate. Id. For example, FCG claims it was charged $30,000 for fixtures when the "*market price* for these fixtures was only $15,000." (Doc. No. 1 ¶46) (emphasis added). While at first glance it may seem like FCG has identified a sum that is "capable of identification" or "determinate"—*i.e.*, a $15,000 over-charge—it has not. FCG cannot unilaterally decide what the "market price" is for any good, and the issue of market pricing will almost certainly be hotly litigated for each good that HYDS Inc. sold to FCG. Moreover, even FCG approximates the "market price" of certain goods in some of its allegations. E.g., ¶ 102 ("the market contractor cost of those same lights fixtures is *less than* $15,000") (emphasis added).

In its oppositions, FCG suggests that its money damages are "specific and identifiable." (Doc. No. 92 at 18; Doc. No. 93 at 14). However, its argument is based on the amount of kickbacks that were paid to Shore. (Id.). This argument falters for two reasons: (1) the amount HYDS paid Shore in kickbacks is not the full measure of the alleged conversion because presumably HYDS

24

also got a cut; and (2) the amount of Shore's kickback would be the money Shore "used for his benefit," not the money that HYDS used for its benefit.

This is not a case where $100,000 went into an attorney's trust account and $100,000 needed to come out. This is a case where the parties will dispute the degree of monetary damages for every claim. Therefore, under the unique facts of this case, FCG cannot bring a conversion action.

### d. TCPA

The TCPA identifies dozens of unlawful trade practices. Tenn. Code Ann. § 47-18-104(b)(1)-(72). However, FCG only claims that the HYDS Defendants committed three unlawful practices:

> (1) Falsely passing off goods or services as those of another;
>
> (2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services; and
>
> (3) Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another.

(Doc. No. 1 ¶¶ 167-169) (citing §§ 47-18-104(b)(1)(2) and (3)). These TCPA claims are second cousins of federal trademark claims and are designed to prohibit merchants from passing off their goods as the goods of another. See Chiusa v. Stubenrauch, No. 3:21-CV-00545, 2022 WL 2793579, at *12 (M.D. Tenn. July 15, 2022); Anthony Vince Nail Spa, Inc. v. M. Vince Nail Spa, L.L.C., 2021 WL 5140849, at *5 (M.D. Tenn. Nov. 4, 2021); see also Titan Cloud Software, LLC v. Moore, 2024 WL 5110062, at *7 (M.D. Tenn. Dec. 12, 2024). In the context of this case, § 47-18-104(b)(1), for example, would have precluded the HYDS Defendants from selling FCG "KraftMaid" cabinetry when the cabinets were manufactured by an inferior cabinetmaker. To

25

extend the hypothetical, §§ 47-18-104(b)(1) and (2) would have precluded the HYDS Defendants from selling FCG "CraftMaid" cabinetry when they were expecting to purchase "KraftMaid" cabinets. In other words, there must be some deception about the source, affiliation or quality of the goods or services.

But FCG does not allege any deception about the source, affiliation or quality of the goods. (See Doc. No. 79 at 20) (noting that FCG does not identify any misrepresentations about the goods or services themselves). In fact, some of FCG's allegations show that it knew where the goods were coming from and had no confusion as to their source or affiliation. (E.g., Doc. 1 ¶ 102) ("FCG paid for the *Lowe's* light fixtures") (emphasis added). Simply put, FCG's factual allegations are a round peg and the TCPA is a square whole. FCG's claims do not relate to the nature, quality, or labelling of the goods they received from HYDS. FCG does not complain about the goods themselves; it simply alleges it was overcharged as part of a separate price-gouging scheme. Sections 47-18-104(b)(1), (2) and (3) do not address price-gauging.

Notably, FCG's oppositions only address the HYDS Defendants' statute of limitation arguments as they related to the TCPA claim. (E.g., Doc. No. 92 at 16-17). FCG does not address the substantive argument that it failed to show how the HYDS Defendants misrepresented the nature, source, or quality of any goods or services. This amounts to a waiver. See Humphrey v. U.S. Attorney Gen.'s Office, 279 F. App'x 328, 331 (6th Cir. 2008) (finding that a plaintiff's failure to oppose arguments raised in the defendant's motion to dismiss is grounds for the district court to assume that opposition to the motion is waived); Doe v. Bredesen, 507 F.3d 998, 1007–08 (6th Cir. 2007) (plaintiff abandoned certain claims by failing to defend them in his brief in opposition to defendant's motion to dismiss).

Because FCG did not address whether its TCPA claim should survive on the merits, it waived its arguments on that issue. Alternatively, FCG cannot use §§ 47-18-104(b)(1), (2), and (3) as substitutes for fraud, especially where FCG's claims are close relatives of price-fixing[10] and anti-competitive conduct is not covered by the TCPA. See Bennett v. Visa U.S.A. Inc., 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006). Although the Court acknowledges the TCPA "is a remedial statute" and should be "construed broadly in favor of consumer protection," see Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Small Smiles Holding Co., LLC, 2011 WL 1260164, at *4 (M.D. Tenn. Mar. 31, 2011), FCG's claims are untethered to the specific provisions of the TCPA they rely upon.

## IV.     CONCLUSION

The allegations paint a sordid picture where FCG was systematically defrauded over several years. Shore and JWSC, the proverbial ringleaders, continue to be in default and are not actively participating in this case. While there is smoke surrounding some of the individual Lowe's employees, the problem is their alleged schemes appear to be largely unconnected to the alleged schemes of the HYDS Defendants. Therefore, these two distinct cases should not proceed as one. To cure the misjoinder, the Court will dismiss the Lowe's Defendants from this action and deny all their pending motions as moot. FCG can decide whether to proceed against the Lowe's Defendants, and if so, how.

Regarding FCG's RICO, fraud, and conspiracy claims against the HYDS Defendants, there is more than just smoke. Those claims clearly survive a motion to dismiss. FCG's conversion and

---

[10] It is difficult to label the conduct FCG has identified. The Court has referred to Shore's and HYDS' conduct as a price-gouging scheme; however, it could also be referred to as a price-fixing scheme where Shore eliminated all other competitors, artificially stood in the shoes of those competitors, and fixed a price with HYDS. What is clear is that HYDS Inc. could only charge its prices because there was no market competition.

27

TCPA claims do not, however. Consequently, the HYDS Defendants motions to dismiss will be granted in part and denied in part.

An appropriate order will issue.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE